# EXHIBIT 1

**SUPERIOR COURT OF HENRY COUNTY**
**STATE OF GEORGIA**

**⚖ EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
HENRY COUNTY, GEORGIA
**SUCV2021001066**
HV
APR 15, 2021 11:30 AM

Sabriya Hill, Clerk
Henry County, Georgia

CIVIL ACTION NUMBER   SUCV2021001066

Bennett International Group, LLC

---

**PLAINTIFF**

**VS.**

Allied World Specialty Insurance Company

---

**DEFENDANT**

**SUMMONS**

TO: ALLIED WORLD SPECIALTY INSURANCE COMPANY

You are hereby summoned and required to file with the Clerk of said court and serve upon the
Plaintiff's attorney, whose name and address is:

> **Jon M Hughes**
> **McMickle, Kurey & Branch, LLP**
> **217 Roswell Street, Suite 200**
> **Alpharetta, Georgia 30009**

an answer to the complaint which is herewith served upon you, within 30 days after service of
this summons upon you, exclusive of the day of service. If you fail to do so, judgment by
default will be taken against you for the relief demanded in the complaint.

**This 15th day of April, 2021.**

Clerk of Superior Court

Sabriya Hill, Clerk
Henry County, Georgia

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
HENRY COUNTY, GEORGIA

**SUCV2021001066**
HV
APR 15, 2021 11:30 AM

Sabriya Hill, Clerk
Henry County, Georgia

**IN THE SUPERIOR COURT OF HENRY COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| BENNETT INTERNATIONAL GROUP, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. _____ |
| | ) |
| ALLIED WORLD SPECIALTY INSURANCE | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

COMES NOW Plaintiff Bennett International Group, LLC, by and through the undersigned counsel, and for its Complaint against Defendant Allied World Specialty Insurance Company, states as follows:

## PARTIES, JURISDICTION AND VENUE

1.

Plaintiff Bennett International Group, LLC ("Bennett" or "Plaintiff") is a corporation incorporated under the laws of Georgia, with its principal place of business in Henry County, Georgia.

2.

Defendant Allied World Specialty Insurance Company ("Allied World" or "Defendant"), an insurance company, is a Delaware corporation with its principal place of business in the state of New York.

3.

Allied World is registered with the Georgia Secretary of State to conduct business in Georgia and may be served with process by service on its Registered Agent, Corporation Service Company, at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

M0710281.1 15187

4.

Allied World has transacted business in the state of Georgia through issuance of policies of insurance, including the policy at issue in this case, which include within their coverage territory the state of Georgia. Allied World is therefore subject to personal jurisdiction in Georgia under O.C.G.A. § 9-10-91.

5.

This Court has subject matter jurisdiction over this action.

6.

Venue is proper in this Court under O.C.G.A. § 33-4-1(4), as Plaintiff Bennett, which is entitled to proceeds of an insurance contract issued by Allied World, is a resident of Henry County, Georgia.

## FACTUAL BACKGROUND

### The Allied World Policy

7.

Defendant Allied World issued a policy of insurance, no. 0307-2801, that was in effect from March 30, 2019 to March 30, 2020 (the "Policy"). A copy of the Policy is attached hereto as Exhibit A.

8.

The Policy contains a coverage form titled Commercial Output Program Property Coverage Part, which provides coverage for Business Personal Property.

9.

Under the terms of the Policy, covered business personal property includes "g. personal property of others.  This means personal property of others that is in 'your' care, custody, or control."

10.

The Policy also contains a Schedule of Coverages that adds flood coverage to the Policy, with a coverage limit of $1,000,000.

11.

The Policy provides for a $10,000 deductible for Property of Others at Scheduled Locations.

12.

The Policy does not contain a separate or additional document for damages caused by flood.

**The Property Loss**

13.

On or about February 7, 2020, flooding caused damage to 25 travel trailers that were being stored at Bennett's facility located at 4620 NW McKennon Road, Pendleton, Oregon (the "Loss").

14.

The travel trailers were being stored by Bennett on behalf of their owner, Keystone RV Company ("Keystone"), for subsequent delivery to a dealership.

15.

The travel trailers were in Bennett's care, custody, or control on February 7, 2020 at the time of the Loss.

16.

The Bennett facility at which the travel trailers were being stored and where the Loss occurred is a Scheduled Location in the Policy.

**The Claim**

17.

As a result of the loss to property of others at a scheduled location from flooding, Bennett filed a claim with Allied World under the terms of the Policy.

18.

Allied World had the travel trailers inspected and appraised, determining that they were all a total loss and appraising the value of the travel trailers to be $481,387.00.

19.

Bennett paid $478,417.00 to satisfy the claim of owner of the travel trailers, Keystone.

20.

Bennett timely submitted its claim to Allied World and cooperated fully with Allied World.

21.

Allied World initially denied Bennett's claim on May 21, 2020.

22.

Bennett asked for reconsideration on several occasions and Allied World subsequently denied the claim two additional times: May 29, 2020 and November 30, 2020.

23.

As the sole reason for its denial, Allied World asserted a $500,000 deductible that does not appear in the Policy.

## COUNT I
## BREACH OF CONTRACT

24.

Plaintiff adopts and incorporates herein by reference all allegations contained in Paragraphs 1 through 23 of this Complaint.

25.

The Loss, and all resulting damages, are covered under, and not excluded by, the terms of the Policy.

26.

The only deductible in the Policy that is applicable to the Loss is in the amount of $10,000.

27.

Allied World has failed, refused, and/or neglected to timely or properly adjust or pay for the Loss and/or the damages arising from the Loss pursuant to the terms of the Policy, and is in breach of its contractual obligations to Bennett.

28.

Allied World's breach of its obligations under the Policy constitutes a breach of contract.

29.

Bennett has suffered damages as a result of Allied World's breach of the contract, which include but are not limited to Bennett's payment of $478,417.00 to satisfy the claim of the owner of the travel trailers.

30.

Bennett has performed all conditions precedent under the Policy and all conditions precedent to recovery under this Count, or those conditions precedent have been waived or otherwise satisfied.

31.

**WHEREFORE,** Bennett respectfully requests that the Court enter judgment in favor of Bennett and against Allied World for Allied World's breach of contract for failing to properly investigate, adjust, and pay the claim resulting from Loss, in the following amounts:

(a) the principal amount of $468,417.00;

(b) all costs of this action; and

(c) such other and further relief as the Court deems just and proper.

## COUNT II
## BAD FAITH AND ATTORNEYS' FEES UNDER O.C.G.A. § 33-4-6

32.

Plaintiff adopts and incorporates herein by reference all allegations contained in Paragraphs 1 through 31 of this Complaint.

33.

Allied World initially denied Bennett's claim by letter dated May 21, 2020, relying on a purported $500,000 flood deductible that does not appear in the Policy.

34.

Bennett requested reconsideration of Allied World's determination and Allied responded with another letter dated May 29, 2020, reiterating its denial based on a purported $500,000 flood deductible that does not appear in the Policy.

35.

Bennett again requested reconsideration in an email dated November 18, 2020, explaining why Bennett believed that Allied's determination was incorrect.

36.

On November 30, 2020, Allied sent a third letter denying the claim, again based solely upon a purported $500,000 flood deductible that does not appear in the Policy.

37.

On December 22, 2020, Bennett's legal counsel sent a demand letter to Allied World, pursuant to O.C.G.A. § 33-4-6. A copy of the demand letter is attached hereto as Exhibit B and incorporated herein.

38.

Bennett's December 22, 2020 demand to Allied World was sent more than 60 days before this action was filed.

39.

Bennett's December 22, 2020 demand to Allied World was made at a time when immediate payment for the claim resulting from the Loss was due.

40.

Bennett's December 22, 2020 demand to Allied World made it clear that Allied World was facing a bad faith claim for its failure to pay damages for the claim resulting from the Loss.

41.

On February 19, 2021, Allied World's legal counsel sent a letter to Bennett's counsel responding to Bennett's demand, and again denying the claim based solely upon a purported $500,000 flood deductible that does not appear in the Policy.

42.

Allied World's failure to pay Bennett's claim arising from the Loss was wrongful and was motivated by bad faith.

43.

Allied World has further acted in bad faith by failing to properly investigate, adjust, and pay Bennett's claim.

44.

Allied World has not attempted in good faith to effectuate a prompt, fair and equitable settlement of the claim even though coverage is clear.

45.

Because Allied World refused to pay Bennett's claim and because such refusal was in bad faith, in addition to the loss amount of $468,417.00, Bennett is entitled to not more than 50 percent of the liability of Allied World for the loss or $5,000.00, whichever is greater, and all reasonable attorneys' fees for the prosecution of this action, pursuant to O.C.G.A. § 33-4-6.

46.

Pursuant to O.C.G.A. § 33-4-6(b), within 20 days of bringing this action, in addition to completing service of process as prescribed by Georgia law, Bennett will also mail to the Commissioner of Insurance a copy of Bennett's demand and this Complaint by first class mail.

47.

Bennett has performed all conditions precedent under the Policy and all conditions precedent to recovery under this Count, or those conditions precedent have been waived or otherwise satisfied.

48.

**WHEREFORE,** Bennett respectfully requests that the Court enter judgment in favor of Bennett and against Allied World for Allied World's bad faith in failing to properly investigate, adjust, and pay the claim resulting from Loss, in the following amounts:

(a) the principal amount of $468,417.00;

(b) a penalty of $234,208.50 for Allied World's bad faith;

(c) all costs of this action;

(d) all reasonable attorneys' fees; and

(e) such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Bennett hereby respectfully demands a trial by jury as to all counts and issues in this Complaint.

This 15th day of April, 2021.

MCMICKLE, KUREY & BRANCH, LLP

BY /s/Scott W. McMickle
    SCOTT W. McMICKLE
    Georgia Bar No. 497779

    /s/Jon M. Hughes
    JON M. HUGHES
    Georgia Bar No. 835057

    **Attorneys for Plaintiff**

217 Roswell Street
Suite 200
Alpharetta, GA 30009
Telephone:     (678) 824-7800
Facsimile:     (678) 824-7801

M0710281.1 15187                                  9



Policy Number:  0307-2801

# COMMON POLICY DECLARATIONS

| Allied World Specialty Insurance Company<br>1690 New Britain Avenue, Suite 101<br>Farmington, Connecticut 06032<br>Tel. (860) 284-1300<br>Fax. (860) 284-1301 | Producer:<br>Assured Partners NL, LLC<br>2305 River Road<br>Louisville, KY 40206 |
|---|---|

| | |
|---|---|
| NAMED INSURED: | Bennett International Group, LLC |
| MAILING ADDRESS: | 1001 Industrial Parkway |
| | Mcdonough, GA 30253 |

POLICY PERIOD:  FROM   March 30, 2019   TO   March 30, 2020   AT 12:01 A.M. STANDARD

| BUSINESS DESCRIPTION | Distribution Company |
|---|---|

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

**THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.**

**PREMIUM**

Commercial Output Program          $ ███
Contractors' Equipment             $
TRIA (Fire Following)              $
                                   $
                                   $
                                   $
                                   $
                                   $
                                   $
                                   $
                                   $
                                   $
                            TOTAL: $ ███

Premium shown is payable:$ ███ at inception.          $ ███

THE POLICY MAY BE SUBJECT TO ADJUSTMENT

Includes copyrighted material of Insurance Services Office, Inc. with it's permission

**FORMS APPLICABLE TO ALL COVERAGE PARTS:**

1. CL 1045 (01/2015) Policyholder Disclosure Notice Of Terrorism Insurance Coverage
2. CM-IL 00014 00 (04/2015) What To Do If A Loss Occurs General Information
3. CL 0128 (02/2015) Amendatory Endorsement -   Georgia
4. CL 0700 (10/2006) Virus Or Bacteria Exclusion
5. CL 0100 (03/1999) Common Policy Conditions
6. BIG MANU A Minimum Earned Premium Endorsement
7. BIG MANU B Notice of Cancellation Amendatory
8. BIG MANU C Named Insureds Endorsement
9. BIG MANU D Water Damage Limitation
10. BIG MANU E Deductible Endorsement

ADDRESS FOR NOTICES UNDER THIS POLICY:

   A.  Claims-Related Notices:
       Allied World Specialty Insurance Company
       Claims Department
       199 Water Street, 29th Floor
       New York, NY 10038

   B.  All Other Notices:
       Allied World Specialty Insurance Company
       Claims Department
       199 Water Street, 29th Floor
       New York, NY 10038

In Witness Whereof, the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned by a duly authorized representative of the **Insurer**.

President                                    Secretary

                                             **AUTHORIZED REPRESENTATIVE**

IL 00029 00 (07/15)                    Page 2 of 2

Includes copyrighted material of Insurance Services Office, Inc. with it's permission

**AAIS**
**CL 1045 01 15**
**Page 1 of 3**

**Insurance Company: Allied World Specialty Insurance Company**

**Policy Number: 0307-2801**

**Named Insured: Bennett International Group, LLC**

# POLICYHOLDER DISCLOSURE
# NOTICE OF TERRORISM INSURANCE COVERAGE

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, you have a right to purchase insurance coverage for losses resulting from acts of terrorism, as defined in Section 102(1) of the Act. See the next page for a further description of an act of terrorism as provided under the Act.

## ACCEPTANCE OR REJECTION OF TERRORISM INSURANCE COVERAGE

You may accept or reject this offer of coverage. If you choose to accept this coverage, the premium for this coverage is payable according to the terms of your billing notice. You may reject this offer by completing and signing this statement and returning it to us. If you send us a signed rejection of coverage, your policy will exclude coverage for certified terrorism losses.

In the state of GA, a terrorism exclusion makes an exception for fire losses resulting from an act of terrorism. Accordingly, if you reject the offer of terrorism coverage as provided under the program, that rejection is not applicable to fire losses resulting from an act of terrorism. In this state, the coverage in your policy for such fire losses will continue. The premium for such fire coverage is stated below. This premium is due whether or not you reject the offer described above for terrorism coverage.

One of the following premiums is due:
If you accept this offer, the premium for terrorism coverage is $3,624.00
If you reject this offer, the premium for terrorism (fire only) coverage is $1,280.00

_____    I accept this offer of terrorism coverage and acknowledge that I have been notified that under the Terrorism Risk Insurance Act, as amended, any losses resulting from certified acts of terrorism under my policy may be partially reimbursed by the United States government and may be subject to a $100 billion cap that may reduce my coverage, and I have been notified of the portion of my premium attributable to such coverage.

_____    I hereby reject this offer of terrorism coverage. I understand that an exclusion of certified terrorism losses will be made part of this policy. I also acknowledge that I have been notified that under the Terrorism Risk Insurance Act, as amended, any fire losses resulting from certified acts of terrorism under my policy may be partially reimbursed by the United States government and may be subject to a $100 billion cap that may reduce my coverage, and I have been notified of the portion of my premium attributable to such coverage.

Copyright, American Association of Insurance Services, Inc., 2015

**AAIS**
**CL 1045 01 15**
**Page 2 of 3**

The portion of your annual premium that is attributable to coverage for acts of terrorism, as defined in the Act, is:

_____     I accept this offer of terrorism coverage and acknowledge that I have been notified that under the Terrorism Risk Insurance Act, as amended, any losses resulting from certified acts of terrorism under my policy may be partially reimbursed by the United States government and may be subject to a $100 billion cap that may reduce my coverage, and I have been notified of the portion of my premium attributable to such coverage.

_____     I hereby reject this offer of terrorism coverage. I understand that an exclusion of certified terrorism losses will be made part of this policy. I also acknowledge that I have been notified that under the Terrorism Risk Insurance Act, as amended, any losses resulting from certified acts of terrorism under my policy may be partially reimbursed by the United States government and may be subject to a $100 billion cap that may reduce my coverage, and I have been notified of the portion of my premium attributable to such coverage.

You should know that where coverage is provided by this policy for losses resulting from certified acts of terrorism, such losses may be partially reimbursed by the United States government under a formula established by federal law. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019; and 80% beginning on January 1, 2020 of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The premium charged for this coverage is shown above and does not include any charges for the portion of loss that may be covered by the federal government under the Act.

You should also know that the Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses in any one calendar year exceeds $100 billion. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

**Policyholder's Signature:**                                        **Date:**

_____        _____

Print Name

_____

Copyright, American Association of Insurance Services, Inc., 2015

**AAIS**
**CL 1045 01 15**
**Page 3 of 3**

The following excerpt from the Act is provided for your information:

According to Section 102(1) of the Terrorism Risk Insurance Act, as amended, "The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States ---- (i) to be an act of terrorism; (ii) to be a violent act or an act that is dangerous to (I) human life; (II) property; or (III) infrastructure; (iii) to have resulted in damage within the United States, or outside the United States in the case of (I) an air carrier or vessel described in paragraph (5)(B); or (II) the premises of a United States mission; and (iv) to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion."

**CL 1045 01 15**

Copyright, American Association of Insurance Services, Inc., 2015

# <u>NOTICE</u>

## WHAT TO DO IF A LOSS OCCURS
## GENERAL INFORMATION

In the event "you" suffer a loss which "you" believe is covered by "your" policy, please contact Network Adjusters Inc. at:

| | |
|---|---|
| **Phone:** | **1-877-533-1211** |
| **Fax:** | **1-860-284-1307** |
| **New Loss E-mail:** | **Inlandmarinenewloss@awac.com** |
| **Web:** | **<u>www.networkadjusters.com</u>** |

In the event a loss occurs or is imminent, "your" primary duty is to act in every aspect as if no insurance existed and to employ reasonable means to minimize the loss and to prevent further damage.

PLEASE REFER TO EACH POLICY FOR SPECIFIC INSTRUCTIONS IN THE EVENT OF A LOSS.

CM-IL 00014 00 (04/15)

AAIS
CL 0128 02 15
Page 1 of 2

This endorsement changes
the policy
-- PLEASE READ THIS CAREFULLY --

# AMENDATORY ENDORSEMENT
## GEORGIA

1.  Under Common Policy Conditions, Cancellation is deleted and replaced by the following:

    **Cancellation and Nonrenewal**

    a.  "You" may cancel this policy by returning the policy to "us" or by giving "us" a written notice and stating at what future date coverage is to stop.

        1)  If only "your" interest is affected, cancellation will become effective on:

            a)  the date on which "we" receive either the returned policy or "your" written notice; or
            b)  the date specified in "your" written notice;

            whichever is later. "We" can waive the requirement that "you" state a future date of cancellation by giving "you" written confirmation of the date and time of cancellation.

        2)  If by statute, regulation, or contract this policy cannot be cancelled unless notice is given to a governmental agency, mortgagee, or other third party, "we" will deliver or mail such notice to the third party's last address of record at least 10 days before cancellation is effective. If notice is mailed, it will be mailed first class. Proof of delivery or mailing is sufficient proof of notice.

            Cancellation will become effective:

            a)  10 days after "our" notice is delivered or mailed; or
            b)  on the date specified in "your" written request for cancellation;

            whichever is later.

    b.  "We" may cancel or not renew this policy by delivering or mailing written notice to "you" and any lienholder, if applicable, at the last mailing address known to "us" or "our" authorized agent. If notice is mailed, it will be mailed first class. The notice to "you" and any lienholder may be delivered by electronic means if "you" or the lienholder have affirmatively consented to that method of delivery and "we" have obtained such consent in accordance with Georgia law. Proof of delivery or mailing is sufficient proof of notice.

    c.  If this policy has been in effect for less than 60 days at the time "we" cancel, "we" will give "you" notice at least 10 days before cancellation is effective.

    d.  If this policy has been in effect for 60 days or more, or if it is a renewal of a policy issued by "us", at the time "we" cancel, "we" will give "you" notice:

        1)  at least 10 days before cancellation is effective, if the cancellation is for nonpayment of premium; or
        2)  at least 45 days before cancellation is effective, if the cancellation is for any other reason.

        Notwithstanding the foregoing, if the "terms" of this policy permit an audit and "you" fail to submit to or allow an audit for the current or most recently expired term, "we" may cancel by giving "you" notice at least 10 days before cancellation is effective, but only if:

        1)  "we" have made two documented efforts to notify "you" and "your" agent of potential cancellation; and
        2)  the notice is not mailed within 20 days of the first such documented effort.

        The notice of cancellation will be sent by certified mail or statutory overnight delivery.

Copyright, American Association of Insurance Services, Inc., 2014

AAIS
CL 0128 02 15
Page 2 of 2

e.  "Your" return premium, if any, will be calculated according to "our" rules and will be refunded:

1)  at the time of cancellation or as soon as practicable, if "you" cancel this policy; or
2)  with the cancellation notice or sent to "you" or "your" authorized agent on or before the date on which cancellation is effective, if "we" cancel this policy;

unless the final premium is subject to audit or rate investigation, or the premium was financed by a premium finance company. If the final premium is subject to audit or rate investigation, the return premium will be refunded within 30 days after the conclusion of the audit or rate investigation. If the premium was financed by a premium finance company, "the return premium will be refunded to the premium finance company within 10 working days after cancellation.

Payment or tender of the unearned premium is not a condition of cancellation.

f.  If "we" decide not to renew this policy, "we" will give "you" notice at least 45 days before the nonrenewal is effective.

2.  Under Common Policy Conditions, the following condition is added:

**Conditional Renewal**

If "we" decide to renew this policy with:

a.  an increase in premium rates of more than 15% of the expiring policy premium; or

b.  with a change in any policy provision which limits or restricts coverage;

"we" will deliver or mail written notice of the changes to "you" at least 45 days prior to the effective date of the changes. Such notice may be delivered by electronic means if "you" have affirmatively consented to that method of delivery and "we" have obtained such consent in accordance with Georgia law. When the increase in premium exceeds 15% of the expiring policy premium, the notice will indicate the dollar amount of the increase. However, this provision does not apply to an increase due to audit, change in risk, exposure, or experience modification.

CL 0128 02 15

Copyright, American Association of Insurance Services, Inc., 2014

**AAIS**
**CL 0700 10 06**
**Page 1 of 1**

This endorsement changes
the policy
**-- PLEASE READ THIS CAREFULLY --**

# VIRUS OR BACTERIA EXCLUSION

## DEFINITIONS

**Definitions Amended --**

When "fungus" is a defined "term", the definition of "fungus" is amended to delete reference to a bacterium.

When "fungus or related perils" is a defined "term", the definition of "fungus or related perils" is amended to delete reference to a bacterium.

## PERILS EXCLUDED

The additional exclusion set forth below applies to all coverages, coverage extensions, supplemental coverages, optional coverages, and endorsements that are provided by the policy to which this endorsement is attached, including, but not limited to, those that provide coverage for property, earnings, extra expense, or interruption by civil authority.

1.  The following exclusion is added under Perils Excluded, item 1.:

    **Virus or Bacteria --**

    "We" do not pay for loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress.

This exclusion applies to, but is not limited to, any loss, cost, or expense as a result of:

a.  any contamination by any virus, bacterium, or other microorganism; or

b.  any denial of access to property because of any virus, bacterium, or other microorganism.

2.  **Superseded Exclusions --** The Virus or Bacteria exclusion set forth by this endorsement supersedes the "terms" of any other exclusions referring to "pollutants" or to contamination with respect to any loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress.

## OTHER CONDITIONS

**Other Terms Remain in Effect --**

The "terms" of this endorsement, whether or not applicable to any loss, cost, or expense, cannot be construed to provide coverage for a loss, cost, or expense that would otherwise be excluded under the policy to which this endorsement is attached.

**CL 0700 10 06**

Copyright, American Association of Insurance Services, Inc., 2006

AAIS
CL 0600 01 15
Page 1 of 1

This endorsement changes
the policy
-- PLEASE READ THIS CAREFULLY --

# CERTIFIED TERRORISM LOSS

1. The following definitions are added.

   a. "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States:

      1) to be an act of terrorism;
      2) to be a violent act or an act that is dangerous to human life, property, or infrastructure;
      3) to have resulted in damage:

         a) within the United States; or
         b) to an air carrier (as defined in section 40102 of title 49, United States Code); to a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or at the premises of any United States mission;

      4) to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion; and
      5) to have resulted in insured losses in excess of five million dollars in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act, as amended.

   b. "Certified terrorism loss" means loss that results from a "certified act of terrorism".

2. The "terms" of any terrorism exclusion that is part of or that is attached to this Coverage Part are amended by the following provision:

   This exclusion does not apply to "certified terrorism loss".

3. The following provision is added.

   If the Secretary of the Treasury determines that the aggregate amount of "certified terrorism loss" has exceeded one hundred billion dollars in a calendar year (January 1 through December 31), and "we" have met "our" insurer deductible under the Terrorism Risk Insurance Act, as amended, "we" will not pay for any portion of "certified terrorism loss" that exceeds one hundred billion dollars. If the "certified terrorism loss" exceeds one hundred billion dollars in a calendar year (January 1 through December 31), losses up to one hundred billion dollars are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury under the Terrorism Risk Insurance Act, as amended.

4. The following provisions are added.

   a. Neither the "terms" of this endorsement nor the "terms" of any other terrorism endorsement attached to this Coverage Part provide coverage for any loss that would otherwise be excluded by this Coverage Part under:

      1) exclusions that address war, military action, or nuclear hazard; or
      2) any other exclusion; and

   b. the absence of any other terrorism endorsement does not imply coverage for any loss that would otherwise be excluded by this Coverage Part under:

      1) exclusions that address war, military action, or nuclear hazard; or
      2) any other exclusion.

CL 0600 01 15

Copyright, American Association of Insurance Services, Inc., 2015

AAIS
CL 0100 03 99
**Page 1 of 1**

## COMMON POLICY CONDITIONS

1.  **Assignment** -- This policy may not be assigned without "our" written consent.

2.  **Cancellation** -- "You" may cancel this policy by returning the policy to "us" or by giving "us" written notice and stating at what future date coverage is to stop.

    "We" may cancel this policy, or one or more of its parts, by written notice sent to "you" at "your" last mailing address known to "us". If notice of cancellation is mailed, proof of mailing will be sufficient proof of notice.

    If "we" cancel this policy for nonpayment of premium, "we" will give "you" notice at least ten days before the cancellation is effective. If "we" cancel this policy for any other reason, "we" will give "you" notice at least 30 days in advance of cancellation. The notice will state the time that the cancellation is to take effect.

    "Your" return premium, if any, will be calculated according to "our" rules. It will be refunded to "you" with the cancellation notice or within a reasonable time. Payment or tender of the unearned premium is not a condition of cancellation.

3.  **Change, Modification, or Waiver of Policy Terms** -- A waiver or change of the "terms" of this policy must be issued by "us" in writing to be valid.

4.  **Inspections** -- "We" have the right, but are not obligated, to inspect "your" property and operations at any time. This inspection may be made by "us" or may be made on "our" behalf. An inspection or its resulting advice or report does not warrant that "your" property or operations are safe, healthful, or in compliance with laws, rules, or regulations. Inspections or reports are for "our" benefit only.

5.  **Examination of Books and Records** -- "We" may examine and audit "your" books and records that relate to this policy during the policy period and within three years after the policy has expired.

---

CL 0100 03 99
Copyright, American Association of Insurance Services, 1998

This endorsement changes
the policy
**--PLEASE READ THIS CAREFULLY--**

This endorsement, effective: March 30, 2019
(at 12:01 A.M. standard time at the address of the Named Insured as shown on the Declarations)
forms a part of Policy No:  0307-2801

---

### MINIMUM EARNED PREMIUM ENDORSEMENT

**This endorsement modifies the  insurance provided within this Policy.**

The **Declarations** is amended to include the following additional provision:

> Minimum Earned Premium:        25% of total premium charged

The Policy is amended to include the following Condition:

**Minimum Earned Premium --**

The Minimum Earned Premium shown on the Declarations will be deemed to be 100% earned at policy inception.  This Minimum Earned Premium will be applied to the total premium charged for the policy period indicated on the declarations, including any additional premium charged during the policy period.

**The provisions of this endorsement supersede any contrary terms, definitions, conditions, exclusions or limitations contained in this policy or any of its other endorsements.**

All of other terms of this policy remain unchanged.

BIG MANU A

This endorsement changes
the policy
**--PLEASE READ THIS CAREFULLY--**

This endorsement, effective: March 30, 2019
(at 12:01 A.M. standard time at the address of the Named Insured as shown on the Declarations)
forms a part of Policy No:  0307-2801

---

### NOTICE OF CANCELLATION AMENDATORY

This endorsement modifies the insurance provided under the following:

**COMMERCIAL OUTPUT PROGRAM**
**COMMERCIAL INLAND MARINE**

For any reason other than non-payment of premium, the number of days required for notice of cancellation, as provided in provision 2. **Cancellation** of the **Common Policy Conditions** or as amended by the applicable state cancellation endorsement, is increased to 60 days.  All other terms of the Cancellation provision remain applicable.

All other terms and conditions remain unchanged.

BIG MANU B

This endorsement changes
the policy
**--PLEASE READ THIS CAREFULLY—**

This endorsement, effective: March 30, 2019
(at 12:01 A.M. standard time at the address of the Named Insured as shown on the Declarations)
forms a part of Policy No:  0307-2801

_____

**Named Insured Endorsement**

The following Named Insured's are now recognized as part of the policy:

Bennett On-Site Services, LLC dba BOSS

Boss Engineered Logistics, LLC

Hoback Investments, LLC      45-0711828

Bennett Distribution Services, LLC   58-2406252

Bennett Motor Express Management, Inc.   58-1751514

BOSS Oilfield Service & Supply A Division of Bennett On-Site Services, LLC

BIG MANU C

This endorsement changes
the policy
--**PLEASE READ THIS CAREFULLY**--

This endorsement, effective: March 30, 2019
(at 12:01 A.M. standard time at the address of the Named Insured as shown on the Declarations)
forms a part of Policy No: 0307-2801

# WATER DAMAGE LIMITATION

(The entries required to complete this endorsement
will be shown below or on the "schedule of coverages".)

## WATER DAMAGE SCHEDULE

Water Damage Limit:                             Included

Water Deductible Amount:                        $25,000

## SUPPLEMENTAL COVERAGES

**Interior Water Damage** --

1. **Coverage** -- "We" cover "water damage" to a covered "building or structure".

2. **Coverage Limitation** -- "We" only cover a "building or structure" at "your" "jobsite".

3. **Definition of "Water Damage"** – "Water Damage" means physical loss or damage caused by water, regardless of the source, other than as caused by "flood" or named windstorm.

4. **Limit and Deductible**--

    a. **Any One Occurrence** – "The most "we" pay in any one occurrence for loss caused by or resulting from "water damage" as described in this endorsement is only that part of "your" loss over the deductible amount and subject to the Water Damage Limit indicated on the Water Damage Schedule.

BIG MANU D                          Page **1** of 1

This endorsement changes the coverage
**-- PLEASE READ THIS CAREFULLY --**

### DEDUCTIBLE ENDORSEMENT

For the perils of earthquake, flood, windstorm and hail, the deductibles set forth below apply. These deductibles supersede any other deductible pertaining to earthquake, flood, windstorm and hail contained in this policy, including but not limited to, those listed on any Schedule of Coverages.

(1)   Earthquake:  Not Covered

(2)   Flood: See Endorsement

(3)   Windstorm and Hail: The following sum(s) shall be deducted from any adjusted loss due to windstorm and hail:

    (a)  With respect to locations within Tier I wind zones, NOT COVERED

    (b)  With respect to all other locations, all loss, damage, and/or expense arising out of any one occurrence shall be adjusted as one loss, the deductible shall be 0% of the total values at the time of loss or damage at each location involved in the loss or damage, subject to a minimum of $10,000 for any one occurrence.

    ©  All reference herein to "Tier I", "Tier I wind zones", "Tier I Windstorm" or similar "Tier I" references, shall be defined as all locations situated within Tier I States or Counties or Parishes as specified below:

      <u>Alabama:</u>  Baldwin, Mobile;

      <u>Florida:</u>  Entire State of Florida;

      <u>Georgia:</u>  Bryan, Camden, Chatham, Glynn, Liberty, McIntosh;

      <u>Louisiana:</u>  Cameron, Iberia, Jefferson, Lafourche, Orleans, Plaquemines, St. Mary, St. Bernard, St. Tammany, Terrebonne, Vermilion;

      <u>Mississippi:</u>  Hancock, Harrison, Jackson;

      <u>North Carolina:</u>  Beaufort, Bertie, Brunswick, Camden, Carteret, Chowan, Craven, Currituck, Dare, Hyde, New Hanover, Onslow, Pamlico, Pasquotank, Pender, Perquimans, Tyrrell, Washington;

      <u>South Carolina:</u>  Beaufort, Berkeley, Charleston, Colleton, Georgetown, Horry, Jasper;

      <u>Texas:</u>  Aransas, Brazoria, Calhoun, Cameron, Chambers, Galveston, Jackson, Jefferson, Kenedy, Kleberg, Matagorda, Nueces, Orange, Refugio, San Patricio, Victoria, Willacy;

      <u>Virginia:</u>  Accomack, Chesapeake, Essex, Gloucester, Hampton, Isle of Wight, James City, King George, Lancaster, Mathews, Middlesex, Newport News, Norfolk, Northampton, Northumberland, Poquoson, Portsmouth, Richmond, Stafford, Suffolk, Surry, Virginia Beach, Westmoreland, Williamsburg, York.

**The provisions of this endorsement and the application of these deductibles supersede any contrary terms, definitions, conditions, and exclusions of this policy or any of its endorsements.**

BIG MANU E



# ALLIED WORLD SPECIALTY INSURANCE COMPANY
**1690 New Britain Avenue, Farmington, CT 06032 ·Tel. (860) 284-1300 · Fax (860) 284-1301**

## COMMERCIAL OUTPUT PROGRAM -- DECLARATIONS

POLICY NUMBER:0307-2801                    RENEWAL OF:0307-2801


PRODUCER NAME AND ADDRESS::   AssuredPartners NL, LLC
                              2305 River Road
                              Louisville, KY 40206




NAME OF INSURED:  Bennett International Group, LLC


MAILING ADDRESS:       1001 Industrial Parkway
                       Mcdonough, GA 30253


POLICY PERIOD:     From:March 30, 2019          To:March 30, 2020          at
                   12:01 a.m. Standard Time at your mailing address shown above.

IN RETURN FOR YOUR PAYMENT OF THE PREMIUM, WE PROVIDE THE INSURANCE AS
DESCRIBED IN THIS POLICY.

BUSINESS DESCRIPTION:   Distirubution Company


MORTGAGE HOLDER NAME AND MAILING ADDRESS:


LOCATION ADDRESS:       Per SOV


CO 00001 00 (07/15)                    Page 1 of 2

Includes copyrighted material of the American Association of Insurance Services,
2002 with its permission

FORMS APPLICABLE TO ALL COVERAGES:

1. CO 0408 (06/2013) Amendatory Endorsement - Georgia
2. CO 1051 (03/2005) Schedule of Coverages - Commercial Output Program
3. CO 1052 (04/2002) Location Schedule
4. BIG MANU F Blanket Loss Payee/Mortgagee
5. CO 1227 (05/2002) Scheduled Locations Endorsement
6. CO 1229 (10/2007) Named Storm Exclusion
7. CO 1235 (04/2002) Multiple Deductible - Scheduled Locations and Property
8. CO 1281 (04/2002) Waiting Period -- Income Coverage
9. CL 0677 (01/2011) How Much We Pay - No Coverage For Diminished Value
10. CL 0620 (01/2015) Certified Act Of Terrorism Exclusion (With Limited Exception)
11. CO 1000 (10/2002) Commercial Output Program - Property Coverage Part
12. CO 1001 (04/2002) Commercial Output Program - Income Coverage Part
13. CO 1003 (04/2002) Equipment Breakdown Coverage Part

PREMIUM: $ █████████

IN WITNESS WHEREOF, WE HAVE CAUSED THIS POLICY TO BE EXECUTED AND ATTESTED. THIS POLICY SHALL NOT BE VALID UNLESS COUNTERSIGNED BY OUR DULY AUTHORIZED REPRESENTATIVE.

PRESIDENT

ASST. SECRETARY

AUTHORIZED REPRESENTATIVE

CO 00001 00 (07/15)                    Page 2 of 2

Includes copyrighted material of the American Association of Insurance Services, 2002 with its permission

**AAIS**
**CO 0408 06 13**
**Page 1 of 1**

This endorsement changes
the policy
**-- PLEASE READ THIS CAREFULLY --**

# AMENDATORY ENDORSEMENT
## GEORGIA

1.  Under Perils Excluded, Criminal, Fraudulent, Dishonest, or Illegal Acts, item 2.e. of the Property Coverage Part and items 2.a. of the Crime Coverage Parts, if applicable, are amended to include the following:

    However, if the loss is caused by an intentional act of an insured against whom a family violence complaint is brought for the act causing this loss, this exclusion will not apply to an otherwise covered loss suffered by another insured who did not cooperate with or contribute to the act that caused the loss.

    Subject to all other "terms" of this policy, "our" payment to an insured who did not cooperate in or contribute to the act that caused the loss may be limited to that person's insurable interest in the property, less any payment made to a mortgagee or other party with a legal secured interest in the property. "We" retain all rights set forth in the Subrogation condition of this policy with regard to action against the perpetrator of the act that caused the loss.

2.  Under Other Conditions, Misrepresentation, Concealment, or Fraud is deleted and replaced by the following:

    **Misrepresentation, Concealment, Or Fraud** – "We" do not provide coverage for "you" or any other insured if, before or after a loss:

    a.  "you" or any other insured have willfully concealed or misrepresented:

        1)  a material fact or circumstance that relates to this insurance or the subject thereof; or
        2)  "your" interest herein; or

    b.  there has been fraud or false swearing by "you" or any other insured with regard to a matter that relates to this insurance or the subject thereof.

**CO 0408 06 13**

Copyright, American Association of Insurance Services, Inc., 2013

# SCHEDULE OF COVERAGES
# COMMERCIAL OUTPUT PROGRAM

(The information required to complete this schedule
will be shown below or on the "schedule of coverages".)

|  | Limit of Insurance |
|---|---|
| **Catastrophe Limit** -- The most "we" pay for any combination of or total of losses arising under one or more coverages in any one occurrence is: | $50,000,000 |

## PROPERTY COVERAGE PART

### LIMITS

| -- | Building Property Limit -- The most "we" pay for loss at any one "covered location" is: | Per SOV |
|---|---|---|
| -- | Business Personal Property Limit -- The most "we" pay for loss at any one "covered location" is: | Per SOV |

or

| -- | Combined Blanket Limit -- The most "we" pay for loss at any one "covered location" is: | Not Covered |
|---|---|---|

☒ Refer To Scheduled Locations

### COVERAGE EXTENSIONS

| -- | Consequential Loss | See Form |
|---|---|---|
| -- | Debris Removal, Additional Expense | $250,000 |
| -- | Emergency Removal | 365 days |
| -- | Emergency Removal Expense | $25,000 |
| -- | Fraud and Deceit | $5,000 |
| -- | Damage From Theft | See Form |
| -- | Off Premises Utility Service Interruption | |
| - | Limit | $50,000 |

☐ Overhead Transmission Lines Excluded

Copyright, American Association of Insurance Services, Inc., 2005

**AAIS**
**CO 1051 03 05**
**Page 2 of 9**

## SUPPLEMENTAL COVERAGES

--    Brands or Labels Expense       $50,000

--    Expediting Expenses       $50,000

--    Fire Department Service Charges       $25,000

--    Inventory and Appraisal Expense       $50,000

--    Ordinance or Law (Demolition of Undamaged Parts of Buildings)       $250,000

--    Ordinance or Law (Increased Cost to Repair/ Cost to Demolish and Clear Site)       $250,000

--    Personal Effects       $25,000

--    Pollutant Cleanup And Removal       $100,000

--    Recharge of Fire Extinguishing Equipment       Included

--    Rewards       $250,000

--    Sewer Backup and Water Below the Surface       $100,000

--    Trees, Shrubs, and Plants       $50,000

--    Underground Pipes, Pilings, Bridges, and Roadways       $250,000

## SUPPLEMENTAL MARINE COVERAGES

--    Accounts Receivable       $100,000

--    Electrical or Magnetic Disturbance of Computers       See Form

--    Power Supply Disturbance of Computers       See Form

--    Virus and Hacking Coverage

     -    Limit any one occurrence       $25,000

     -    Limit any 12 month period       $50,000

--    Fine Arts       $100,000

--    Off Premises Computers       $25,000

--    Property On Exhibition       $50,000

Copyright, American Association of Insurance Services, Inc., 2005

**AAIS**
**CO 1051 03 05**
**Page 3 of 9**

### SUPPLEMENTAL MARINE COVERAGES (cont.)

| | | |
|---|---|---|
| -- | Property In Transit | $50,000 |
| -- | Sales Representative Samples | $50,000 |
| -- | Software Storage | $50,000 |
| -- | Valuable Papers | $100,000 |

### ADDITIONAL PROPERTY SUBJECT TO LIMITATIONS

| | | |
|---|---|---|
| -- | Furs (theft) | $10,000 |
| -- | Jewelry (theft) | $10,000 |
| -- | Stamps, Tickets, Letters of Credit | $5,000 |

### COVERAGE OPTIONS (check if applicable)

☐ Actual Cash Value Applies

☐ Automatic Increase

   -   Automatic Increase              Not Covered

☒ Scheduled Locations

| | | |
|---|---|---|
| - | Newly Built or Acquired Buildings | $1,000,000 |
| - | Personal Property - Acquired Locations | $500,000 |
| - | Locations "You" Elect Not To Describe | $250,000 |
| - | Coinsurance | 0% |

## DEDUCTIBLE

Check One

☒ Deductible Amount              Per CO 1235 Multiple Deductible
                                  Endorsement

☐ Refer to Deductible Endorsements

Copyright, American Association of Insurance Services, Inc., 2005

AAIS
CO 1051 03 05
Page 4 of 9

## INCOME COVERAGE PART

**COVERAGE** (check one)

☐ Income Coverage Does Not Apply

☒ Earnings, Rents, and Extra Expense

☐ Earnings and Extra Expense

☐ Rents and Extra Expense

☐ Extra Expense Only

**LIMIT** (check one)

☒ Income Coverage Limit -- The most
"we" pay for loss at any one "covered location" is:    See Form

☒ Refer To Scheduled Locations (check if applicable)

**COVERAGE EXTENSIONS**

-- Interruption By Civil Authority          30 days

-- Period of Loss Extension                 90 days

**SUPPLEMENTAL COVERAGES**

-- Computer Virus and Hacking

  - Limit any one occurrence              $25,000

  - Limit any 12 month period             $75,000

  - Waiting Period                        12 HOURS

-- Dependent Locations                     $100,000

-- Off Premises Utility
   Service Interruption

  - Limit                                 $10,000

  - Waiting Period                        12 HOURS

  ☐ Overhead Transmission Lines Excluded

Copyright, American Association of Insurance Services, Inc., 2005

## INCOME COVERAGE PART (cont.)

**SUPPLEMENTAL COVERAGES** (cont.)

-- Contract Penalty

  - Limit any one occurrence $25,000

  - Limit any 12 month period $100,000

-- Pollutants Cleanup and Removal $25,000

-- Property In Transit, On Exhibition, or Custody
   of Sales Representatives $10,000

**COVERAGE OPTIONS** (check if applicable)

☒ Scheduled Locations

  - Newly Built or Acquired Locations $500,000

  - Coinsurance 0%

☒ Waiting Period 48 Hours

☐ Monthly Limitation Not Covered

## FLOOD COVERAGE

☐ Not Covered

☒ Scheduled Flood Coverage

  - "Catastrophe Limit" $1,000,000

  - Flood Deductible ($,%) Per BIG MANU E - Deductible Endorsement

☐ Blanket Flood Coverage

  - "Occurrence Limit" Not Covered

  - "Aggregate Limit" Not Covered

  - "Catastrophe Limit" Not Covered

  - Flood Deductible ($,%) Not Covered

Copyright, American Association of Insurance Services, Inc., 2005

## EARTHQUAKE COVERAGE

☒ Not Covered

☐ Scheduled Earthquake Coverage

- "Catastrophe Limit"                    Not Covered

- Earthquake Deductible ($,%)            Not Covered

☐ Blanket Earthquake Coverage

- "Occurrence Limit"                     Not Covered

- "Aggregate Limit"                      Not Covered

- "Catastrophe Limit"                    Not Covered

- Earthquake Deductible ($,%)            Not Covered

## EQUIPMENT BREAKDOWN COVERAGE PART

☐ Not Covered

☒ EQUIPMENT BREAKDOWN COVERAGE

|                    | LIMITS  | COINSURANCE |
|--------------------|---------|-------------|
| Property Damage    | Per SOV | 0%          |
| Income Coverages   | Per SOV | 0%          |

**Income Coverages**

| Period of Loss Extension | 180 Days |
|--------------------------|----------|

Coverage Options (check one)

☒ Earnings, Rents, and Extra Expense

☐ Earnings and Extra Expense

☐ Rents and Extra Expense

☐ Extra Expense Only

Copyright, American Association of Insurance Services, Inc., 2005

## EQUIPMENT BREAKDOWN COVERAGE PART (cont.)

### COVERAGE EXTENSIONS/SUPPLEMENTAL COVERAGES

|  | | Limit |
| --- | --- | --- |
| -- | Expediting Expense | $50,000 |
| -- | Pollutants | $100,000 |
| -- | Ordinance or Law (Undamaged Parts of Buildings) | $100,000 |
| -- | Ordinance or Law (Increased Cost to Repair / Cost to Demolish and Clear Site) | $100,000 |
| -- | Off Premises Utility Service Interruption | $100,000 |
| -- | Defense Costs | covered |

### DEDUCTIBLES

| | |
| --- | --- |
| Property Coverages | $1,000 |
| Income Coverages ($, hrs., ADV, or Combined) | 3 Days |
| Other (describe) | |

### INCOME COVERAGE OPTIONS (describe)

### OTHER CONDITIONS (describe)

Copyright, American Association of Insurance Services, Inc., 2005

AAIS
CO 1051 03 05
Page 8 of 9

## SPOILAGE COVERAGE PART

☒ Not Covered

☐ **BLANKET SPOILAGE COVERAGE**

    **Spoilage Limits**

    Location Limit -- The most "we" pay for
    loss at any one "covered location" is:        Not Covered

    Catastrophe Limit -- The most "we" pay for
    loss in any one occurrence is:        Not Covered

    **Spoilage Deductible**        Not Covered

    **Additional Conditions** (check if applicable)

    ☐ Selling Price Valuation

    ☐ Refrigeration, Maintenance, or Service
       Agreement

☐ **SCHEDULED SPOILAGE COVERAGE**

    **Spoilage Limits**

    Catastrophe Limit -- The most "we" pay for
    loss in any one occurrence is:        Not Covered

    **Spoilage Deductible**        Not Covered

    **Additional Conditions** (check if applicable)

    ☐ Selling Price Valuation

    ☐ Refrigeration, Maintenance, or Service Agreement

    **Perils Covered** (check if applicable)

    ☐ Breakdown, Malfunction, or Failure (Equipment Breakdown)

    ☐ Refrigerant Contamination (Equipment Breakdown)

    ☐ Refrigerant Contamination (Other Causes Of Loss)

    ☐ Power Disruption (Equipment Breakdown)

    ☐ Power Disruption (Other Causes Of Loss)

Copyright, American Association of Insurance Services, Inc., 2005

## OPTIONAL COVERAGES AND ENDORSEMENTS

CO 1051 03 05

Copyright, American Association of Insurance Services, Inc., 2005

AAIS
CO 1052 04 02

# LOCATION SCHEDULE

(The entries required to complete this endorsement
will be shown below or on the "schedule of coverages".)

Coverage provided by the Commercial Output Program coverage parts applies
only to the "covered locations" described below. Refer to "schedule of
coverages" for applicable "limits", additional coverages, and applicable
coinsurance percentage.

| Loc | ADDRESS | CITY | ST | ZIP | OCCUPANCY | FLOATER | BLDG | BUS PP | BPPO | BI | OP Hardwar | OP Softwar | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2301 SOUTH MAIN ST | MORTON | IL | | OFFICE, WHSE | | $280,000 | | | | | | $280,000 |
| 2 | 391 LAWTON AVE | MONROE | OH | 45050 | OFFICE | | $150,000 | | | | | | $150,000 |
| 3 | 1501 AND 1603 BLUE ROCK ST | CINCINNATI | OH | 45223 | OFFICE | $32,000 | | | | | | | $32,000 |
| 4 | 1538 BLUE ROCK ST | CINCINNATI | OH | 45223 | WHSE, SHOP, OFFICE | | | | $10,000,000 | $100,000 | | | $10,100,000 |
| 5 | 1660 DIXON AIRLINE RD | AUGUSTA | GA | 30906 | | | $5,000,000 | | | | | | $5,100,000 |
| 6 | 5122 PATTERSON AVE | PERRIS | CA | 92571 | YARD | | | | $500,000 | | | | $500,000 |
| 17 | 305 W CRYSTAL LAKE RD | FOREST CIT | | 50436 | OFFICE AND YARD | | $100,000 | $3,996 | $12,000,000 | $100,000 | | | $12,203,996 |
| 18 | 80 PAUL R. FOULKE PKWY | HAGERSTOWN | IN | 47346 | OFFICE | $30,000 | $116,262 | $5,000 | $2,000,000 | $100,000 | | | $2,311,262 |
| 19 | 56960 ELK PARK DR | ELKHART | IN | 46516 | OFFICE-YARD | | $115,000 | $20,000 | $5,000,000 | $100,000 | | | $5,235,000 |
| 20 | 501 KESCO DR | BRISTOL | IN | 46507 | OFFICE -YARD | | $40,000 | $785 | $2,000,000 | $100,000 | | | $2,140,785 |
| 21 | 3052 HACKBERRY DRIVE | GOSHEN | IN | 46526 | YARD, BLDG 10-12 acres fenced - modular bldg for office | | $45,000 | | $2,000,000 | | | | $2,045,000 |
| 22 | 4800 URBANA RD | SPRINGFIELD | OH | 45504 | OFFICE | $12,000 | | $22,000 | $3,500,000 | $100,000 | | | $3,634,000 |
| 23 | 4620 NV MCKENNON RD | PENDLETON | OR | 97801 | 2 MH OFFICE- 5 ACRE YARD | $3,000 | | | $2,000,000 | | | | $2,003,000 |
| 25 | 4900 JOHN DEERE PKWY | GROVETOWN | GA | 30813 | OFFICE/YARD | | | | $2,500,000 | $100,000 | | | $2,600,000 |
| 26 | 922 MOLLY POND RD | AUGUSTA | GA | 30806 | OFFICE/WAREHOUSE | | | | $5,000,000 | | | | $5,100,000 |
| 27 | 2340 DOUG BERNARD PKWY-Airport | AUGUSTA | GA | 30806 | OFFICE-WAREHOUSE | $575,287 | $10,300,000 | $250,000 | $10,000,000 | $100,000 | | | $21,825,287 |
| 28 | 233 JOHN DEERE PKWY | GROVETOWN | GA | 30813 | OFFICE-WAREHOUSE | | $25,000,000 | | $2,500,000 | $100,000 | | | $27,600,000 |
| 30 | 4301 EVANS TO LOCKS RD | EVANS | GA | 30809 | 6.00 acres | | | | $2,500,000 | | | | $2,600,000 |
| 35 | 1001 INDUSTRIAL PKWY | MCDONOUG | GA | 30253 | OFFICE | | $300,000 | $100,000 | | $100,000 | $61,400 | $583,700 | $1,145,100 |
| 36 | 1001 INDUSTRIAL PKWY | MCDONOUG | GA | 30253 | OFFICE | | $1,000,000 | $100,000 | | $100,000 | $58,000 | | $1,258,000 |
| 37 | 1001 INDUSTRIAL PKWY | MCDONOUG | GA | 30253 | OFFICE | | $1,200,000 | $350,000 | | $100,000 | $100,400 | | $1,750,400 |
| 38 | 1001 INDUSTRIAL PKWY | MCDONOUG | GA | 30253 | OFFICE | | $225,000 | $25,000 | | $100,000 | $14,500 | | $364,500 |
| 39 | 1001 INDUSTRIAL PKWY | MCDONOUG | GA | 30253 | OFFICE | | $398,700 | $301,300 | | $100,000 | $55,000 | | $855,000 |
| 40 | 1001 INDUSTRIAL PKWY | MCDONOUG | GA | 30253 | OFFICE | | $100,000 | $20,000 | | $100,000 | $33,700 | | $253,700 |
| 41 | 1001 INDUSTRIAL PKWY | MCDONOUG | GA | 30253 | OFFICE | | $100,000 | $70,000 | | $100,000 | $58,100 | | $318,100 |
| 42 | 1001 INDUSTRIAL PKWY | MCDONOUG | GA | 30253 | STORAGE | | $80,000 | | | $100,000 | | | $180,000 |
| 43 | 1001 INDUSTRIAL PKWY | MCDONOUG | GA | 30253 | SHOP-OFFICE | | $155,000 | $25,000 | | $100,000 | $14,300 | | $294,300 |
| 44 | 1001 INDUSTRIAL PKWY | MCDONOUG | GA | 30253 | OFFICE | | $165,053 | $128,353 | | $100,000 | $64,600 | | $459,006 |
| 45 | 1001 INDUSTRIAL PKWY | MCDONOUG | GA | 30253 | YARD | $25,000 | | | $2,500,000 | | | | $2,525,000 |
| 46 | 1001 INDUSTRIAL PKWY | MCDONOUG | GA | 30253 | DRIVERS LOUNGE | | $76,000 | $5,000 | | | $5,400 | | $86,400 |
| 47 | 531 RIVERSIDE DRIVE | LITHIA SPRIN | GA | 30122 | DATA CENTER | | | | | $277,900 | | | $277,900 |
| 48 | 4117 S MERIDIAN | PUYALLUP | WA | 98373 | OFFICE | | $5,000 | | | | | | $5,000 |
| 50 | 1649 S 55TH AVE | PHOENIX | AZ | 85043 | OFFICE | $56,015 | | | | | | | $56,015 |
| 51 | 18111 S SANTA FE AVE UNIT B | RANCHO DO | CA | 90221 | WAREHOUSE-YARD-OFFICE | $16,000 | | | $10,000,000 | $100,000 | | | $10,116,000 |
| 52 | 23166 E VICTORIA ST | RANCHO DO | CA | 90221 | WAREHOUSE | | | | $1,000,000 | | | | $1,000,000 |
| 53 | 1167 DIXON AIRLINE ROAD | AUGUSTA | GA | 30906 | STORAGE YARD | | | | $2,500,000 | | | | $2,500,000 |
| 56 | 276 W STATE RD 130 | VALPARAISO | IN | 46385 | OFFICE - YARD | | $69,000 | $2,000 | | | | | $71,000 |
| 58 | 1021 E 11TH ST | CHATTANOOC | TN | 37408 | OFFICE-YARD | | $175,000 | $40,000 | | $100,000 | | | $315,000 |
| 59 | 5451 OATES RD | HOUSTON | TX | 77013 | OFFICE/YARD | | | | $5,000,000 | | | | $5,000,000 |
| 60 | 1510 N HAMPTON RD STE 110 | DESOTO | TX | 75115 | OFFICE | | $100,000 | $10,000 | | | | | $110,000 |
| 61 | 10500 OLD BEAUMONT HWY | HOUSTON | TX | 77078 | OFFICE-YARD | $505,500 | $150,000 | $32,000 | $500,000 | $100,000 | $40,000 | $0 | $1,327,500 |
| 62 | 402 S MCCOY BLVD | NEW BOSTO | TX | 75570 | OFFICE | $100,000 | $350,000 | $15,000 | | $100,000 | | | $565,000 |
| 63 | 20851 MINES RD | LAREDO | TX | 78045 | OFFICE -YARD | $400,000 | 43450 bldg 1, and 12,000 bldg 2 | | | $100,000 | | | $500,000 |
| 64 | 801 N 2ND AVE | CARBON CLI | IL | 61239 | OFFICE-SHOP | $43,000 | $420,000 | | | | | | $463,000 |
| 68 | 805 HWY 181 NORTH | BEEVILLE | TX | 78102 | OFFICE AND YARD | | $250,000 | $15,000 | | | | | $265,000 |
| 69 | 2101 NW Frontage Rd 181 Bypass Apt 71 | BEEVILLE | TX | 78102 | Apartment | | | $12,500 | | | | | $12,500 |
| 70 | 4836 W LOOP 281 | LONGVIEW | TX | 75603 | | | $1,083,750 | | | $100,000 | | | $1,183,750 |
| 75 | 8515 PRATT AVE | DURHAM | CA | 95938 | OFFICE | | | $5,000 | | | | | $5,000 |
| 80 | 608 CARNATION DRIVE | NAMPA | ID | | YARD ONLY | | | | $250,000 | | | | $250,000 |
| 82 | 11812 CR 12 | MIDDLEBUR | IN | 46540 | | | $10,000 | | | | | | $10,000 |
| 84 | 1144 N MAIN ST STE B | ROXBORO | NC | 27573 | OFFICE | | | $10,000 | | | | | $10,000 |
| 85 | 1360 INDUSTRIAL WAY | WOODBURN | OR | 97071 | OFFICE-YARD | | $25,000 | | | | | | $25,000 |
| 91 | 10545 RT 322 | SHIPPENVILL | PA | 16254 | OFFICE-YARD | | | $20,000 | $250,000 | | | | $270,000 |
| 92 | 1203 N OLD ROBINSON RD | ROBINSON | TX | 76706 | MOBILE OFFICE | | $0 | $10,000 | | | | | $10,000 |
| | | | | | | $1,867,802 | $48,308,765 | $1,579,934 | $93,600,000 | $2,700,000 | $793,800 | $583,700 | $140,034,101 |

This endorsement changes
the policy
**--PLEASE READ THIS CAREFULLY--**

This endorsement, effective:  March 30, 2019
(at 12:01 A.M. standard time at the address of the Named Insured as shown on the Declarations)
forms a part of Policy No:  0307-2801

---

### Blanket Loss Payee/Mortgagee

This endorsement modifies insurance provided under the following:

COMMERCIAL OUTPUT PROGRAM

The **COMMERCIAL OUTPUT PROGRAM PROPERTY COVERAGE PART** is amended to include the following:

**Blanket Loss Payee/Mortgagee**
A Blanket Loss Payee is added for covered property under this policy as their interest(s) may appear under a written agreement with you prior to any loss or damage.

All other terms and conditions remain unchanged.

BIG MANU F

**AAIS**
**CO 1227 05 02**
**Page 1 of 3**

This endorsement changes
the policy
**-- PLEASE READ THIS CAREFULLY --**

# SCHEDULED LOCATIONS ENDORSEMENT

## PROPERTY COVERED

The following provision is added to Property Covered.

**Scheduled Locations** -- Coverage provided by the Commercial Output Program coverages applies only to the "covered locations" described on the Location Schedule.

## ADDITIONAL COVERAGES

The following Additional Coverages indicate an applicable "limit". This "limit" may also be shown on the "schedule of coverages". If a different "limit" is indicated on the "schedule of coverages", that "limit" will apply instead of the "limit" shown below.

However, if no "limit" is indicated for an Additional Coverage, coverage is provided up to the full "limit" for the applicable covered property unless a different "limit" is indicated on the "schedule of coverages".

Unless otherwise indicated, a "limit" for an Additional Coverage provided below is separate from, and not part of, the applicable "limit" for coverage described under Property Covered. The "limit" available for coverage described under an Additional Coverage:

  a. is the only "limit" available for the described coverage; and

  b. is not the sum of the "limit" indicated for an Additional Coverage and the "limit" for coverage described under Property Covered.

Unless otherwise stated, each additional coverage:

  a. applies to loss caused by a covered peril;

  b. is not subject to and not considered in applying coinsurance when coinsurance conditions are added to this coverage; and

  c. does not extend coverage to personal property at fairs or exhibitions.

1. **Newly Built or Acquired Buildings** -- "We" cover direct physical loss to "your" buildings or structures:

   a. being built at "covered locations" or while being built at other than "covered locations"; or

   b. that "you" acquire during the policy period.

   This additional coverage applies for 120 days from the date "you" acquire or begin to construct the building or structure or until "you" report the property to "us", whichever occurs first. This coverage does not go beyond the end of the policy period.

   "You" must pay any additional premium due from the date construction is started or from the date "you" acquire the property.

   The most "we" pay in any one occurrence for each newly built or acquired building or structure is $500,000.

2. **Business Personal Property - Acquired Locations** -- "We" cover direct physical loss to "your" business personal property at locations that "you" acquire during the policy period.

   This coverage applies for 120 days from the date "you" acquire the location or until "you" report the acquired location to "us", whichever occurs first. This coverage does not go beyond the end of the policy period.

   "You" must pay any additional premium due from the date "you" acquire the location.

The most "we" pay in any one occurrence for business personal property at each location "you" acquire is $250,000.

3. **Locations "You" Elect Not To Describe --** "We" cover direct physical loss to "your" building property and business personal property at locations that are not described on the Location Schedule.

   The "limit" provided under this additional coverage cannot be combined or added to the "limits" for Newly Acquired Buildings and Personal Property - Acquired Locations.

   The most "we" pay in any one occurrence for each unscheduled location is $50,000.

4. **Newly Built or Acquired Locations - Income Coverage --** If the Commercial Output Program - Income Coverage Part is attached to this policy, "we" extend "your" coverage for earnings and extra expense to include direct physical loss to "your" covered property while at any location being built or at locations that "you" acquire during the policy period.

   If a loss occurs at a location being built and the loss delays the start of "your" "business", the "restoration period" starts from the time "your" "business" would have begun had no loss occurred.

   This coverage applies for 120 days from the date the location is acquired or construction begins or until "you" report the location to "us", whichever occurs first. This coverage does not go beyond the end of the policy period.

   "You" must pay any additional premium due from the date construction is started or "you" acquire the location.

   The most "we" pay in any one occurrence for loss of earnings and incurred extra expense at each newly acquired or built location is $250,000.

## HOW MUCH WE PAY

The following provisions are added to How Much We Pay if a coinsurance percentage is indicated on the "schedule of coverages".

1. **Coinsurance, Property Coverage Part --** "We" pay only a part of the loss if the "limit" is less than the value of the covered property at the time of the loss multiplied by the coinsurance percentage. "Our" part of the loss is determined using the following steps:

   a. multiply the value of the covered property at the time of the loss by the coinsurance percentage;

   b. divide the "limit" for covered property by the result determined in a. above;

   c. multiply the total amount of loss, after the application of any deductible, by the result determined in b. above.

   "We" pay the amount determined in c. above or the "limit", whichever is less. "We" do not pay any remaining part of the loss.

   If there is more than one "limit" indicated on the "schedule of coverage", this procedure applies separately to each covered property for which a "limit" is shown.

   If there is only one "limit" indicated on the "schedule of coverage", this procedure applies to the total of all covered property to which the "limit" applies.

2. **Coinsurance, Income Coverage Part --** If the Commercial Output Program - Income Coverage Part is attached to this policy, "we" pay only a part of the loss if the "limit" is less than the coinsurance percentage multiplied by the sum of "your" net income (net profit or loss before income taxes) and continuing operating expenses projected for the 12 months following the inception of this policy or the last previous anniversary date of this policy (whichever is later), normally earned by "your" "business".

**AAIS**
**CO 1227 05 02**
**Page 3 of 3**

"Our" part of the loss is determined using the following steps:

a.  multiply the coinsurance percentage by the sum of "your" net income and continuing operating expenses projected for the 12 months following the inception of this policy or the last previous anniversary date of this policy;

b.  divide the "limit" by the figure determined in a. above;

c.  multiply the total amount of loss by the figure determined in b. above.

"We" pay the amount determined in c. above or the "limit", whichever is less. "We" do not pay any remaining part of the loss.

If there is more than one "limit" indicated on the "schedule of coverage" for the Income Coverage Part, this procedure applies separately to each "limit".

Coinsurance does not apply to coverage for extra expense.

**CO 1227 05 02**
Copyright, American Association of Insurance Services, 2002

| | | |
|---|---|---|
| **AAIS** | This endorsement changes | |
| **CO 1229 10 07** | the policy | |
| **Page 1 of 1** | -- PLEASE READ THIS CAREFULLY -- | |

# NAMED STORM EXCLUSION

"We" do not cover the property at the location described below for loss caused by or resulting from a named storm.

Excluded Locations:

   "All Locations"

"We" do not pay for loss or damage caused directly or indirectly by a named tropical windstorm or hurricane to property at the locations listed above. Such loss or damage is excluded regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded cause.

A named tropical windstorm or hurricane means a storm system that has been declared and named a tropical windstorm or hurricane by the National Hurricane Center of the National Weather Service continuing for the time period during which the tropical storm or hurricane conditions exist and ending 72 hours following the termination of the last tropical storm or hurricane watch or warning issued by the National Hurricane Center of the National Weather Service.

**CO 1229 10 07**

Copyright, American Association of Insurance Services, Inc., 2007

**AAIS**
**CO 1235 04 02**
**Page 1 of 1**

This endorsement changes
the policy
**-- PLEASE READ THIS CAREFULLY --**

# MULTIPLE DEDUCTIBLE
## SCHEDULED LOCATIONS AND PROPERTY

(The entries required to complete this endorsement
will be shown below or on the "schedule of coverages".)

## HOW MUCH WE PAY

The deductible provision is deleted and replaced by the following:

For the locations described on this schedule, "we" pay only that part of "your" loss over the deductible amount indicated for the described location, in any one occurrence.

All other "covered locations" not described on the Multiple Deductible schedule

Scheduled Locations and Property Schedule Locations

| Property/Coverage Deductible Applies to; | Deductible; |
| --- | --- |
| Building | $10,000 |
| Property of Others | $10,000 |
| Interior Water Damage Deductible | $25,000 |
| Business Person Property | $1,000 |

**CO 1235 04 02**

Copyright, American Association of Insurance Services, 2002

**AAIS**
**CO 1281 04 02**
**Page 1 of 2**

This endorsement changes
the policy
**-- PLEASE READ THIS CAREFULLY --**

# WAITING PERIOD -- INCOME COVERAGE

As specified below, this endorsement amends the provisions of the Commercial Output Program -- Income Coverage Part.

## DEFINITIONS

The Definition of "restoration period" is deleted and replaced by the following:

"Restoration period" means:

1. The time it should reasonably take to resume "your" "business" to a similar level of service beginning:

   a. for earnings, after the first 72 hours (unless otherwise indicated on the "schedule of coverages") following the direct physical loss of or damage to property at a "covered location" that is caused by a covered peril; and

   b. for extra expenses, immediately following the direct physical loss of or damage to property at a "covered location" that is caused by a covered peril.

   The "restoration period" ends on the date the property should be rebuilt, repaired, or replaced or the date business is resumed at a new permanent location. This is not limited by the expiration date of the policy.

2. The "restoration period" also means the increased time required to comply with the enforcement of any ordinance, law, or decree that:

   a. regulates the construction, use, or repair of any property; or

   b. requires the demolition of any property, in part or in whole, not damaged by a covered peril.

   The ordinance, law, or decree must be in force at the time of loss.

3. Only as regards coverage described under Dependent Locations in the Coverage Extensions, "restoration period" also means the time it should reasonably take to resume "your" "business" to a similar level of service beginning:

   a. for earnings, after the first 72 hours (unless otherwise indicated on the "schedule of coverages") following the direct physical loss of or damage to property at a "covered location" that is caused by a covered peril; and

   b. for extra expenses, immediately following the direct physical loss of or damage to property at a "covered location" that is caused by a covered peril.

   The "restoration period" for "dependent locations" ends on:

   a. the date the property at the "dependent location" should be rebuilt, repaired, or replaced; or

   b. the date business is resumed at a new permanent location.

   This is not limited by the expiration date of the policy.

**AAIS**
**CO 1281 04 02**
**Page 2 of 2**

## COVERAGE EXTENSION

The following coverage extension is deleted and replaced by the following:

**Interruption by Civil Authority** -- "We" extend "your" coverage for earnings and extra expense to include loss sustained while access to "covered locations" or a dependent location is specifically denied by an order of civil authority. This order must be a result of direct physical loss of or damage to property, other than at a "covered location" and must be caused by a covered peril.

Unless otherwise indicated on the "schedule of coverages", this coverage extension begins:

1.  for earnings, 72 hours after the time the order is issued and ends 30 consecutive days and 72 hours from the date of the order; and

2.  for extra expense, immediately after the time the order is issued, and ends 30 consecutive days and 72 hours from the date of the order.

## SUPPLEMENTAL COVERAGES

The waiting period described under Off Premises Utility Service Interruption is not deleted and replaced by the provisions of this endorsement.

If the Interruption of Web Site endorsement is attached to the Commercial Output Program -- Income Coverage Part, the described waiting period under Interruption of Web Site is not deleted and replaced by the provisions of this endorsement.

**CO 1281 04 02**
Copyright, American Association of Insurance Services, 2002

**AAIS**
**CL 0677 01 11**
**Page 1 of 1**

This endorsement changes
the policy
**-- PLEASE READ THIS CAREFULLY --**

# HOW MUCH WE PAY
## NO COVERAGE FOR DIMINISHED VALUE

### HOW MUCH WE PAY

Under How Much We Pay, the Loss Settlement Terms are amended to include the following provision.

**No Coverage For Diminished Value** -- Regardless of the method used to determine the amount under Valuation or under Valuation Of Property Losses, "we" do not pay for any loss in market value as a result of repairing, replacing, or rebuilding the covered property.

**CL 0677 01 11**

Copyright, American Association of Insurance Services, Inc., 2010

AAIS
CL 0620 01 15
Page 1 of 2

This endorsement changes
the policy
-- PLEASE READ THIS CAREFULLY --

# CERTIFIED ACT OF TERRORISM EXCLUSION
# (WITH LIMITED EXCEPTION)

1.  The following definitions are added.

    a.  "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States:

        1)  to be an act of terrorism;
        2)  to be a violent act or an act that is dangerous to human life, property, or infrastructure;
        3)  to have resulted in damage:

            a)  within the United States; or
            b)  to an air carrier (as defined in section 40102 of title 49, United States Code); to a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or at the premises of any United States mission;

        4)  to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion; and
        5)  to have resulted in insured losses in excess of five million dollars in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act, as amended.

    b.  "Certified terrorism loss" means loss that results from a "certified act of terrorism".

2.  The following exclusion is added.

    **CERTIFIED ACT OF TERRORISM EXCLUSION**

    "We" will not pay for loss or damage caused directly or indirectly by a "certified act of terrorism". Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

    **Fire Exception** -- If a "certified act of terrorism" results in fire, "we" will pay for the loss or damage caused by that fire. This exception for fire applies only to direct loss or damage by fire to covered property. This exception does not apply to coverage for loss of earnings, extra expense, or fire legal liability.

    If the Secretary of the Treasury determines that the aggregate amount of "certified terrorism loss" has exceeded one hundred billion dollars in a calendar year (January 1 through December 31), and "we" have met "our" insurer deductible under the Terrorism Risk Insurance Act, as amended, "we" will not pay for any portion of "certified terrorism loss" that exceeds one hundred billion dollars. If the "certified terrorism loss" exceeds one hundred billion dollars in a calendar year (January 1 through December 31), losses up to one hundred billion dollars are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury under the Terrorism Risk Insurance Act, as amended.

Copyright, American Association of Insurance Services, Inc., 2015

**AAIS**
**CL 0620 01 15**
**Page 2 of 2**

3.  The following provisions are added.

    a.  Neither the "terms" of this endorsement nor the "terms" of any other terrorism endorsement attached to this Coverage Part provide coverage for any loss that would otherwise be excluded by this Coverage Part under:

        1)  exclusions that address war, military action, or nuclear hazard; or
        2)  any other exclusion; and

    b.  the absence of any other terrorism endorsement does not imply coverage for any loss that would otherwise be excluded by this Coverage Part under:

        1)  exclusions that address war, military action, or nuclear hazard; or
        2)  any other exclusion.

    **CL 0620 01 15**

Copyright, American Association of Insurance Services, Inc., 2015

# COMMERCIAL OUTPUT PROGRAM
# PROPERTY COVERAGE PART

## AGREEMENT

In return for "your" payment of the required premium, "we" provide the coverage described herein subject to all the "terms" of the Commercial Output Program. This coverage is also subject to the "schedule of coverages" and additional policy conditions relating to assignment or transfer of rights or duties, cancellation, changes or modifications, inspections, and examination of books and records.

Endorsements and schedules may also apply. They are identified on the "schedule of coverages".

Refer to Definitions for words and phrases that have special meaning. These words and phrases are shown in quotation marks or bold type.

## DEFINITIONS

1.  The words "you" and "your" mean the persons or organizations named as the insured on the "schedule of coverages".

2.  The words "we", "us", and "our" mean the company providing this coverage.

3.  "Accident" means direct physical loss as follows:

    a.  mechanical breakdown;

    b.  rupturing or bursting of moving parts of machinery caused by centrifugal force;

    c.  loss caused by arcing or electrical currents other than lightning;

    d.  explosion of steam boilers, steam pipes, steam turbines, or steam engines that "you" own or lease or that are operated under "your" control;

    e.  loss to steam boilers, steam pipes, steam turbines, or steam engines caused by any condition or occurrence within such equipment; or

    f.  loss to hot water boilers or heaters caused by any condition or occurrence within such equipment.

4.  "Business" means the usual business operations occurring at "covered locations" including the tenantability of "covered locations" when the selected coverage option includes "rents".

5.  "Computers" means:

    a.  "hardware" owned by "you" or in "your" care, custody, or control; or

    b.  "software".

6.  "Computer hacking" means an unauthorized intrusion by an individual or group of individuals, whether employed by "you" or not, into a "computer", a Web site, or a "computer" network and that results in but is not limited to:

    a.  deletion, destruction, generation, or modification of "software";

    b.  alteration, contamination, corruption, degradation, or destruction of the integrity, quality, or performance of "software";

    c.  observation, scanning, or copying of "data records", "programs and applications", and "proprietary programs";

Copyright, American Association of Insurance Services, Inc., 2002

AAIS
CO 1000 10 02
Page 2 of 31

d. damage, destruction, inadequacy, malfunction, degradation, or corruption of any "hardware" or "media" used with "hardware"; or

e. denial of access to or denial of services from "computers", "computer" network, or Web site including related "software".

7. "Computer virus" means the introduction into a "computer", "computer" network, or Web site of any malicious, self-replicating electronic data processing code or other code and that is intended to result in, but is not limited to:

a. deletion, destruction, generation, or modification of "software";

b. alteration, contamination, corruption, degradation, or destruction of the integrity, quality, or performance of "software";

c. damage, destruction, inadequacy, malfunction, degradation, or corruption of any "hardware" or "media" used with "hardware"; or

d. denial of access to or denial of services from "computers", "computer" network, or Web site including related "software".

8. "Covered equipment", unless otherwise specified in a schedule, means equipment:

a. that generates, transmits, or utilizes energy; or

b. which, during normal usage, operates under vacuum or pressure, other than the weight of its contents.

Such equipment must be covered property, except as specifically provided for under Utility Service Interruption coverage and the Spoilage Coverage Part.

"Covered equipment" does not mean:

a. equipment manufactured by "you" for sale;

b. buildings, structures, or compartments that cover or house "covered equipment";

c. foundations that support "covered equipment";

d. sewage and other underground piping and vessels, water piping, or sprinkler system piping. However, "we" cover:

1) boiler feedwater and condensate return piping; and
2) water piping for heating, air conditioning, or refrigeration systems;

e. "mobile equipment", including but not limited to draglines or other excavation equipment;

f. aircraft or watercraft and their motors, equipment, and accessories;

g. automobiles, motor trucks, tractors, trailers, and similar conveyances and their motors, equipment, and accessories. However, any property that is stationary, permanently installed at a "covered location", and receives electrical power from an external power supplier will not be considered an automobile, motor truck, tractor, or trailer; or

h. "computers".

9. "Covered location" means any location or premises where "you" have buildings, structures, or business personal property covered under this coverage.

However, if the Scheduled Locations Endorsement is added to this policy, "covered location" means a location that is described on the Location Schedule.

"Covered location" does not mean vehicles containing covered property, except vehicles on or within 1,000 feet of the premises of any covered building or structure.

Copyright, American Association of Insurance Services, Inc., 2002

AAIS
CO 1000 10 02
Page 3 of 31

10. "Data records" means files, documents, and information in an electronic format and that are stored on "media".

11. "Dependent locations" means locations that are operated by others and that "your" "business" depends on, as described below. Dependent locations includes but is not limited to:

    a. contributing locations, these are "your" suppliers' locations or locations of suppliers that deliver services or materials to others for "your" account. Contributing locations do not include suppliers of:

       1) water;
       2) telecommunications, including but not limited to Internet service providers; or
       3) power;

    b. recipient locations, these are locations that receive "your" products;

    c. leader locations, these are locations that attract customers to "your" "business"; or

    d. manufacturing locations, these are locations that make products for delivery to "your" customers under contract of sale.

12. "Fine arts" means bona fide works of art of rarity, historical value, or artistic merit, including but not limited to paintings, etchings, pictures, tapestries, and art glass windows.

13. "Flood" means flood, surface water, waves, tidal water, or the overflow of a body of water, all whether driven by wind or not. This includes spray that results from any of these whether driven by wind or not.

14. "Hardware" means a network of electronic machine components (microprocessors) capable of accepting instructions and information, processing the information according to the instructions, and producing desired results. "Hardware" includes but not limited to:

    a. mainframe and mid-range computers and servers;

    b. personal computers and workstations;

    c. laptops, palmtops, notebook PCs, other portable computer devices and accessories including, but not limited to, multimedia projectors; and

    d. peripheral data processing equipment, including but not limited to, printers, keyboards, monitors, and modems.

15. "Limit" means the amount of coverage that applies.

16. "Media" means an instrument that is used with "hardware" and on which "data records", "programs and applications", and proprietary programs can be recorded or stored. "Media" includes, but is not limited to, films, tapes, cards, discs, drums, cartridges, cells, DVDs, or CD-ROMs.

17. "Mobile equipment" means:

    a. contractors' equipment or similar equipment of a mobile or floating nature;

    b. self-propelled vehicles designed and used primarily to carry mounted equipment; or

    c. vehicles designed for highway use that are unlicensed and not operated on public roads.

18. "Money" means currency, bullion, coins, bank notes in current use, and traveler's checks, register checks, and money orders held for sale to the public.

19. "Off-site server" means a server for "your" Web site that is being maintained or operated by and that is located at the premises of:

    a. an independent contractor acting as "your" Web host; or

    b. "your" Internet service provider that is acting as "your" Web host.

Copyright, American Association of Insurance Services, Inc., 2002

20. "One accident" means:

When an initial "accident" causes or results in other "accidents", all of the "accidents" will be considered "one accident". All "accidents" that are the result of the same occurrence will be considered "one accident".

21. "Perishable stock" means personal property preserved and maintained under controlled conditions and susceptible to loss or damage if the controlled conditions change.

22. "Pollutant" means:

a. any solid, liquid, gaseous, thermal, or radioactive irritant or contaminant, including but not limited to acids, alkalis, chemicals, fumes, smoke, soot, vapor, and waste. Waste includes materials to be recycled, reclaimed, or reconditioned, as well as disposed of; and

b. electrical or magnetic emissions, whether visible or invisible, and sound emissions.

23. "Programs and applications" means operating programs and applications that "you" purchase and that are:

a. stored on "media"; or

b. pre-installed and stored in "hardware".

Applications includes, but is not limited to, programs for word processing, spreadsheet calculations, and graphic design.

24. "Proprietary programs" means proprietary operating programs and applications that "you" developed or that "you" had developed specifically for "you" and that are:

a. stored on "media"; or

b. installed and stored in "hardware".

25. "Rents" means "your" actual loss of:

a. rental income from a "covered location" as furnished or equipped by "you", less any expenses that do not continue;

b. the fair rental value of any part of a "covered location" that "you" occupy, less any expenses that do not continue; and

c. other charges for which a tenant is legally obligated and which "you" would otherwise be obligated.

26. "Restoration period" means:

a. The time it should reasonably take to resume "your" "business" to a similar level of service starting from the date of a physical loss of or damage to property at a "covered location" that is caused by a covered peril and ending on the date:

1) the property should be rebuilt, repaired, or replaced; or
2) business is resumed at a new permanent location.

This is not limited by the expiration date of the policy.

b. The "restoration period" also means the increased time required to comply with the enforcement of any ordinance, law, or decree that:

1) regulates the construction, use, or repair of any property; or
2) requires the demolition of any property, in part or in whole, not damaged by a covered peril.

However, except as provided under Supplemental Income Coverage, Pollutant Cleanup and Removal, "we" do not cover the costs associated with the enforcement of any ordinance, law, or decree that requires "you" or anyone else to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize or in any way respond to or assess the effects of "pollutants".

The ordinance, law, or decree must be in force at the time of loss.

Copyright, American Association of Insurance Services, Inc., 2002

c. Only as regards coverage described under Dependent Locations in the Supplemental Income Coverages, "restoration period" also means the time it should reasonably take to resume "your" "business" starting from the date of direct physical loss of or damage to a "dependent location" caused by a covered peril, and ending on the date:

1) the property at the "dependent location" should be rebuilt, repaired, or replaced; or
2) business is resumed at a new, permanent location.

This is not limited by the expiration date of the policy.

d. Only as regards coverage described under Off Premises Utility Service Interruption; and Property In Transit, On Exhibition, or In the Custody Of Sales Representatives in the Supplemental Income Coverages, "restoration period" also means the time it should reasonably take to resume "your" "business" starting from the date of direct physical loss of or damage caused by a covered peril to:

1) property not located at a "covered location" and that is owned by a utility, a landlord, or another utility supplier;
2) the "off-site server" for "your" Web site or the location that houses the "off-site server" for "your" Web site; or
3) property in transit, on exhibition, or in the custody of sales representatives;

and ending on the date the property should be rebuilt, repaired, or replaced. This is not limited by the expiration date of the policy.

27. "Schedule of coverages" means:

a. all pages labeled schedule of coverages or schedules which pertain to this coverage; and

b. declarations or supplemental declarations which pertain to this coverage.

28. "Securities" means negotiable and nonnegotiable instruments or contracts representing either "money" or other property. This includes, but is not limited to, stock certificates; tokens, tickets, revenue, or stamps (whether represented by actual stamps or unused value in a meter) in current use; and evidences of debt used in connection with charge, credit, or debit cards that are not issued by "you", but does not include "money".

29. "Sinkhole collapse" means the sudden settlement or collapse of earth supporting the covered property into subterranean voids created by the action of water on a limestone or similar rock formation. It does not include the value of the land or the cost of filling sinkholes.

30. "Software" means:

a. "media";

b. "data records";

c. "programs and applications"; and

d. "proprietary programs".

31. "Specified perils" means aircraft; civil commotion; explosion; falling objects; fire; hail; leakage from fire extinguishing equipment; lightning; riot; "sinkhole collapse"; smoke; sonic boom; vandalism; vehicles; "volcanic action"; water damage; weight of ice, snow, or sleet; and windstorm.

Falling objects does not include loss to:

a. business personal property in the open; or

b. to the interior of buildings or structures, or business personal property inside buildings or structures unless the exterior of the roof or walls are first damaged by a falling object.

Copyright, American Association of Insurance Services, Inc., 2002

Water damage means the sudden or accidental discharge or leakage of water or steam as a direct result of breaking or cracking of a part of the system or appliance containing the water or steam.

32. "Spoilage" means any detrimental change in physical state of "perishable stock". Detrimental change includes, but is not limited to, thawing of frozen goods, warming of refrigerated goods, solidification of liquid or molten material, chemical reactions to material in process, and reduction in value of time sensitive materials.

33. "Terms" are all provisions, limitations, exclusions, conditions, and definitions that apply.

34. "Theft" means any act of stealing, including burglary or robbery.

35. "Valuable papers" means documents, manuscripts, or records that are inscribed, printed, or written. This includes, but is not limited to, abstracts, books, deeds, drawings, films, maps, or mortgages.

36. "Volcanic action" means airborne volcanic blast or airborne shock waves; ash, dust, or particulate matter; or lava flow. It does not include the cost to remove ash, dust, or particulate matter that does not cause direct physical loss to the covered property.

## PROPERTY COVERED

"We" cover the following property unless the property is excluded or subject to limitations.

"We" cover direct physical loss to covered property at a "covered location" caused by a covered peril.

### BUILDING PROPERTY

1. **Covered Building Property** -- Covered Building Property means buildings and structures and:

   a. completed additions;

   b. fixtures, machinery, and equipment which are a permanent part of a covered building or structure;

   c. outdoor fixtures;

   d. personal property owned by "you" and used to maintain or service a covered building or structure or its premises. This includes air-conditioning equipment; fire extinguishing apparatus; floor coverings; and appliances for refrigerating, cooking, dish washing, and laundering;

   e. if not covered by other insurance, buildings and additions to buildings under construction, alteration, and repair including:

      1) materials, equipment, supplies, and temporary structures, on or within 1,000 feet of a "covered location", intended and designated for use in the construction, alteration, and repair of buildings or additions to buildings; and
      2) "your" contractual liability for the interest of contractors and sub-contractors in buildings and additions to buildings under construction, alteration, and repair such as materials, equipment, supplies, and temporary structures, on or within 1,000 feet of a "covered location", intended and designated for use in the construction, alteration, and repair of buildings or additions to buildings;

   f. building glass;

   g. the following property if it is located on or within 1,000 feet of a covered building or structure:

      1) radio and television towers, antennas, satellite dishes, masts, lead-in wiring, and guy wires. This includes foundations and any other property that is permanently attached to any of these types of property;

Copyright, American Association of Insurance Services, Inc., 2002

AAIS
CO 1000 10 02
Page 7 of 31

2) awnings or canopies; and
3) fences;

h. signs, whether or not they are attached to covered buildings, or structures; or

i. foundations of buildings, structures, machinery, or boilers.

2. **Building Property That Is Not Covered --** Except as provided under Supplemental Coverages - Underground Pipes, Pilings, Bridges and Roadways, Covered Building Property does not include:

a. pilings, piers, wharves, docks, or retaining walls;

b. underground pipes, flues, or drains; and

c. bridges, walkways, roadways, and other paved surfaces.

## BUSINESS PERSONAL PROPERTY

1. **Covered Business Personal Property --** Covered business personal property means "your" business personal property in buildings or structures at a "covered location" or in the open (or in vehicles) on or within 1,000 feet of a "covered location". This includes:

a. "your" use interest as a tenant in improvements to the buildings or structures. Improvements are fixtures, alterations, installations, or additions:

1) to a building or structure "you" occupy but do not own; and
2) made or acquired at "your" expense and which cannot be legally removed by "you".

"We" also cover "your" interest as a tenant in undamaged improvements that "you" lose because "your" lease has been canceled by the lessor as a result of damage to the building or structure "you" occupy but do not own. The damage to the building must be caused by a covered peril;

b. leased personal property which "you" have a contractual responsibility to insure;

c. "your" interest in personal property of others to the extent of "your" labor, material, and services;

d. "computers", if not covered by other insurance;

e. personal property which will become a part of "your" installation, fabrication, or erection project while:

1) at the site of installation, fabrication, or erection; or
2) while in temporary storage awaiting installation, fabrication, or erection.

Coverage under this provision is not restricted to buildings or structures at a "covered location" or within 1,000 feet of a "covered location";

f. "mobile equipment", if not covered by other insurance. Coverage under this provision is not restricted to buildings or structures at a "covered location" or within 1,000 feet of a "covered location"; and

g. personal property of others. This means personal property of others that is in "your" care, custody, or control.

Personal property of others includes property that is sold under an installation agreement where "your" responsibility continues until the property is accepted by the buyer.

"Our" payment for loss to personal property of others will only be for the benefit of the owners of the personal property.

2. **Business Personal Property That Is Not Covered --** Covered business personal property does not include:

a. "off-site server"; and

Copyright, American Association of Insurance Services, Inc., 2002

AAIS
CO 1000 10 02
Page 8 of 31

b. except as provided under Supplemental Marine Coverages;

   1) personal property in transit as described under Property In Transit;
   2) "fine arts" as described under Fine Arts;
   3) "computers" while away from a "covered location" as described under Off Premises Computers;
   4) property while temporarily on display or exhibit as described under Property On Exhibition;
   5) samples of "your" stock as described under Sales Representative Samples; and
   6) duplicate or back-up "software" as described under Software Storage.

# PROPERTY NOT COVERED

1. **Airborne or Waterborne Property** -- "We" do not cover airborne or waterborne personal property unless the property is being transported by regularly scheduled airlines or ferry service.

2. **Aircraft or Watercraft** -- "We" do not cover aircraft or watercraft (and their motors, equipment, and accessories) that are operated principally away from a "covered location". However, "we" do cover:

   a. aircraft or watercraft (and their motors, equipment, and accessories) that "you" manufacture, process, warehouse, or hold for sale; and

   b. rowboats or canoes out of water at a "covered location".

3. **Animals** -- "We" do not cover animals, including but not limited to birds and fish, unless owned by others and boarded by "you". "We" do cover animals "you" own and hold for sale while inside of buildings.

4. **Automobiles and Vehicles** -- "We" do not cover automobiles, motor trucks, tractors, trailers, and similar conveyances designed and used for over-the-road transportation of people or cargo.

   "We" do cover:

   a. "mobile equipment" described under Business Personal Property; and

   b. automobiles and vehicles that "you" manufacture, process, or warehouse. However, "we" do not cover automobiles or vehicles held for sale, lease, loan or rental.

5. **Checked Luggage** -- "We" do not cover loss resulting from "theft" or disappearance of a laptop, palmtop, notebook PC, or any portable "computer" while in transit as checked luggage.

6. **Contraband** -- "We" do not cover contraband or property in the course of illegal transportation or trade.

7. **Cost of Excavation** -- "We" do not cover the cost of excavations, grading, filling, or backfilling. However, if a covered loss occurs to covered property below the surface of the ground, "we" cover costs that are a necessary part of the repairing, rebuilding, or replacement of the property.

8. **Crops While Outside of Buildings** -- "We" do not cover grain, hay, straw, or other crops while outside of buildings.

9. **Exports and Imports** -- "We" do not cover exported or imported property that is covered under any ocean marine cargo insurance policy or any similar policy that anyone has obtained covering exports and imports.

10. **Land, Water, and Growing Crops** -- "We" do not cover:

    a. land, including but not limited to land on which the covered property is located;

Copyright, American Association of Insurance Services, Inc., 2002

b.   underground or surface water; or

c.   growing crops.

11. **Money, Securities, Accounts, and Valuable Papers** -- Except as provided elsewhere in this policy, "we" do not cover "money", "securities", accounts, bills, and the cost to reproduce, replace, or restore "valuable papers" and lost information.

12. **Outdoor Trees, Shrubs, Plants, or Lawns** -- Except as provided under Supplemental Coverages - Trees, Shrubs, and Plants, "we" do not cover trees, shrubs, plants, or lawns (other than stock).

13. **Property More Specifically Insured** -- "We" do not cover property which is more specifically insured in whole or in part by any other insurance. "We" do cover the amount in excess of the amount due from the more specific insurance whether "you" can collect on it or not.

14. **Property of Others** -- "We" do not cover property of others for which "you" are responsible as:

a.   a carrier for hire; or

b.   an arranger of transportation. This includes carloaders, consolidators, brokers, freight forwarders, or shipping associations.

15. **Property You Have Sold** -- "We" do not cover property that "you" have sold after it has been delivered. This does not include property which "you" have sold under an installation agreement.

# COVERAGE EXTENSIONS

The following Coverage Extensions indicate an applicable "limit". This "limit" may also be shown in the "schedule of coverages". If a different "limit" is indicated in the "schedule of coverages", that "limit" will apply instead of the "limit" shown below.

However, if no "limit" is indicated for a Coverage Extension, coverage is provided up to the full "limit" for the applicable covered property unless a different "limit" is indicated on the "schedule of coverages".

Unless otherwise indicated, the coverages provided below are part of and not in addition to the applicable "limit" for coverage described under Property Covered.

The "limit" provided under a Coverage Extension cannot be combined or added to the "limit" for any other Coverage Extension or Supplemental Coverage including a Coverage Extension or Supplemental Coverage that is added to this policy by endorsement.

The following coverage extensions are not subject to and not considered in applying coinsurance when coinsurance conditions are added to this coverage.

1.   **Consequential Loss** -- "We" pay for "your" consequential loss of undamaged business personal property. Consequential loss means the loss of value of an undamaged part or parts of a product which becomes unmarketable. It must be unmarketable due to a physical loss to another part or parts of the product caused by a covered peril.

2.   **Debris Removal** -- "We" pay the cost to remove the debris of covered property that is caused by a covered peril. This coverage does not include costs to:

a.   extract "pollutants" from land or water; or

b.   remove, restore, or replace polluted land or water.

"We" do not pay any more under this coverage than 25% of the amount "we" pay for the direct physical loss. "We" will not pay more for loss to property and debris removal combined than the "limit" for the damaged property.

Copyright, American Association of Insurance Services, Inc., 2002

However, "we" pay up to an additional $50,000 for debris removal expense when the debris removal expense exceeds 25% of the amount "we" pay for direct physical loss or when the loss to property and debris removal combined exceeds the "limit" for the damaged property.

"We" do not pay any expenses unless they are reported to "us" in writing within 180 days from the date of direct physical loss to covered property.

3. **Emergency Removal** -- "We" pay for any direct physical loss to covered property while it is being moved or being stored to prevent a loss caused by a covered peril. This coverage applies for up to 365 days after the property is first moved, but does not extend past the date on which this policy expires.

4. **Emergency Removal Expenses** -- "We" pay up to $5,000 for "your" expenses to move or store covered property to prevent a loss caused by a covered peril. This coverage applies for up to 365 days after the property is first moved, but does not extend past the date on which this policy expires.

The "limit" for Emergency Removal Expenses is separate from, and not part of, the applicable "limit" for coverage described under Property Covered.

5. **Fraud and Deceit** -- "We" pay up to $5,000 for "theft" of covered property when "you", "your" agents, customers, or consignees are fraudulently induced to part with the covered property:

a. to persons who falsely represent themselves as the proper persons to receive the property; or

b. by the acceptance of fraudulent bills of lading or shipping receipts.

6. **Damage From Theft** -- "We" cover direct physical damage caused by "theft" or attempted "theft" to:

a. a building that "you" do not own and that contains "your" business personal property; or

b. personal property not owned by "you" within such building and that is used to maintain or service the building or structure or its premises.

This coverage extension only applies to a location where "you" are a tenant and the terms of "your" lease make "you" liable for damage caused by "theft" or attempted "theft".

7. **Off Premises Utility Service Interruption**

a. **Coverage** -- "We" cover direct physical loss or damage caused by the interruption of an off premises utility service when the interruption:

1) results in the direct physical loss or damage to covered property located at a "covered location"; and

2) is a result of direct physical loss or damage by a covered peril to property that is not located at a "covered location" and that is owned by a utility, a landlord, or another supplier who provides "you" with:

a) power or gas;

b) telecommunications, including but not limited to Internet access; or

c) water, including but not limited to waste water treatment.

Copyright, American Association of Insurance Services, Inc., 2002

b.  **Overhead Transmission Lines** -- If the "schedule of coverages" indicates that overhead transmission lines are excluded, coverage under this extension does not include loss to overhead transmission lines that deliver utility service to "you". Overhead transmission lines include, but are not limited to:

1)  overhead transmission and distribution lines;
2)  overhead transformers and similar equipment; and
3)  supporting poles and towers.

c.  **Perishable Stock Exclusion** -- Coverage under this extension does not include loss of "perishable stock" due to "spoilage" that results from:

1)  complete or partial lack of electrical power; or
2)  fluctuation of electrical current.

d.  **Applicable Limit** -- The most "we" pay in any one occurrence under this Coverage Extension is $50,000.

## SUPPLEMENTAL COVERAGES

The following Supplemental Coverages indicate an applicable "limit". This "limit" may also be shown in the "schedule of coverages". If a different "limit" is indicated in the "schedule of coverages", that "limit" will apply instead of the "limit" shown below.

However, if no "limit" is indicated for a Supplemental Coverage, coverage is provided up to the full "limit" for the applicable covered property unless a different "limit" is indicated on the "schedule of coverages".

Unless otherwise indicated, a "limit" for a Supplemental Coverage provided below is separate from, and not part of, the applicable "limit" for coverage described under Property Covered. The "limit" available for coverage described under a Supplemental Coverage:

a.  is the only "limit" available for the described coverage; and

b.  is not the sum of the "limit" indicated for a Supplemental Coverage and the "limit" for coverage described under Property Covered.

The "limit" provided under a Supplemental Coverage cannot be combined or added to the "limit" for any other Supplemental Coverage or Coverage Extension including a Supplemental Coverage or Coverage Extension that is added to this policy by endorsement.

Unless otherwise stated, each supplemental coverage:

a.  applies to covered property in or on buildings or structures at a "covered location" or in the open (or in vehicles) within 1,000 feet of a "covered location"; and

b.  is not subject to and not considered in applying coinsurance when coinsurance conditions are added to this coverage.

1.  **Brands or Labels Expense** -- If covered business personal property is damaged and the damage is caused by a covered peril, "we" have the option to take all or any part of the damaged business personal property at the agreed or appraised value. "You" may stamp salvage or remove any brands or labels from the property or its containers. "You" must not damage the property or containers when "you" remove the brands or labels. "You" must re-label the merchandise or its containers if required by law.

The most "we" pay in any one occurrence for "your" expenses for stamping or removing brands or labels is $50,000.

Copyright, American Association of Insurance Services, Inc., 2002

2. **Expediting Expenses** -- When a covered peril occurs to covered property, "we" pay for reasonable expenses necessary to expedite permanent repairs or replacement and make temporary repairs to damaged covered property. Expediting expenses include additional labor or overtime, and transportation costs.

   The most "we" pay for all expediting expenses in any one occurrence is $50,000.

3. **Fire Department Service Charges** -- "We" pay up to $25,000 to cover "your" liability, assumed by contract or agreement prior to the loss, for fire department service charges.

   This coverage is limited to charges incurred when the fire department is called to save or protect covered property from a covered peril.

   No deductible applies.

4. **Inventory and Appraisal Expense** -- "We" pay up to $50,000 for reasonable expenses, for the taking of inventory and appraisals, incurred by "you" at "our" request to assist "us" in the determination of the amount of a loss caused by a covered peril.

   "We" do not pay for:

   a. any expenses incurred under the Other Conditions, Appraisal section of this coverage; or

   b. any public adjusters' fees or attorneys' fees.

5. **Ordinance or Law (Undamaged Parts of a Building)** -- When a covered peril occurs to a covered building or structure, "we" pay for the value of undamaged parts of a covered building or structure that is required to be demolished as a result of the enforcement of any ordinance, law, or decree that:

   a. requires the demolition of undamaged parts of a covered building or structure that is damaged or destroyed by a covered peril;

   b. regulates the construction or repair of a building or structure, or establishes building, zoning, or land use requirements at a "covered location"; and

   c. is in force at the time of loss.

   "We" do not cover the costs associated with the enforcement of any ordinance, law, or decree that requires "you" or anyone else to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize or in any way respond to or assess the effects of "pollutants".

   This coverage is part of and not in addition to the applicable "limit" for coverage described under Property Covered.

6. **Ordinance or Law (Increased Cost to Repair and Cost to Demolish and Clear Site)** --

   a. **Increased Cost to Repair** -- When a covered peril occurs to a covered building or structure, "we" cover the:

      1) increased cost to repair, rebuild, or reconstruct damaged portions of a covered building or structure; and
      2) increased cost to repair, rebuild, or reconstruct undamaged portions of a covered building or structure whether or not those undamaged portions need to be demolished;

      as a result of the enforcement of building, zoning, or land use ordinance, law, or decree and is in force at the time when a covered peril occurs to a covered building or structure.

      If a covered building or structure is repaired or rebuilt, it must be intended for similar occupancy as the current property, unless otherwise required by building, zoning, or land use ordinance, law, or decree.

Copyright, American Association of Insurance Services, Inc., 2002

AAIS
CO 1000 10 02
Page 13 of 31

"We" do not cover the increased cost of construction until the covered building or structure is actually repaired or replaced and unless the repairs or replacement are made as soon as reasonably possible after the loss, not to exceed two years.

b.  **Cost to Demolish and Clear Site --** "We" cover the cost to demolish and clear the site of undamaged parts of the covered building or structure that is damaged or destroyed by a covered peril. The demolition must be a result of the enforcement of a building, zoning, or land use ordinance, law, or decree that is in force at the time when a covered peril occurs to a covered building or structure.

c.  **We Do Not Cover --** "We" do not cover the costs associated with the enforcement of any ordinance, law, or decree that:

   1)  requires "you" or anyone else to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize or in any way respond to or assess the effects of "pollutants"; or
   2)  "you" were required to comply with before the covered peril occurred to a covered building or structure, even if the building or structure was undamaged and "you" failed to comply with the ordinance, law, or decree.

d.  **What We Pay If The Building Is Repaired or Replaced --** If the covered building or structure is repaired or replaced, "we" pay the lesser of:

   1)  the amount "you" actually spend to demolish and clear the site, plus the actual increased cost to repair, rebuild, or construct the property but not for more than a building or structure of the same height, floor area, and style; or
   2)  $100,000.

e.  **What We Pay If The Building Is Not Repaired or Replaced --** If the covered building or structure is not repaired or replaced, "we" pay the lesser of:

   1)  the amount "you" actually spend to demolish and clear the site; plus the cost "you" would have incurred to replace the damaged or destroyed property with other property:

      a)  of like kind, and quality;
      b)  of the same height, floor area, and style; and
      c)  used for the same purpose; or

   2)  $100,000.

7.  **Personal Effects --** "We" cover direct physical loss caused by a covered peril to personal effects owned by "you", "your" officers, "your" partners, or "your" employees.

   The most "we" pay for loss to personal effects in any one occurrence or at any one "covered location" is $15,000.

8.  **Pollutant Cleanup and Removal --** "We" pay "your" expense to extract "pollutants" from land or water if the discharge, dispersal, seepage, migration, release, or escape of the "pollutants" is caused by a covered peril that occurs during the policy period. The expenses are paid only if they are reported to "us" in writing within 180 days from the date the covered peril occurs.

   "We" do not pay the cost of testing, evaluating, observing, or recording the existence, level, or effects of "pollutants". However, "we" pay the cost of testing which is necessary for the extraction of "pollutants" from land or water.

   The most "we" pay for each site or "covered location" is $50,000 for the sum of all such expenses arising out of a covered peril occurring during each separate 12 month period of this policy.

Copyright, American Association of Insurance Services, Inc., 2002

9. **Recharge of Fire Extinguishing Equipment** -- "We" pay up to $50,000 to cover "your" incurred expenses to recharge "your" automatic fire extinguishing equipment or hand held fire extinguishing equipment when the equipment is discharged:

    a.   to fight a fire;

    b.   as a result of a covered peril; or

    c.   as a result of an accidental discharge.

    However, "we" do not pay for "your" expenses to recharge equipment as a result of a discharge during testing or installation.

    If it is less expensive to do so, "we" will pay "your" costs to replace "your" automatic fire extinguishing equipment or hand held fire extinguishing equipment rather than recharge the equipment.

10. **Rewards** -- "We" pay up to $10,000 as a reward for information that leads to a conviction for arson, "theft", or vandalism. The conviction must involve a covered loss caused by arson, "theft", or vandalism.

    The amount "we" pay is not increased by the number of persons involved in providing the information.

11. **Sewer Backup and Water Below the Surface** -- "We" cover direct physical loss caused by:

    a.   water that backs up through a sewer or drain; or

    b.   water below the surface of the ground, including but not limited to water that exerts pressure on or flows, seeps, or leaks through or into a covered building or structure, sidewalk, driveway, foundation, swimming pool, or other structure.

The most "we" pay for loss caused by sewer backup and water below the surface in any one occurrence is $25,000.

12. **Trees, Shrubs, and Plants** -- "We" cover direct physical loss (and debris removal expenses) to outdoor trees, shrubs, plants, and lawns at a "covered location". "We" only cover loss caused by:

    a.   fire;

    b.   lightning;

    c.   explosion;

    d.   riot or civil commotion;

    e.   falling objects; or

    f.   vandalism.

    The most "we" pay for loss to trees, shrubs, and plants in any one occurrence is $50,000.

    Coverage under this supplemental coverage does not apply to property held for sale by "you".

13. **Underground Pipes, Pilings, Bridges, and Roadways** -- "We" cover direct physical loss caused by a covered peril to:

    a.   pilings, piers, wharves, docks, or retaining walls;

    b.   underground pipes, flues, or drains; and

    c.   bridges, walkways, roadways, and other paved surfaces.

    The most "we" pay under this Supplemental Coverage in any one occurrence or at any one "covered location" is $250,000.

Copyright, American Association of Insurance Services, Inc., 2002

# SUPPLEMENTAL MARINE COVERAGES

The following Supplemental Marine Coverages indicate an applicable "limit". This "limit" may also be shown in the "schedule of coverages". If a different "limit" is indicated in the "schedule of coverages", that "limit" will apply instead of the "limit" shown below.

However, if no "limit" is indicated for a Supplemental Marine Coverage, coverage is provided up to the full "limit" for the applicable covered property unless a different "limit" is indicated on the "schedule of coverages".

Unless otherwise indicated, a "limit" for a Supplemental Marine Coverage provided below is separate from, and not part of the applicable "limit" for coverage described under Property Covered. The "limit" available for coverage described under a Supplemental Marine Coverage:

a. is the only "limit" available for the described coverage; and

b. is not the sum of the "limit" indicated for a Supplemental Marine Coverage and the "limit" for coverage described under Property Covered.

The "limit" provided under a Supplemental Marine Coverage cannot be combined or added to the "limit" for any other Supplemental Marine Coverage, Supplemental Coverage, or Coverage Extension including a Supplemental Marine Coverage, Supplemental Coverage, or Coverage Extension that is added to this policy by endorsement.

The following supplemental marine coverages are not subject to and not considered in applying coinsurance when coinsurance conditions are added to this coverage.

1. **Accounts Receivable** -- "We" pay up to $50,000 to cover losses and expenses that "you" incur as a result of a direct physical loss caused by a covered peril to "your" records of accounts receivable.

   Losses and expenses under this coverage means:

   a. all sums due "you" from customers, provided "you" are unable to effect collection;

   b. interest charges on any loan used to offset impaired collections pending "our" payment of such sums;

   c. collection expenses in excess of normal collection costs made necessary because of loss or damage; and

   d. other reasonable expenses incurred by "you" in recreating records of accounts receivable following such loss or damage.

2. **Electrical or Magnetic Disturbance of Computers** -- "We" cover direct physical loss to "computers" caused by electrical or magnetic disturbance that results in electrical or magnetic damage to "computers" and damage to, disturbance of, or erasure of electronic records.

   This coverage is part of and not in addition to the applicable "limit" for coverage described under Property Covered.

3. **Power Supply Disturbance of Computers** -- "We" cover direct physical loss to "computers" caused by power supply disturbance such as interruption of power supply, power surge, blackout, or brownout.

   This coverage is part of and not in addition to the applicable "limit" for coverage described under Property Covered.

Copyright, American Association of Insurance Services, Inc., 2002

4. **Virus and Hacking Coverage** -- "We" cover direct physical loss to covered "computers", "your" "computer" network and "your" Web site caused by a "computer virus" or by "computer hacking". However, "we" do not cover:

   a. loss of exclusive use of any "data records" or "proprietary programs" that have been copied, scanned, or altered;

   b. loss of or reduction in economic or market value of any "data records" or "proprietary programs" that have been copied, scanned, or altered;

   c. theft from "your" "data records" or "proprietary programs" of confidential information through the observation of the "data records" or "proprietary programs" by accessing covered "computers", "your" computer network, or "your" Web site without any alteration or other physical loss or damage to the records or programs.

      Confidential information includes, but is not limited to, customer information, processing methods, or trade secrets; and

   d. except as provided under the Supplemental Income Coverages section of the Commercial Output Program - Income Coverage Part (if attached to this policy), denial of access to or services from "computers", "your" "computer" network, or "your" Web site.

   The most "we" pay in any one occurrence under this Supplemental Marine Coverage is $25,000.

   The most "we" pay for all covered losses under this Supplemental Marine Coverage during each separate 12-month period of this policy is $50,000.

5. **Fine Arts** -- "We" cover direct physical loss caused by a covered peril to "your" "fine arts" at a "covered location". "We" also cover "your" "fine arts" while:

   a. temporarily on display or exhibit away from a "covered location"; or

   b. in transit between a "covered location" and a location where the "fine arts" will be temporarily on display or exhibit.

   The most "we" pay for loss to "fine arts" in any one occurrence or at any one "covered location" is $100,000.

6. **Off Premises Computers** -- "We" cover direct physical loss caused by a covered peril to "computers" in the custody of "you", "your" officers, "your" partners, or "your" employees, while:

   a. away from a "covered location"; or

   b. in transit between a "covered location" and "you", "your" officers, "your" partners, or "your" employees.

   The most "we" pay in any one occurrence for loss to off premises "computers" is $25,000.

7. **Property on Exhibition** -- "We" cover direct physical loss caused by a covered peril to business personal property while temporarily on display or exhibit at locations "you" do not regularly occupy.

   The most "we" pay in any one occurrence for loss to property on exhibition is $50,000.

8. **Property in Transit** -- "We" cover direct physical loss caused by a covered peril to business personal property while in transit, regardless if the loss involves one or more vehicles, conveyances, containers, trailers, or any combination of these.

Copyright, American Association of Insurance Services, Inc., 2002

a. **Property You Have Sold** -- "We" also cover direct physical loss caused by a covered peril to business personal property that "you" have sold and are shipping at the owner's risk. "We" only pay for loss to business personal property that "you" have sold when the shipment has been rejected by the owner because:

1) the property is damaged; and
2) the owner of the property has refused to pay "you".

b. **Rejected Shipments** -- "We" also cover direct physical loss caused by a covered peril to rejected shipments while in due course of transit back to "you" or while awaiting return shipment to "you".

c. **Bills of Lading** -- "You" may accept bills of lading or shipping receipts issued by carriers for hire that limit their liability to less than the actual cash value of the covered property.

d. **Perishable Stock** -- "We" do not cover loss to "perishable stock" resulting from a breakdown of refrigeration equipment on any vehicle, conveyance, container, or trailer.

The most "we" pay in any one occurrence for loss to property in transit is $50,000.

9. **Sales Representative Samples** -- "We" cover direct physical loss caused by a covered peril to samples of "your" stock in trade (and containers) and similar property of others.

"We" cover samples of "your" stock in trade while the property is:

a. in the custody of "your" sales representatives and agents;

b. in "your" custody while acting as a sales representative; or

c. in transit between a "covered location" and "your" sales representatives.

The most "we" pay in any one occurrence for loss to samples of "your" stock in trade is $50,000.

10. **Software Storage** -- "We" cover direct physical loss caused by a covered peril to duplicate and back-up "software" stored at a "software" storage location. Each "software" storage location must be in a separate building which is at least 100 feet away from a "covered location".

The most "we" pay in any one occurrence for loss to duplicate and back-up "software" is $50,000.

11. **Valuable Papers** -- "We" pay up to $100,000 for the cost of research or other expenses necessary to reproduce, replace, or restore lost information that results from a direct physical loss caused by a covered peril to "your" "valuable papers".

## PERILS COVERED

"We" cover risks of direct physical loss unless the loss is limited or caused by a peril that is excluded.

## PERILS EXCLUDED

1. "We" do not pay for loss or damage caused directly or indirectly by one or more of the following excluded causes or events. Such loss or damage is excluded regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events.

Copyright, American Association of Insurance Services, Inc., 2002

AAIS
CO 1000 10 02
Page 18 of 31

a.  **Ordinance or Law** -- Except as provided under Supplemental Coverages - Ordinance or Law, "we" do not pay for loss or increased cost caused by enforcement of any code, ordinance, or law regulating the use, construction, or repair of any building or structure; or requiring the demolition of any building or structure including the cost of removing its debris.

"We" do not pay for loss regardless if the loss is caused by or results from the:

1) enforcement of any code, ordinance, or law even if a building or structure has not been damaged; or
2) increased costs that "you" incur because of "your" compliance with a code, ordinance, or law during the construction, repair, rehabilitation, remodeling, or razing of a building or structure, including the removal of debris, following a direct physical loss to the property.

b.  **Earth Movement** -- "We" do not pay for loss caused by any earth movement (other than "sinkhole collapse") or caused by eruption, explosion, or effusion of a volcano. Earth movement includes, but is not limited to: earthquake; landslide; mudflow; mudslide; mine subsidence; or sinking, rising, or shifting of earth.

"We" do cover direct loss by fire, explosion, or "volcanic action" resulting from either earth movement or eruption, explosion, or effusion of a volcano.

This exclusion does not apply to "computers", "mobile equipment", and the Supplemental Marine Coverages.

c.  **Civil Authority** -- "We" do not pay for loss caused by order of any civil authority, including seizure, confiscation, destruction, or quarantine of property.

"We" do cover loss resulting from acts of destruction by the civil authority to prevent the spread of fire, unless the fire is caused by a peril excluded under this coverage.

d.  **Nuclear Hazard** -- "We" do not pay for loss caused by or resulting from a nuclear reaction, nuclear radiation, or radioactive contamination (whether controlled or uncontrolled; whether caused by natural, accidental, or artificial means). Loss caused by nuclear hazard is not considered loss caused by fire, explosion, or smoke. Direct loss by fire resulting from the nuclear hazard is covered.

e.  **War and Military Action** -- "We" do not pay for loss caused by:

1) war, including undeclared war or civil war; or
2) a warlike action by a military force, including action taken to prevent or defend against an actual or expected attack, by any government, sovereign, or other authority using military personnel or other agents; or
3) insurrection, rebellion, revolution, or unlawful seizure of power including action taken by governmental authority to prevent or defend against any of these.

With regard to any action that comes within the "terms" of this exclusion and involves nuclear reaction, nuclear radiation, or radioactive contamination, this War and Military Action Exclusion will apply in place of the Nuclear Hazard Exclusion.

Copyright, American Association of Insurance Services, Inc., 2002

AAIS
CO 1000 10 02
Page 19 of 31

f.  **Flood** -- "We" do not pay for loss caused by "flood". However, "we" do cover the resulting loss if fire, explosion, or sprinkler leakage results.

This exclusion does not apply to "computers", "mobile equipment", and the Supplemental Marine Coverages.

g.  **Utility Failure** -- Except as provided under Coverage Extensions - Off Premises Utility Service Interruption, "we" do not pay for loss caused by or resulting from the failure of a utility to supply electrical power or other utility service to a "covered location", however caused, if the failure takes place away from the "covered location".

But if failure of a utility to supply electrical or other utility service to a "covered location" results in a covered peril, "we" cover the loss or damage caused by that covered peril.

This exclusion does not apply to "computers", "mobile equipment", and the Supplemental Marine Coverages.

h.  **Sewer Backup and Water Below the Surface** -- Except as provided under Supplemental Coverages - Sewer Backup and Water Below the Surface, "we" do not pay for loss caused by or resulting from:

1)  water that backs up through a sewer or drain; or
2)  water below the surface of the ground, including but not limited to water that exerts pressure on or flows, seeps, or leaks through or into a covered building or structure, sidewalk, driveway, foundation, swimming pool, or other structure.

But if sewer backup and water below the surface results in fire, explosion, or sprinkler leakage, "we" cover the loss or damage caused by that fire, explosion, or sprinkler leakage.

This exclusion does not apply to "computers", "mobile equipment", and the Supplemental Marine Coverages.

2.  "We" do not pay for loss or damage that is caused by or results from one or more of the following excluded causes or events:

a.  **Animal Nesting, Infestation, or Discharge** -- "We" do not pay for loss caused by nesting, infestation, discharge, or release of waste products or secretions by animals, including but not limited to, birds, insects, or vermin.

But if nesting, infestation, discharge, or release of waste products or secretions by animals results in a "specified peril" or breakage of building glass, "we" cover the loss or damage caused by that "specified peril" or breakage of building glass.

b.  **Collapse** -- "We" do not pay for loss caused by collapse, except as provided under the Other Coverages, Collapse. But if collapse results in a covered peril, "we" cover the loss or damage caused by that covered peril.

This exclusion does not apply to "computers", "mobile equipment", and the Supplemental Marine Coverages.

c.  **Computer Virus or Computer Hacking** -- Except as provided under Supplemental Marine Coverages - Virus and Hacking Coverage, "we" do not pay for:

1)  any direct or indirect loss or damage; or
2)  loss of access, loss of use, or loss of functionality

caused by a "computer virus" or by "computer hacking".

Copyright, American Association of Insurance Services, Inc., 2002

AAIS
CO 1000 10 02
Page 20 of 31

d. **Contamination or Deterioration** -- "We" do not pay for loss caused by contamination or deterioration including corrosion, decay, fungus, mildew, mold, rot, rust, or any quality, fault, or weakness in covered property that causes it to damage or destroy itself.

But if contamination or deterioration results in a "specified peril" or breakage of building glass, "we" cover the loss or damage caused by that "specified peril" or breakage of building glass.

This exclusion does not apply to loss caused by corrosion, decay, fungus, mildew, mold, rot, or rust to "computers" that results from direct physical damage by a covered peril to the air conditioning system that services "your" "computers".

e. **Criminal, Fraudulent, Dishonest, or Illegal Acts** -- "We" do not pay for loss caused by or resulting from criminal, fraudulent, dishonest, or illegal acts committed alone or in collusion with another by:

1) "you";
2) others who have an interest in the property;
3) others to whom "you" entrust the property;
4) "your" partners, officers, directors, trustees, joint adventurers; or
5) the employees or agents of 1), 2), 3), or 4) above, whether or not they are at work.

This exclusion does not apply to acts of destruction by "your" employees, but "we" do not pay for "theft" by employees.

This exclusion does not apply to covered property in the custody of a carrier for hire.

f. **Defects, Errors, and Omissions** -- "We" do not pay for loss which results from one or more of the following:

1) an act, error, or omission (negligent or not) relating to:

   a) land use;
   b) the design, specification, construction, workmanship, installation, or maintenance of property;
   c) planning, zoning, development, siting, surveying, grading, or compaction; or
   d) maintenance of property (such as land, structures, or improvements);

   whether on or off a "covered location";

2) a defect, weakness, inadequacy, fault, or unsoundness in materials used in construction or repair, whether on or off a "covered location";
3) the cost to make good an error in design; or
4) a data processing error or omission in programming or giving improper instructions.

In addition, "we" do not pay for loss to business personal property caused by deficiencies or defects in design, specifications, materials, or workmanship, or caused by latent or inherent defects.

But if a defect, error, or omission as described above results in a covered peril, "we" cover the loss or damage caused by that covered peril.

Copyright, American Association of Insurance Services, Inc., 2002

AAIS
CO 1000 10 02
Page 21 of 31

g.  **Electrical Currents** -- "We" do not pay for loss caused by arcing or by electrical currents other than lightning. But if arcing or electrical currents other than lightning result in fire, "we" cover the loss or damage caused by that fire.

"We" do cover the direct loss by a covered peril which occurs at "covered locations" as a result of any power interruption or other utility services.

This exclusion does not apply to "computers".

h.  **Steam Boiler Explosion** -- "We" do not pay for loss caused by an explosion of steam boilers, steam pipes, steam turbines, or steam engines that "you" own or lease or that are operated under "your" control.

But if an explosion of steam boilers, steam pipes, steam turbines, or steam engines results in a fire or combustion explosion, "we" cover the loss or damage caused by that fire or combustion explosion. "We" also cover loss or damage caused by or resulting from the explosion of gas or fuel in a firebox, combustion chamber, or flue.

i.  **Increased Hazard** -- "We" do not pay for loss occurring while the hazard has been materially increased by any means within "your" knowledge or "your" control.

j.  **Loss of Use** -- "We" do not pay for loss caused by loss of use, delay, or loss of market.

k.  **Mechanical Breakdown** -- "We" do not pay for loss caused by mechanical breakdown or rupturing or bursting of moving parts of machinery caused by centrifugal force.

But if a mechanical breakdown or rupturing or bursting of moving parts of machinery caused by centrifugal force results in a "specified peril", the breakage of building glass, or an elevator collision, "we" cover the loss or damage caused by that "specified peril", breakage of building glass, or elevator collision.

This exclusion does not apply to "computers".

l.  **Neglect** -- "We" do not pay for loss caused by "your" neglect to use all reasonable means to save covered property at and after the time of loss.

"We" do not pay for loss caused by "your" neglect to use all reasonable means to save and preserve covered property when endangered by a covered peril.

m.  **Pollutants** -- "We" do not pay for loss caused by or resulting from release, discharge, seepage, migration, dispersal, or escape of "pollutants":

1)  unless the release, discharge, seepage, migration, dispersal, or escape is caused by a "specified peril" or
2)  except as specifically provided under the Supplemental Coverages, Pollutant Cleanup and Removal.

"We" do pay for any resulting loss caused by a "specified peril".

n.  **Seepage** -- "We" do not pay for loss caused by continuous or repeated seepage or leakage of water or steam that occurs over a period of 14 days or more.

Copyright, American Association of Insurance Services, Inc., 2002

o. **Settling, Cracking, Shrinking, Bulging, or Expanding** -- "We" do not pay for loss caused by settling, cracking, shrinking, bulging, or expanding of pavements, footings, foundations, walls, ceilings, or roofs. But if settling, cracking, shrinking, bulging, or expanding results in a "specified peril" or the breakage of building glass, "we" cover the loss or damage caused by that "specified peril" or the breakage of building glass.

This exclusion does not apply to "computers" and "mobile equipment".

p. **Smoke, Vapor, or Gas** -- "We" do not pay for loss caused by smoke, vapor, or gas from agricultural smudging or industrial operations.

This exclusion does not apply to "computers" and "mobile equipment".

q. **Smog** -- "We" do not pay for loss caused by smog . But if smog results in a "specified peril" or the breakage of building glass, "we" cover the loss or damage caused by that "specified peril" or the breakage of building glass.

This exclusion does not apply to "computers" and "mobile equipment".

r. **Temperature/Humidity** -- "We" do not pay for loss to:

1) personal property, except as provided under Coverage Extensions - Off Premises Utility Service Interruption; or
2) "perishable stock";

caused by dryness, dampness, humidity, or changes in or extremes of temperature.

But if dryness, dampness, humidity, or changes in or extremes of temperature, as described above, results in a "specified peril" or the breakage of building glass, "we" cover the loss or damage caused by that "specified peril" or the breakage of building glass.

"We" do pay for loss to "computers" that results from direct physical damage by a covered peril to the air conditioning system that services "your" "computers".

s. **Wear and Tear** -- "We" do not pay for loss caused by wear and tear, marring, or scratching.

But if wear and tear, marring, or scratching results in a "specified peril" or the breakage of building glass, "we" cover the loss or damage caused by that "specified peril" or the breakage of building glass.

t. **Weather** -- "We" do not pay for loss caused by weather conditions if the weather conditions contribute in any way with a cause or event excluded in paragraph 1. above to produce the loss or damage.

But if weather conditions result in a covered peril, "we" cover the loss or damage caused by that covered peril.

u. **Voluntary Parting** -- Except as provided under Coverage Extensions - Fraud and Deceit, "we" do not pay for loss caused by or resulting from voluntary parting with title to or possession of any property because of any fraudulent scheme, trick, or false pretense.

## ADDITIONAL PROPERTY NOT COVERED OR SUBJECT TO LIMITATIONS

1. **Accounts Receivable** -- "We" do not cover loss to accounts receivables that is a result of:

a. an error or omission in bookkeeping, accounting, or billing; or

Copyright, American Association of Insurance Services, Inc., 2002

b. "your" discovery of a discrepancy in "your" books or records if an audit or inventory computation is necessary to prove the factual existence of the discrepancy.

2. **Animals** -- "We" do not cover loss to animals, including but not limited to birds and fish, except death or destruction of animals held for sale caused by "specified perils" or breakage of building glass.

3. **Boilers** -- "We" do not cover loss to steam boilers, steam pipes, steam turbines, or steam engines caused by any condition or occurrence within such equipment. "We" do cover loss to such equipment caused by the explosion of gas or fuel in a firebox, combustion chamber, or flue.

   "We" do not cover loss to hot water boilers or heaters caused by any condition or occurrence within such equipment other than explosion. This exclusion includes bursting, cracking, or rupturing.

4. **Contamination of Perishable Stock Due to Release of Refrigerant** -- "We" do not pay for loss of "perishable stock" due to contamination from the release of a refrigerant, including but not limited to ammonia.

5. **Furs** -- "We" do not cover furs or fur garments for loss by "theft" for more than $10,000 total in any one occurrence.

6. **Glassware/Fragile Articles** -- "We" do not cover breakage of fragile articles such as glassware and porcelains, except as a result of "specified perils" or breakage of building glass.

   This exclusion does not apply to:

   a. glass that is a part of a building or structure;

   b. bottles or other containers held for sale;

   c. lenses of photographic and scientific instruments; or

d. "fine arts" as described under Supplemental Marine Coverages.

7. **Jewelry, Watches, and Precious Stones** -- "We" do not cover more than $10,000 total in any one occurrence for loss by "theft" of jewelry, watches, and precious stones, including but not limited to watch movements, jewels, pearls, and semi-precious stones. This limitation does not apply to items of jewelry, watches, or precious stones worth $100 or less.

8. **Missing Property** -- "We" do not cover missing property when the only proof of loss is unexplained or mysterious disappearance, or shortage discovered on taking inventory, or other instance where there is no physical evidence to show what happened to the property.

   This exclusion does not apply to property in the custody of carriers for hire.

9. **Personal Property in the Open** -- "We" do not cover loss to personal property in the open caused by rain, snow, ice, or sleet.

   This exclusion does not apply to "mobile equipment" or to property in the custody of carriers for hire.

10. **Stamps, Tickets, and/or Letters of Credit** -- "We" do not cover more than $5,000 total in any one occurrence for loss by "theft" to stamps, tickets (such as lottery tickets held for sale), or letters of credit.

11. **Unauthorized or Fraudulent Transfer** -- Except as provided under Coverage Extensions - Fraud and Deceit, "we" do not cover loss of, or loss caused by the transfer or delivery of covered property from a "covered location" or "your" "computer" to a person or place outside of a "covered location" on the basis of unauthorized or fraudulent instructions, including but not limited to instructions transmitted:

    a. by a computer, whether or not owned by "you", or

Copyright, American Association of Insurance Services, Inc., 2002

b.  via any telecommunications transmission method.

12. **Valuable Papers** -- "We" do not cover loss to "valuable papers" caused by errors or omissions in processing or copying.

## OTHER COVERAGES

1.  **Collapse** -- "We" pay for loss caused by direct physical loss involving collapse as described in a., b., and c. below.

    a.  Collapse of a building or structure, any part of a building or structure, or personal property inside a building or structure, if the collapse is caused by one or more of the following:

        1)  "specified perils" or breakage of building glass all only as insured against in this Coverage Part;
        2)  hidden decay, unless "you" know of the presence of the decay prior to the collapse;
        3)  hidden insect or vermin damage, unless "you" know of the damage prior to the collapse;
        4)  weight of people or personal property;
        5)  weight of rain that collects on a roof; or
        6)  use of defective material or methods in construction, remodeling, or renovation if the collapse occurs during the course of the construction, remodeling, or renovation.

            However, if the collapse occurs after construction, remodeling, or renovation is complete and is caused in part by a peril listed in 1) through 5) above, "we" will pay for the loss or damage even if the use of defective material or methods in construction, remodeling, or renovation, contributes to the collapse.

    b.  The following property is covered for loss involving collapse only if the collapse is of a building or structure or any part of a building or structure and is caused by one or more of the causes listed above in 1.a. or collapse caused by "specified perils" or breakage of building glass all only as insured against in this Coverage Part:

        1)  outdoor radio or television antennas (and satellite dishes) and their lead-in wiring, masts, or towers;
        2)  awnings, gutters, and down spouts;
        3)  yard fixtures;
        4)  outdoor swimming pools;
        5)  fences;
        6)  bulkheads, piers, wharves, and docks;
        7)  beach or diving platforms or appurtenances;
        8)  retaining walls that are not part of buildings; and
        9)  bridges, walkways, roadways, and other paved surfaces.

    c.  Collapse means a sudden and unexpected falling in or caving in of a building or structure or any portion of a building or structure with the result that the building or portion of the building cannot be occupied for its intended purpose.

    d.  The following are not considered to be in a state of collapse:

        1)  a building or structure that is standing or any portion of a building that is standing even if it displays evidence of bending, bulging, cracking, expansion, leaning, sagging, settling, or shrinkage;
        2)  a building or structure or any portion of a building structure in danger of falling in or caving; and
        3)  a portion of a building or structure that is standing even if it has separated from another portion of the building or structure.

Copyright, American Association of Insurance Services, Inc., 2002

2. **Tearing Out and Replacing** -- When "we" cover buildings or structures and a loss caused by water, other liquids, powder, or molten material is covered, "we" also pay the cost of tearing out and replacing any part of the covered building or structure to repair damage to the system or appliance from which the water or other substance escapes.

   "We" also pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage results in discharge of any substance from an automatic fire protection system; or is directly caused by freezing.

## WHAT MUST BE DONE IN CASE OF LOSS

1. **Notice** -- In case of a loss, "you" must:

   a. give "us" or "our" agent prompt notice including a description of the property involved ("we" may request written notice);

   b. give notice to the police when the act that causes the loss is a crime; and

   c. give notice to the credit card company if the loss involves a credit card.

2. **Protect Property** -- "You" must take all reasonable steps to protect covered property at and after an insured loss to avoid further loss. "We" will pay the reasonable costs incurred by "you" for necessary repairs or emergency measures performed solely to protect covered property from further damage by a peril insured against if a peril insured against has already caused a loss to covered property. "You" must keep an accurate record of such costs. However "we" will not pay for such repairs or emergency measures performed on property which has not been damaged by a peril insured against. This does not increase "our" "limit".

3. **Proof of Loss** -- "You" must send "us", within 60 days after "our" request, a signed, sworn proof of loss. This must include the following information:

   a. the time, place, and circumstances of the loss;

   b. other policies of insurance that may cover the loss;

   c. "your" interest and the interests of all others in the property involved, including all mortgages and liens;

   d. changes in title or occupancy of the covered property during the policy period;

   e. detailed estimates for repair or replacement of covered property; and

   f. an inventory of damaged and undamaged covered property showing in detail the quantity, description, cost, actual cash value, and amount of the loss. "You" must attach to the inventory copies of all bills, receipts, and related documents that substantiate the inventory.

4. **Examination** -- "You" must submit to examination under oath in matters connected with the loss as often as "we" reasonably request and give "us" sworn statements of the answers. If more than one person is examined, "we" have the right to examine and receive statements separately and not in the presence of others.

5. **Records** -- "You" must produce records, including tax returns and bank microfilms of all canceled checks relating to value, loss, and expense and permit copies and extracts to be made of them as often as "we" reasonably request.

6. **Damaged Property** -- "You" must exhibit the damaged and undamaged property as often as "we" reasonably request and allow "us" to inspect or take samples of the property.

Copyright, American Association of Insurance Services, Inc., 2002

7. **Volunteer Payments** -- "You" must not, except at "your" own expense, voluntarily make any payments, assume any obligations, pay or offer any rewards, or incur any other expenses except as respects protecting property from further damage.

8. **Abandonment** -- "You" may not abandon the property to "us" without "our" written consent.

9. **Cooperation** -- "You" must cooperate with "us" in performing all acts required by the Commercial Output Program coverages.

## VALUATION

1. **Replacement Cost** -- The value of covered property will be based on replacement cost without any deduction for depreciation unless Actual Cash Value is indicated on the "schedule of coverages".

   The replacement cost is limited to the cost of repair or replacement with similar materials on the same site and used for the same purpose. The payment will not exceed the amount "you" spend to repair or replace the damaged or destroyed property.

   Replacement cost valuation does not apply until the damaged or destroyed property is repaired or replaced. "You" may make a claim for actual cash value before repair or replacement takes place, and later for the replacement cost if "you" notify "us" of "your" intent within 180 days after the loss.

   This replacement cost provision does not apply to paragraphs 3. through 13. below.

2. **Actual Cash Value** -- When Actual Cash Value is indicated on the "schedule of coverages" for covered property, the value of covered property will be based on the actual cash value at the time of the loss (with a deduction for depreciation) except as provided in paragraphs 3. through 13. below.

3. **Fine Arts** -- The value of "fine arts" will be based on the fair market value at the time of loss.

4. **Glass** -- The value of glass will be based on the cost of safety glazing material where required by code, ordinance, or law.

5. **Hardware** -- The following is the value of "hardware":

   a. **Hardware That Is Replaced** -- The value of "hardware" that is replaced will be based on the cost of replacing the "hardware" with new equipment that is functionally comparable to the "hardware" that is being replaced.

   b. **Hardware That Is Not Replaced** -- The value of "hardware" that is not repaired or replaced will be based on the actual cash value at the time of loss (with a deduction for depreciation).

   c. **Partial Loss** -- In no event will "we" pay more than the reasonable cost of restoring partially damaged "hardware" to its condition directly prior to the damage.

6. **Software** -- The following is the value of "software":

   a. **Programs and Applications** -- The value of "programs and applications" will be based on the cost to reinstall the "programs or applications" from the licensed discs that were originally used to install the programs or applications.

   If the original licensed discs are lost, damaged, or can no longer be obtained, the value of "programs and applications" will be based on the cost of the most current version of the "programs or applications".

Copyright, American Association of Insurance Services, Inc., 2002

b. **Proprietary Programs** -- The value of "proprietary programs" will be based on the cost of reproduction from duplicate copies. The cost of reproduction includes, but is not limited to, the cost of labor to copy or transcribe from duplicate copies.

If duplicate copies do not exist, the value of "proprietary programs" will be based on the cost of research or other expenses necessary to reproduce, replace, or restore lost "proprietary programs".

c. **Data Records** -- The value of "data records" will be based on the cost of reproduction from duplicate copies. The cost of reproduction includes, but is not limited to, the cost of labor to copy or transcribe from duplicate copies.

If duplicate copies do not exist, the value of "data records" will be based on the cost of research or other expenses necessary to reproduce, replace, or restore lost files, documents, and records.

d. **Media** -- The value of "media" will be based on the cost to repair or replace the "media" with material of the same kind or quality.

7. **Merchandise Sold** -- The value of merchandise that "you" have sold but not delivered will be based on the selling price less all discounts and unincurred expenses.

8. **Manufactured Stock** -- The value of stock manufactured by "you" will be based on the price that such stock would have been sold for, less all discounts and unincurred expenses.

9. **Pair or Set** -- The value of a lost or damaged article which is part of a pair or set is based on a reasonable proportion of the value of the entire pair or set. The loss is not considered a total loss of the pair or set.

10. **Loss to Parts** -- The value of a lost or damaged part of an item that consists of several parts when it is complete is based on the value of only the lost or damaged part or the cost to repair or replace it.

11. **Tenant's Improvements** -- The value of lost or damaged tenant's improvements and the loss of undamaged tenant's improvements due to the cancellation of a lease will be based on the replacement cost if repaired or replaced at "your" expense within 24 months.

The value of lost or damaged tenant's improvements and the loss of undamaged tenant's improvements due to the cancellation of a lease will be based on a portion of "your" original cost if not repaired or replaced within 24 months. This portion is determined as follows:

a. divide the number of days from the date of the loss to the expiration date of the lease by the number of days from the date of installation to the expiration date of the lease; and

b. multiply the figure determined in 11.a. above by the original cost.

If "your" lease contains a renewal option, the expiration of the lease in this procedure will be replaced by the expiration of the renewal option period.

Lost or damaged tenant's improvements and the loss of undamaged tenant's improvements due to the cancellation of a lease are not covered if repaired or replaced at another's expense.

12. **Valuable Papers** -- The value of "valuable papers" will be based on their actual cash value at the time of loss.

13. **Accounts Receivable** -- The value of accounts receivable will be based on the total sum of accounts receivable due. From this total "we" will deduct:

a. all amounts due from the records of accounts receivable that are not lost;

Copyright, American Association of Insurance Services, Inc., 2002

b.  all amounts due that can be established by other means;

c.  all amounts due that "you" have collected from the records that are lost;

d.  all unearned interest and service charges; and

e.  an amount to allow for bad debts.

If a loss occurs and "you" cannot establish the actual accounts receivable due, it will be determined as follows:

a.  "We" will determine the total of the average monthly accounts receivable amounts for the 12 month period that directly precedes the month in which the loss occurred.

b.  "We" will adjust the total for any normal variance in the accounts receivable amount for the month in which the loss occurred.

## HOW MUCH WE PAY

1.  **Insurable Interest** -- "We" do not cover more than "your" insurable interest in any property.

2.  **Deductible** -- "We" pay only that part of "your" loss over the deductible amount stated on the "schedule of coverages" in any one occurrence. The deductible applies to the loss before application of any coinsurance or reporting provisions.

3.  **Earthquake Period** -- All earthquakes or volcanic eruptions that occur within a 168-hour period will be considered a single event. This 168-hour period is not limited by the policy expiration.

4.  **Loss Settlement Terms** -- Subject to paragraphs 1., 2., 3., 5., 6., and 7. under How Much We Pay and coinsurance provisions (if applicable), "we" pay the lesser of:

a.  the amount determined under Valuation;

b.  the cost to repair, replace, or rebuild the property with material of like kind and quality to the extent practicable; or

c.  the "limit" that applies to covered property.

5.  **Insurance Under More Than One Coverage** -- If more than one coverage of this policy insures the same loss, "we" pay no more than the actual claim, loss, or damage sustained.

6.  **Insurance Under More Than One Policy** -- "You" may have another policy subject to the same plan, "terms", conditions, and provisions as this policy. If "you" do, "we" will pay "our" share of the covered loss. "Our" share is the proportion that the applicable "limit" under this policy bears to the "limit" of all policies covering on the same basis.

If there is another policy covering the same loss, other than that described above, "we" will pay only for the amount of covered loss in excess of the amount due from that other policy, whether "you" can collect on it or not. But "we" will not pay more than the applicable "limit".

7.  **Automatic Increase** -- The "limit" on the "schedule of coverages" or the Scheduled Locations Endorsement is automatically increased annually by the annual percentage shown on the "schedule of coverages" or Scheduled Locations Endorsement for Automatic Increase.

Copyright, American Association of Insurance Services, Inc., 2002

## LOSS PAYMENT

1. **Our Options** -- In the event of loss covered by this coverage form, "we" have the following options:

   a. pay the value of the lost or damaged property;

   b. pay the cost of repairing or replacing the lost or damaged property;

   c. rebuild, repair, or replace the property with other property of equivalent kind and quality, to the extent practicable, within a reasonable time; or

   d. take all or any part of the property at the agreed or appraised value.

   "We" must give "you" notice of "our" intent to rebuild, repair, or replace within 30 days after receipt of a duly executed proof of loss.

2. **Your Losses** -- "We" will adjust all losses with "you". Payment will be made to "you" unless another loss payee is named in the policy. An insured loss will be payable 30 days after a satisfactory proof of loss is received, and the amount of the loss has been established either by written agreement with "you" or the filing of an appraisal award with "us".

3. **Property of Others** -- Losses to property of others may be adjusted with and paid to:

   a. "you" on behalf of the owner; or

   b. the owner.

   If "we" pay the owner, "we" do not have to pay "you". "We" may also choose to defend any suits arising from the owners at "our" expense.

## OTHER CONDITIONS

In addition to the "terms" which are contained in other sections of the Commercial Output Program coverages, the following conditions apply.

1. **Appraisal** -- If "you" and "we" do not agree on the amount of the loss or the value of covered property, either party may demand that these amounts be determined by appraisal.

   If either makes a written demand for appraisal, each will select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days of receipt of the written demand. The two appraisers will then select a competent, impartial umpire. If the two appraisers are unable to agree upon an umpire within 15 days, "you" or "we" can ask a judge of a court of record in the state where the property is located to select an umpire.

   The appraisers will then determine and state separately the amount of each loss.

   The appraisers will also determine the value of covered property items at the time of the loss, if requested.

   If the appraisers submit a written report of any agreement to "us", the amount agreed upon will be the amount of the loss. If the appraisers fail to agree within a reasonable time, they will submit only their differences to the umpire. Written agreement so itemized and signed by any two of these three sets the amount of the loss.

   Each appraiser will be paid by the party selecting that appraiser. Other expenses of the appraisal and the compensation of the umpire will be paid equally by "you" and "us".

Copyright, American Association of Insurance Services, Inc., 2002

2.  **Benefit to Others** -- Insurance under the Commercial Output Program coverages will not directly or indirectly benefit anyone having custody of "your" property.

3.  **Conformity With Statute** -- When a condition of this coverage is in conflict with an applicable law, that condition is amended to conform to that law.

4.  **Control of Property** -- The Commercial Output Policy coverages are not affected by any act or neglect beyond "your" control.

5.  **Death** -- If "you" die, "your" rights and duties will pass to "your" legal representative but only while acting within the scope of duties as "your" legal representative. Until "your" legal representative is appointed, anyone having proper temporary custody of "your" property will have "your" rights and duties but only with respect to that property.

6.  **Liberalization** -- If a revision of a form or endorsement which broadens Commercial Output Program coverages without additional premium is adopted during the policy period, or within six months before this coverage is effective, the broadened coverage will apply.

7.  **Misrepresentation, Concealment, or Fraud** -- These Commercial Output Program coverages are void as to "you" and any other insured if, before or after a loss:

    a.  "you" or any other insured have willfully concealed or misrepresented:

        1)  a material fact or circumstance that relates to this insurance or the subject thereof; or
        2)  "your" interest herein; or

    b.  there has been fraud or false swearing by "you" or any other insured with regard to a matter that relates to this insurance or the subject thereof.

8.  **Policy Period** -- "We" pay for a covered loss that occurs during the policy period.

9.  **Recoveries** -- If "we" pay "you" for the loss and lost or damaged property is recovered, or payment is made by those responsible for the loss, the following provisions apply:

    a.  "you" must notify "us" promptly if "you" recover property or receive payment;

    b.  "we" must notify "you" promptly if "we" recover property or receive payment;

    c.  any recovery expenses incurred by either are reimbursed first;

    d.  "you" may keep the recovered property, but "you" must refund to "us" the amount of the claim paid, or any lesser amount to which "we" agree; and

    e.  if the claim paid is less than the agreed loss due to a deductible or other limiting "terms" of this policy, any recovery will be prorated between "you" and "us" based on "our" respective interest in the loss.

10. **Restoration of Limits** -- Except as indicated under Supplemental Coverages - Pollutant Cleanup and Removal and Supplemental Marine Coverages - Virus and Hacking Coverage, any loss "we" pay under the Commercial Output Program coverages does not reduce the "limits" applying to a later loss.

11. **Subrogation** -- If "we" pay for a loss, "we" may require "you" to assign to "us" "your" right of recovery against others. "You" must do all that is necessary to secure "our" rights. "We" will not pay for a loss if "you" impair this right to recover.

    "You" may waive "your" right to recover from others in writing before a loss occurs.

12. **Suit Against Us** -- No one may bring a legal action against "us" under this coverage unless:

    a.  all of the "terms" of the Commercial Output Program coverages have been complied with; and

Copyright, American Association of Insurance Services, Inc., 2002

AAIS
CO 1000 10 02
Page 31 of 31

b.  the suit has been brought within two years after "you" first have knowledge of the loss.

    If any applicable law makes this limitation invalid, then suit must begin within the shortest period permitted by the law.

13. **Territorial Limits** -- "We" cover property while in the United States of America, its territories and possessions, Canada, and Puerto Rico.

    However, "we" do cover foreign shipments as described under Overseas Transit.

14. **Mortgage Provisions** -- If a mortgagee (mortgage holder) is named in this policy, loss to building property will be paid to the mortgagee and "you" as their interest appears. If more than one mortgagee is named, they will be paid in order of precedence.

    The insurance for the mortgagee continues in effect even when "your" insurance may be void because of "your" acts, neglect, or failure to comply with the coverage "terms". The insurance for the mortgagee does not continue in effect if the mortgagee is aware of changes in ownership or substantial increase in risk and does not notify "us".

    If "we" cancel this policy, "we" will notify the mortgagee at least ten days before the effective date of cancellation if "we" cancel for "your" nonpayment of premium, or 30 days before the effective date of cancellation if "we" cancel for any other reason.

    "We" may request payment of the premium from the mortgagee if "you" fail to pay the premium.

    If "we" pay the mortgagee for a loss where "your" insurance may be void, the mortgagee's right to collect that portion of the mortgage debt from "you" then belongs to "us". This does not affect the mortgagee's right to collect the remainder of the mortgage debt from "you".

As an alternative, "we" may pay the mortgagee the remaining principal and accrued interest in return for a full assignment of the mortgagee's interest and any instruments given as security for the mortgage debt.

If "we" choose not to renew this policy, "we" will give written notice to the mortgagee at least ten days before the expiration date of this policy.

15. **Vacancy - Unoccupancy** -- "We" do not pay for loss caused by attempted "theft"; breakage of building glass; sprinkler leakage (unless "you" have protected the system against freezing); "theft"; vandalism; or water damage occurring while the building or structure has been:

a.  vacant for more than 60 consecutive days; or

b.  unoccupied for more than:

    1)  60 consecutive days; or
    2)  the usual or incidental unoccupancy period for a "covered location";

    whichever is longer.

The amount "we" will pay will be reduced by 15% for any loss by a covered peril, not otherwise excluded above, if the building or structure is vacant or unoccupied, as described above.

Unoccupied means that the customary activities or operations at a "covered location" are suspended, but business personal property has not been removed. The building or structure will be considered vacant and not unoccupied when the occupants have moved, leaving the building or structure empty or containing only limited business personal property. Buildings or structures under construction are not considered vacant or unoccupied.

**CO 1000 10 02**

Copyright, American Association of Insurance Services, Inc., 2002

# COMMERCIAL OUTPUT PROGRAM
# INCOME COVERAGE PART

Coverage provided under this coverage part is also subject to the "terms" and conditions in the Commercial Output Program - Property Coverage Part under the sections titled Agreement, Definitions, Property Not Covered, Perils Covered, Perils Excluded, What Must Be Done In Case Of Loss, Loss Payment, and Other Conditions.

## COVERAGE OPTIONS

One of the following described coverage options applies when that option is indicated on the "schedule of coverages":

1.   Earnings, "rents", and extra expense.

2.   Earnings and extra expense.

3.   "Rents" and extra expense.

4.   Extra expense only.

If option 1. above is selected, the term Earnings includes "rents". When Option 3. is indicated, the term Earnings means only "rents".

## COVERAGE

"We" provide the following coverage unless the coverage is excluded or subject to limitations.

"We" provide the coverages described below during the "restoration period" when "your" "business" is necessarily wholly or partially interrupted by direct physical loss of or damage to property at a "covered location" or in the open (or in vehicles) within 1,000 feet thereof as a result of a covered peril.

If "you" lease, rent, or do not own the building "you" occupy, for the purposes of determining an Income Coverage loss, "your" location is the space that "you" lease, rent, or occupy, including but not limited to:

1.   all passageways to "your" location within the building; and

2.   "your" business personal property in the open (or in a vehicle) within 1,000 feet.

### EARNINGS

"We" cover "your" actual loss of net income (net profit or loss before income taxes) that would have been earned or incurred and continuing operating expenses normally incurred by "your" "business", including but not limited to payroll expense.

The net sales value of goods that would have been produced is included in net income for manufacturing risks.

### EXTRA EXPENSE

"We" cover only the extra expenses that are necessary during the "restoration period" that "you" would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a covered peril.

"We" cover any extra expense to avoid or reduce the interruption of "business" and continue operating at a "covered location", replacement location, or a temporary location. This includes expenses to relocate and costs to outfit and operate a replacement or temporary location.

"We" will also cover any extra expense to reduce the interruption of "business" if it is not possible for "you" to continue operating during the "restoration period".

To the extent that they reduce a loss otherwise payable under this Coverage Part, "we" will cover any extra expenses to:

1.  repair, replace, or restore any property; and

2.  research, replace, or restore information on damaged "valuable papers" or "data records".

## EXCLUSIONS AND LIMITATIONS

The following exclusions apply in addition to the exclusions and limitations in the Commercial Output Program - Property Coverage Part.

1.  **Finished Stock** -- "We" do not cover loss caused by or resulting from loss or damage to stock manufactured by "you" which is ready to pack, ship, or sell. This includes loss caused by or resulting from the time required to reproduce such stock. This does not apply to stock manufactured and held for sale at retail outlets that "you" own and that are insured under this Coverage Part.

2.  **Leases, Licenses, Contracts, or Orders** -- "We" do not cover any increase in loss due to the suspension, lapse, or cancellation of leases, licenses, contracts, or orders.

    However, "we" do cover loss during the "restoration period" if the suspension, lapse, or cancellation results directly from the interruption of "your" "business".

    "We" do not cover any extra expense caused by the suspension, lapse, or cancellation of leases, licenses, contracts, or orders beyond the "restoration period".

3.  **Strikes, Protests, and Other Interference** -- "We" do not cover any increase in loss due to interference by strikers or other persons at a "covered location". This applies to interference with rebuilding, repairing, or replacing the property or with resuming "your" "business".

## INCOME COVERAGE EXTENSIONS

The following Income Coverage Extensions indicate an applicable "limit" or limitation. This "limit" or limitation may also be shown on the "schedule of coverages". If a different "limit" or limitation is indicated on the "schedule of coverages", that "limit" or limitation will apply instead of the "limit" or limitation shown below.

The following Income Coverage Extensions are part of and not in addition to the applicable Income Coverage "limit".

1.  **Interruption by Civil Authority** -- "We" extend "your" coverage for earnings and extra expense to include loss sustained while access to "covered locations" or a "dependent location" is specifically denied by an order of civil authority. This order must be a result of direct physical loss of or damage to property, other than at a "covered location" and must be caused by a covered peril. Unless otherwise indicated on the "schedule of coverages", this Income Coverage Extension is limited to 30 consecutive days from the date of the order.

2.  **Period of Loss Extension After Business Resumes** -- "We" extend "your" coverage for earnings to cover loss from the date the covered property that incurred the loss is rebuilt, repaired, or replaced and "business" is resumed or tenantability is restored until:

    a.  the end of 90 consecutive days (unless otherwise indicated on the "schedule of coverages"); or

    b.  the date "you" could reasonably resume "your" "business" to the conditions that would generate the earnings amount or "rents" that would have existed had no loss or damage occurred,

    whichever is earlier.

    Loss of earnings or "rents" must be caused by direct physical loss of or damage to property at a "covered location" or in the open (or in vehicles) within 1,000 feet thereof as a result of a covered peril.

AAIS
CO 1001 04 02
Page 3 of 6

Supplemental Income coverages

Unless otherwise indicated, the following Supplemental Income Coverages apply separately to each "covered location".

The following Supplemental Income Coverages indicate an applicable "limit". This "limit" may also be shown on the "schedule of coverages". If a different "limit" is indicated on the "schedule of coverages", that "limit" will apply instead of the "limit" shown below.

Unless otherwise indicated, a "limit" for a Supplemental Income Coverage provided below is separate from, and not part of, the applicable Income Coverage "limit". The "limit" available for coverage described under a Supplemental Income Coverage:

a.  is the only "limit" available for the described coverage; and

b.  is not the sum of the "limit" indicated for a Supplemental Income Coverage and the Income Coverage "limit".

The "limit" provided under a Supplemental Income Coverage cannot be combined or added to the "limit" for any other Supplemental Income Coverage.

1.  **Computer Virus and Hacking --**

    a.  **Coverage --** Coverage for earnings and/or extra expense is extended to loss of earnings or extra expenses caused by a "computer virus" or by "computer hacking" that results in:

        1)  direct physical loss or damage to covered "computers", "your" computer network, or "your" Web site; or
        2)  denial of access to or services from "your" "computer", "your" computer network, or "your" Web site.

b.  **Exclusions --** "We" do not cover loss of earnings or extra expenses under this Supplemental Income Coverage that results from:

    1)  loss of exclusive use of any "data records" or "proprietary programs" that have been copied, scanned, or altered;
    2)  loss of or reduction in economic or market value of any "data records" or "proprietary programs" that have been copied, scanned, or altered; or
    3)  theft from "your" "data records" or "proprietary programs" of confidential information through the observation of the "data records" or "proprietary programs" by accessing covered "computers", "your" computer network, or "your" Web site without any alteration or other physical loss or damage to the records or programs.

        Confidential information includes, but is not limited to customer information, processing methods, or trade secrets.

c.  **Waiting Period --** Unless otherwise indicated on the "schedule of coverages", "we" do not pay for "your" loss of earnings under this Supplemental Income Coverage until after the first 12 hours following the direct physical loss of or damage to "your" "computers", "your" computer network, or "your" Web site. This waiting period does not apply to extra expenses that "you" incur.

d.  **Applicable Limit --** The most "we" pay in any one occurrence under this Supplemental Income Coverage is $25,000.

    The most "we" pay for all covered losses under this Supplemental Income Coverage during each 12-month period of this policy is $75,000.

2. **Dependent Locations** -- Coverage for earnings and/or extra expense is extended to loss of earnings or extra expenses that "you" incur during the "restoration period" when "your" "business" is interrupted by direct physical loss of or damage, caused by a covered peril, to property at a "dependent location".

The most "we" pay in any one occurrence under this Supplemental Income Coverage is $100,000.

3. **Off Premises Utility Service Interruption** --

a. **Coverage** -- Coverage for earnings and/or extra expense is extended to loss of earnings or extra expenses that "you" incur during the "restoration period" when "your" "business" is interrupted due to the interruption of an off premises utility services when the interruption is a result of direct physical loss or damage by a covered peril to property that is not located at a "covered location" and that is owned by a utility, a landlord, or another supplier who provides "you" with:

   1) power or gas;
   2) telecommunications, including but not limited to Internet access; or
   3) water, including but not limited to waste water treatment.

b. **Overhead Transmission Lines** -- If the "schedule of coverages" indicates that overhead transmission lines are excluded, coverage under this Supplemental Income Coverage does not include loss to overhead transmission lines that deliver utility service to "you". Overhead transmission lines include, but are not limited to:

   1) overhead transmission and distribution lines;
   2) overhead transformers and similar equipment; and
   3) supporting poles and towers.

c. **Waiting Period** -- Unless otherwise indicated on the "schedule of coverages", "we" do not pay for "your" loss of earnings under this Supplemental Income Coverage until after the first 12 hours following the direct physical loss of or damage to the property owned by a utility, a landlord, or another supplier. This waiting period does not apply to extra expenses that "you" incur.

d. **Applicable Limit** -- The most "we" pay in any one occurrence under this Supplemental Income Coverage is $10,000.

4. **Pollutant Cleanup and Removal** -- When there is a loss to a "covered location" caused by a covered peril, coverage for earnings is extended to loss of earnings during the "restoration period" due to the increased time of interruption of "your" "business" caused by the enforcement of any ordinance, law, or decree that requires "you" to extract "pollutants" from land or water at the "covered location".

This Supplemental Income Coverage only applies if the discharge, dispersal, seepage, migration, release, or escape of the "pollutants" into the land or water at the "covered locations" is caused by a covered peril and occurs during the policy period.

Coverage for earnings is not extended to loss of earnings during the "restoration period" due to the increased time of interruption of "your" "business" caused by the enforcement of any ordinance, law, or decree that requires "you" to test, evaluate, observe, or record the existence, level, or effects of "pollutants". However, "we" cover the increased period of interruption when testing is necessary for the extraction of "pollutants" from land or water.

The ordinance, law, or decree must be in force at the time of loss.

The most "we" pay in any one occurrence or at any one location under this Supplemental Income Coverage is $25,000.

**AAIS**
**CO 1001 04 02**
**Page 5 of 6**

5. **Contract Penalty** -- Coverage for earnings is extended to cover contract penalties that "you" are assessed or are required to pay because "you" are unable to complete a project or fill an order in accordance with contract terms or conditions.

"Your" inability to complete a project or fill an order on time must be a direct result of physical loss of or damage to covered property caused by a covered peril at a "covered location".

The most "we" pay in any one occurrence under this Supplemental Income Coverage is $25,000.

The most "we" pay for all covered losses under this Supplemental Income Coverage during each 12-month period of this policy is $100,000.

6. **Property In Transit, On Exhibition, or In The Custody Of Sales Representatives** -- Coverage for earnings is extended to loss of earnings during the "restoration period" when "your" "business" is interrupted as a result of a direct physical loss, caused by a covered peril, to property in transit, on exhibition, or in the custody of sales representatives as described under the Supplemental Marine Coverages in Commercial Output Program - Property Coverage Part.

The most "we" pay in any one occurrence under this Supplemental Income Coverage is $10,000.

## WHAT MUST BE DONE IN CASE OF LOSS

Other "terms" relating to What Must Be Done In Case Of Loss also apply. These "terms" are described in the Commercial Output Program - Property Coverage Part.

**Intent to Continue Business** -- If "you" intend to continue "your" "business", "you" must resume all or part of "your" "business" as soon as possible.

## VALUATION

1. **Earnings** -- In determining an earnings loss "we" consider:

    a. the experience of "your" "business", before the loss and the probable experience during the time of interruption had no loss occurred;

    b. "your" continuing operating expenses normally incurred by "your" "business", including but not limited to payroll expense necessary to resume "business" to a similar level of service that existed before the occurrence of direct physical loss or damage; and

    c. pertinent sources of information and reports including:

        1) "your" accounting procedures and financial records;
        2) bills, invoices, and other vouchers;
        3) contracts, deeds, and liens;
        4) reports on feasibility and status; and
        5) records documenting "your" budget and marketing objectives and results.

"We" do not pay for any increase in loss due to "your" failure to use reasonable efforts to resume all or part of "your" "business". This includes making use of other locations and property to reduce the loss.

If "your" "business" is not resumed as soon as possible, or if it is not resumed at all, the value of loss payment is based on the period of time it would have otherwise taken to resume "your" "business" as soon as possible.

Only as regards coverage described under Dependent Locations in the Income Coverage Extensions, "we" will reduce the amount of "your" loss of earnings to the extent "you" can resume "your" "business" by using other available sources of materials or outlets for "your" products.

AAIS
CO 1001 04 02
Page 6 of 6

2. **Extra Expense** -- In determining extra expenses that "you" have incurred, "we" consider the salvage value of any property bought for temporary use during the "restoration period" and it will be deducted from the amount of loss determined for extra expense.

## HOW MUCH WE PAY

Other "terms" relating to How Much We Pay also apply. These "terms" are described in the Commercial Output Program - Property Coverage Part.

"We" pay no more than the Income Coverage "limit" indicated on the "schedule of coverages" for any one loss. Payment for earnings, extra expense, and "rents" combined does not exceed the "limit".

## LOSS PAYMENT

See the Commercial Output Program - Property Coverage Part.

## OTHER CONDITIONS

The following condition applies as it relates to this Coverage Part, other "terms" also apply. These "terms" are described in the Commercial Output Program - Property Coverage Part.

**Appraisal** -- If "you" and "we" do not agree on the amount of net income (net profit or loss before income taxes), payroll expense, and operating expenses, or the amount of loss, either party may demand that these amounts be determined by appraisal in accordance with the provisions described in the Commercial Output Program - Property Coverage Part under Other Conditions, Appraisal.

**CO 1001 04 02**
Copyright, American Association of Insurance Services, 2002

AAIS
CO 1003 04 02
Page 1 of 10

# EQUIPMENT BREAKDOWN COVERAGE PART

Coverage provided under this coverage part is also subject to the "terms" and conditions in the Commercial Output Program - Property Coverage Part under the sections titled Agreement, Definitions, Property Not Covered, What Must Be Done In Case Of Loss, Loss Payment, and Other Conditions.

Reference to Equipment Breakdown Schedule or schedule in this coverage part means the Equipment Breakdown Schedule or the "schedule of coverages".

## ADDITIONAL DEFINITIONS

Some of the following definitions may not appear elsewhere in this coverage part, but may appear in the Equipment Breakdown Schedule.

1.  "Boilers and vessels" means:

    a.  Boilers, including attached steam, condensate, and feedwater piping; and

    b.  Fired or unfired pressure vessels subject to vacuum or internal pressure other than the static pressure of its contents.

2.  "Production machinery" means machines or apparatus that process or produce a product intended for eventual sale. This includes all component parts of such machine or apparatus and any other equipment used exclusively with such machine or apparatus.

3.  "Suit" means a judicial proceeding that has been set up to determine liability and damages for loss to property of others consisting of covered property that is in "your" care, custody, or control. Judicial proceedings also includes arbitration proceedings that "you" may be required to submit to.

## COVERAGE

**Property Damage** -- "We" cover direct physical loss to covered property caused by or resulting from an "accident" to "covered equipment" at "covered locations" .

The term covered property as used in this coverage part means the types of property described under the Property Covered section of the Commercial Output Program - Property Coverage Part as well as the covered property described in the Supplemental and Supplemental Marine Coverages.

## ADDITIONAL PROPERTY NOT COVERED

In addition to the property identified under the Property Not Covered in the Commercial Output Program - Property Coverage Part, the following additional property is not covered:

1.  **Animals** -- "We" do not cover animals, including but not limited to:

    a.  birds and fish;

    b.  animals owned by others and boarded by "you"; and

    c.  animals "you" own and hold for sale.

2.  **Perishable Stock** -- "We" do not pay for loss of "perishable stock" due to:

    a.  "spoilage" that results from an "accident" to "covered equipment";

    b.  contamination from the release of a refrigerant, including but not limited to ammonia;

c.  "spoilage" that results from a complete or partial lack of electrical power; or

d.  "spoilage" that results from a fluctuation of electrical current.

## COVERAGE EXTENSIONS

If indicated on the Equipment Breakdown Schedule, the following additional coverages also apply to loss caused by or resulting from an "accident" to "covered equipment". The most that "we" will pay for loss arising from any "one accident" is the amount indicated on the schedule for the applicable Coverage Extension.

If two or more "limits" apply to the same portion of a loss, "we" will only pay the smaller "limit" for that portion of the loss.

Except as otherwise provided, the "limits" for the additional coverages are a part of, and not in addition to, the Property Damage Limit.

1.  **Income Coverages** --

    a.  **Coverage** -- If a "limit" is indicated on the Equipment Breakdown Schedule, "we" provide the coverages described below during the "restoration period" when "your" "business" is necessarily wholly or partially interrupted as a result of an "accident" to "covered equipment".

        This coverage applies only when the "accident" to "covered equipment" occurs at "covered locations" or in the open (or in vehicles) within 1,000 feet thereof.

        If "you" lease, rent, or do not own the building "you" occupy, for the purposes of determining an Income Coverage loss, "your" location is the space that "you" lease, rent, or occupy, including but not limited to:

        1)  all passageways to "your" location within the building; and

        2)  "your" business personal property in the open (or in a vehicle) within 1,000 feet.

    b.  **Coverage Options** -- Coverage options include:

        1)  Earnings, "rents", and extra expense.
        2)  Earnings and extra expense.
        3)  "Rents" and extra expense.
        4)  Extra expense only

        Earnings includes "rents" when option 1. is selected. Earnings means only "rents" when option 3. is selected.

    c.  **Earnings** -- "We" cover "your" actual loss of net income (net profit or loss before income taxes) that would have been earned or incurred and continuing operating expenses normally incurred by "your" "business", including but not limited to payroll expense.

        The net sales value of goods that would have been produced is included in net income for manufacturing risks.

    d.  **Extra Expense** -- "We" cover only the extra expenses that are necessary during the "restoration period" that "you" would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from an "accident" to "covered equipment".

        "We" cover any extra expense to avoid or reduce the interruption of "business" and continue operating at a "covered location", replacement location, or a temporary location. This includes expenses to relocate and costs to outfit and operate a replacement or temporary location.

        "We" will also cover any extra expense to reduce the interruption of "business" if it is not possible for "you" to continue operating during the "restoration period".

To the extent that they reduce a loss otherwise payable under this Coverage Part, "we" will cover any extra expenses to:

1) repair, replace, or restore any property; and
2) research, replace, or restore information on damaged "valuable papers" or "data records".

e. **Period of Loss Extension After Business Resumes** -- "We" extend "your" coverage for earnings to cover loss from the date the covered property that incurred the loss is rebuilt, repaired, or replaced until:

1) the end of 30 consecutive days (unless otherwise indicated on the schedule); or
2) the date "you" could reasonably resume "your" "business" to the conditions that would generate the earnings amount or "rents" that would have existed had no loss or damage occurred,

whichever is earlier. This does not increase the "limit".

2. **Expediting Expenses** -- "We" pay the reasonable extra costs to expedite permanent repairs or replacement and make temporary repairs to damaged covered property.

3. **Pollutants** -- "We" pay for the additional cost to repair or replace covered property because of contamination by "pollutants". This includes the additional expenses to clean up or dispose of such property.

Additional expenses mean those beyond what would have been required had no "pollutants" been involved.

"We" will also pay for additional loss as described under Income Coverages caused by contamination by "pollutants", if this coverage is also indicated on the Equipment Breakdown Schedule.

4. **Ordinance or Law** --

a. **Undamaged Parts of a Building** -- When an "accident" to "covered equipment" at a "covered location" occurs, "we" pay for the value of undamaged parts of a covered building or structure that is required to be demolished as a result of the enforcement of any ordinance, law, or decree that:

1) requires the demolition of undamaged parts of a covered building or structure that is damaged or destroyed by an "accident" to "covered equipment";
2) regulates the construction or repair of a building or structure, or establishes building, zoning, or land use requirements at a "covered location"; and
3) is in force at the time of loss.

"We" do not cover the costs associated with the enforcement of any ordinance, law, or decree that requires "you" or anyone else to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize or in any way respond to or assess the effects of "pollutants".

b. **Increased Cost to Repair and Cost to Demolish and Clear Site** --

1) **Increased Cost to Repair** -- When an "accident" occurs to "covered equipment" at a "covered location", "we" cover the:

a) increased cost to repair, rebuild, or reconstruct damaged portions of a covered building or structure; and

b) increased cost to repair, rebuild, or reconstruct undamaged portions of a covered building or structure whether or not those undamaged portions need to be demolished;

as a result of the enforcement of building, zoning, or land use ordinance, law, or decree and is in force at the time when the "accident" to covered equipment occurs at a covered location.

If a covered building or structure is repaired or rebuilt, it must be intended for similar occupancy as the current property, unless otherwise required by building, zoning, or land use ordinance, law, or decree.

"We" do not cover the increased cost of construction until the covered building or structure is actually repaired or replaced and unless the repairs or replacement are made as soon as reasonably possible after the loss, not to exceed two years.

2) **Cost to Demolish and Clear Site --** "We" cover the cost to demolish and clear the site of undamaged parts of the covered building or structure that is damaged or destroyed by an "accident" to "covered equipment". The demolition must be a result of the enforcement of a building, zoning, or land use ordinance, law, or decree that is in force at the time when the "accident" occurs to "covered equipment".

3) **We Do Not Cover --** "We" do not cover the costs associated with the enforcement of any ordinance, law, or decree that:

a) requires "you" or anyone else to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize or in any way respond to or assess the effects of "pollutants"; or

b) "you" were required to comply with before the occurrence of an "accident" to "covered equipment" at a "covered location", even if the building or structure was undamaged and "you" failed to comply with the ordinance, law, or decree.

4) **What We Pay If The Building Is Repaired or Replaced --** If the covered building or structure is repaired or replaced, "we" pay the lesser of:

a) the amount "you" actually spend to demolish and clear the site, plus the actual increased cost to repair, rebuild, or construct the property but not for more than a building or structure of the same height, floor area, and style; or

b) the "limit" indicated on the Schedule.

5) **What We Pay If The Building Is Not Repaired or Replaced --** If the covered building or structure is not repaired or replaced, "we" pay the lesser of:

a) the amount "you" actually spend to demolish and clear the site, plus the cost "you" would have incurred to replace damaged or destroyed property with other property of like kind, and quality; of the same height, floor area, and style; and used for the same purpose; or

b) the "limit" indicated on the schedule.

5. **Off Premises Utility Service Interruption --** "We" extend Income Coverages to loss of earnings or extra expenses that "you" incur during the "restoration period" when "your" "business" is interrupted due to the interruption of an off premises utility service when the interruption is a result of an "accident" to "covered equipment" that is not located at a "covered location" and that is owned by a utility, a landlord, or another supplier who provides "you" with:

   a. power or gas;

   b. telecommunications, including but not limited to Internet access; or

   c. water, including but not limited to waste water treatment.

6. **Defense Costs --** "We" have the right and duty to defend any "suit" brought against "you" as a result of damage to property of others that is in "your" care, custody, or control and is caused by an "accident" to "covered equipment". "We" may investigate and settle a claim or "suit". "We" do not have to provide a defense after "we" have paid the "limit" as a result of a judgment or written settlement.

   "You" must not admit liability for a loss, settle a claim, or incur expense without "our" written consent. "You" must not interfere with "our" negotiation for a settlement.

   "We" will pay the following additional expenses associated with any "suit" "we" defend:

   a. Expenses which "we" incur while investigating and defending the "suit".

   b. Actual loss of "your" salary, up to $250 per day, for "your" time spent away from work at "our" request.

   c. Expenses that "you" incur at "our" request.

   d. All costs that "you" are required to pay as a result of any "suit" "we" defend.

   e. Interest that accrues after entry of a judgment, until "we" tender, deposit in court, or pay "our" part of the judgment.

   f. Interest that is awarded against "you" before the entry of a judgment. If "we" make an offer to settle the "suit", "we" will not pay any interest that accrues after the offer to settle.

   g. Cost of a bond for the release of attachments. "We" are not required to furnish a bond itself.

   This Coverage Extension will not reduce the available Property Damage Limit and does not have to be indicated on the schedule.

## PERILS COVERED

"We" cover risks of direct physical loss caused by or resulting from an "accident" to "covered equipment" unless the loss is limited or caused by a peril that is excluded.

## PERILS EXCLUDED

1. "We" do not pay for loss or damage caused directly or indirectly by one or more of the following excluded causes or events. Such loss or damage is excluded regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events.

   a. **Ordinance or Law --** Except as provided under Coverages Extensions - Ordinance or Law, "we" do not pay for loss or increased cost caused by enforcement of any code, ordinance, or law regulating the use, construction, or repair of any building or structure; or requiring the demolition of any building or structure including the cost of removing its debris.

b.  **Earth Movement or Volcanic Eruption**
-- "We" do not pay for loss caused by any
earth movement or caused by eruption,
explosion, or effusion of a volcano. Earth
movement includes, but is not limited to:
earthquake; landslide; mudflow;
mudslide; mine subsidence; or sinking,
rising, shifting of earth, or "sinkhole
collapse".

c.  **Civil Authority** -- "We" do not pay for
loss caused by order of any civil
authority, including seizure, confiscation,
destruction, or quarantine of property.

d.  **Nuclear Hazard** -- "We" do not pay for
loss caused by or resulting from a
nuclear reaction, nuclear radiation, or
radioactive contamination (whether
controlled or uncontrolled; whether
caused by natural, accidental, or artificial
means).

e.  **War and Military Action** -- "We" do not
pay for loss caused by:

    1)  war, including undeclared war or civil
    war; or
    2)  a warlike action by a military force,
    including action taken to prevent or
    defend against an actual or expected
    attack, by any government,
    sovereign, or other authority using
    military personnel or other agents; or
    3)  insurrection, rebellion, revolution, or
    unlawful seizure of power including
    action taken by governmental
    authority to prevent or defend
    against any of these.

    With regard to any action that comes
    within the "terms" of this exclusion and
    involves nuclear reaction, nuclear
    radiation, or radioactive contamination,
    this War and Military Action Exclusion
    will apply in place of the Nuclear Hazard
    Exclusion.

f.  **Water** -- "We" do not pay for loss caused
by water. This means:

    1)  "flood";

    2)  water that backs up through a sewer
    or drain; and
    3)  water below the surface of the
    ground. This includes water that
    exerts pressure on or flows, seeps,
    or leaks through or into a building or
    structure, sidewalk, driveway,
    foundation, swimming pool, or other
    structure.

    However, if electrical "covered
    equipment" requires drying out as a
    result of the above described peril, "we"
    pay for the direct expenses for drying out
    the electrical "covered equipment".

2.  "We" do not pay for loss or damage that is
caused by or results from one or more of the
following excluded causes or events:

    a.  **Wear, Tear, Deterioration, and
    Corrosion** -- "We" do not pay for loss
    caused by wear and tear, marring,
    scratching, deterioration, erosion, or
    corrosion.

        "We" do pay for any resulting loss
        caused by an "accident".

    b.  **Animals** -- "We" do not pay for loss
    caused by animals, including birds,
    insects, or vermin. "We" do pay for any
    resulting loss caused by an "accident".

    c.  **Windstorm and Hail** --"We" do not pay
    for loss caused by windstorm or hail.

    d.  **Fire and Combustion Explosion** --
    "We" do not pay for loss caused by fire or
    combustion explosion whether or not
    caused by or resulting from an
    "accident".

    e.  **Discharge of Water** -- "We" do not pay
    for loss caused by the discharge of water
    or other extinguishing agent to fight a
    fire.

    f.  **Breakage of Glass, Freezing,
    Collapse, and Molten Material** --"We"
    do not pay for loss caused by breakage
    of glass, weather related freezing,
    collapse, or molten materials.

g. **Specified Perils** -- "We" do not pay for loss caused by "specified perils". However, this exclusion does not apply to explosion of steam boilers, steam pipes, steam turbines, or steam engines.

3. "We" do not pay for "your" loss of earnings or extra expenses that "you" incur if one or more of the following excluded causes or events apply.

   a. **Leases, Licenses, Contracts, or Orders** -- "We" do not pay for any increase in loss of earnings or extra expenses due to the suspension, lapse, or cancellation of leases, licenses, contracts, or orders. However, "we" do cover loss during the "restoration period" if the suspension, lapse, or cancellation results directly from the interruption of "your" "business".

   "We" do not cover any loss of earnings or extra expense beyond the "restoration period" caused by the suspension, lapse, or cancellation of leases, licenses, contracts, or orders.

   b. **Due Diligence to Resume Your Business** -- "We" do not pay for any increase in loss of earnings or extra expenses due to "your" failure to use due diligence and dispatch and all reasonable means to resume "your" "business".

# VALUATION

1. **Covered Property** -- Unless otherwise indicated on the Equipment Breakdown Schedule, the value of covered property will be determined in accordance with:

   a. replacement cost provisions; and

b. items 3. through 9;

as described in the Valuation section of the Commercial Output Program - Property Coverage Part and is subject to the provisions described below for Environmental, Safety, and Efficiency Improvements and Equipment Utilizing CFC Refrigerants.

2. **Environmental, Safety, and Efficiency Improvements** -- If "covered equipment" requires replacement due to an "accident", "we" will pay your additional cost to replace with equipment that "we" agree is better for the environment, safer for people, or more energy efficient than the equipment being replaced, subject to the following conditions:

   a. "we" will not pay more than 125% of what the cost would have been to replace with like kind and quality;

   b. "we" will not pay to increase the size or capacity of the equipment;

   c. this provision only applies to Property Damage coverage;

   d. this provision does not increase any of the applicable limits;

   e. this provision does not apply to any property valued on an Actual Cash Value basis; and

   f. this provision does not apply to the replacement of component parts.

3. **Equipment Utilizing CFC Refrigerants** -- Air conditioning or refrigeration equipment that utilizes a refrigerant containing CFC (chlorofluorocarbon) substances will be valued at the cost to do the least expensive of the following:

   a. repair or replace the damaged property and replace any lost CFC refrigerant;

   b. repair the damaged property, retrofit the system to accept a non-CFC refrigerant, and charge the system with a non-CFC refrigerant; or

c. replace the system with one using a non-CFC refrigerant.

In determining the least expensive option, "we" will include any associated Income or Extra Expense loss. If option b. or c. is more expensive than a., but you wish to retrofit or replace anyway, "we" will consider this better for the environment and therefore eligible for valuation under paragraph 2., Environmental, Safety, and Efficiency Improvements. In such case, a. of that section is amended to read: "We" will not pay more than 125% of what the cost would have been to repair or replace with like kind and quality.

## HOW MUCH WE PAY

1. **Insurable Interest** -- "We" do not cover more than "your" insurable interest in any property.

2. **Deductible** -- If deductibles vary by type of "covered equipment" and more than one type of equipment is involved in any "one accident", the highest deductible will apply. Unless the Equipment Breakdown Schedule indicates that a single deductible applies to all Equipment Breakdown coverages, multiple deductibles may apply to any "one accident".

   a. Property and Income Coverages -- Unless otherwise indicated on the Equipment Breakdown Schedule, the Property Coverage Deductible applies to all loss covered by this coverage part, with the exception of those coverages subject to the Income Coverage Deductible as described below.

   Unless more specifically indicated on the Equipment Breakdown Schedule, the Income Coverage Deductible applies to

   1) earnings, "rents", and extra expense; and
   2) service interruption.

   b. Application of Deductibles --

   1) Dollar Deductibles -- "We" will not pay for loss resulting from any "one accident" until the amount of loss exceeds the applicable deductible indicated on the Equipment Breakdown Schedule. "We" will then pay the amount of loss in excess of the applicable deductible or deductibles, subject to the applicable "limit" indicated on the schedule.

   2) Multiple of Average Daily Value Deductibles -- If a deductible is expressed as a number times Average Daily Value (ADV), the deductible will be calculated as follows:

   The ADV will be the operating expenses that would have been normally earned or incurred during the "restoration period" by "your" "business" had no "accident" occurred divided by the number of working days in that period.

   Operating expenses includes net income (net profit or loss before income taxes), payroll expense, interest, and other continuing operating expenses.

   No reduction will be made:

   a) for operating expenses not being earned;
   b) in the number of working days because of the "accident"; or
   c) for any other scheduled or unscheduled shutdowns during the "restoration period".

   The ADV applies to all "covered locations" included in the valuation of the loss. The number indicated on the Equipment Breakdown Schedule will be multiplied by the ADV as determined above. The result will be used as the applicable deductible.

AAIS
CO 1003 04 02
Page 9 of 10

3) Time Deductibles -- If a time deductible is indicated on the Equipment Breakdown Schedule, "we" will not be liable for any loss occurring during the specified number of hours or days immediately following the "accident". If a time deductible is expressed in days, each consecutive day will mean twenty-four consecutive hours.

3. **Loss Settlement Terms** -- Subject to paragraphs 1., 2., 4., 5., and 6. under How Much We Pay, "we" pay the lesser of:

   a. the amount determined under Valuation;

   b. the cost to repair, replace, or rebuild the property with material of like kind and quality to the extent practicable subject to the Valuation provisions under:

      1) Environmental, Safety and Efficiency Improvements; and
      2) Equipment Utilizing CFC Refrigerants; or

   c. the "limit" that applies to covered property.

4. **Coinsurance** -- If indicated on the Equipment Breakdown Schedule, specified coverages may be subject to coinsurance.

   a. Property Damage -- "We" will not pay for the full amount of "your" loss if the applicable "limit" is less than the product of the specified coinsurance percentage times the value of the property subject to the coverage at the time of the loss. Instead, "we" will determine what percentage this calculated product is compared to the applicable "limit" and apply that percentage to the loss after application of the Deductible. The resulting amount or the applicable "limit" is the most "we" will pay. "We" will not pay for the remainder of the loss.

   b. Income Coverage -- "We" pay only a part of the loss if the "limit" is less than the coinsurance percentage multiplied by the sum of "your" net income (net profit or loss before income taxes), payroll expense, interest, and other continuing operating expenses projected for the 12 months following the inception, or last previous anniversary date of this policy (whichever is later), normally earned by "your" "business". "Our" part of the loss is determined using the following steps:

      1) multiply the coinsurance percentage by the sum of "your" net income (net profit or loss before income taxes), payroll expense, interest, and other continuing operating expenses projected for the 12 months following the inception, or last previous anniversary date of this policy;
      2) divide the "limit" by the figure determined in 1. above;
      3) multiply the total amount of loss by the figure determined in 2) above.

      "We" pay the amount determined in 3) above or the "limit", whichever is less. "We" do not pay any remaining part of the loss.

   Coinsurance does not apply to coverage for extra expense.

5. **Insurance Under More Than One Coverage** -- If more than one coverage of this policy insures the same loss, "we" pay no more than the actual claim, loss, or damage sustained.

6. **Insurance Under More Than One Policy** -- "You" may have another policy subject to the same plan, "terms", conditions, and provisions as this policy. If "you" do, "we" will pay "our" share of the covered loss. "Our" share is the proportion that the applicable "limit" under this policy bears to the "limit" of all policies covering on the same basis.

If there is another policy covering the same loss, other than that described above, "we" will pay only for the amount of covered loss in excess of the amount due from that other policy, whether "you" can collect on it or not. But "we" will not pay more than the applicable "limit".

## ADDITIONAL CONDITIONS

1. **Suspension** -- When any "covered equipment" is discovered to be in, or exposed to a dangerous situation or condition, any representative of "ours" may immediately suspend the insurance coverage against loss from an "accident" to that equipment. The suspension will not apply to any other covered peril under any other coverage part.

   "We" can do this by mailing or delivering a written notice of suspension to "your" address as shown in the declarations, or at the address where the "covered equipment" is located.

   Once so suspended, "your" insurance can be reinstated only by written notice from "us". If "your" insurance is so suspended, "you" will get a pro rata premium refund. But the suspension is effective even if "we" have not yet offered or made a refund.

2. **Jurisdictional Inspections** -- If any property that is "covered equipment" under the Equipment Breakdown Coverage requires inspection to comply with state or municipal boiler and pressure vessel regulations, "we" agree to perform such inspection on "your" behalf.

Copyright, American Association of Insurance Services, 2002



## ALLIED WORLD SPECIALTY INSURANCE COMPANY
**1690 New Britain Avenue, Farmington, CT 06032 ·Tel. (860) 284-1300 · Fax (860) 284-1301**

## COMMERCIAL INLAND MARINE -- DECLARATIONS

POLICY NUMBER:   0307-2801          RENEWAL OF:  0307-2801

PRODUCER NAME AND ADDRESS:   Assured Partners NL, LLC
2305 River Road
Louisville, KY 40206

NAME OF INSURED:  Bennett International Group, LLC

MAILING ADDRESS:   1001 Industrial Parkway
Mcdonough, GA 30253

POLICY PERIOD:   From:  March 30, 2019          To:   March 30, 2020          at
12:01 a.m. Standard Time at your mailing address shown above.

IN RETURN FOR YOUR PAYMENT OF THE PREMIUM, WE PROVIDE THE INSURANCE AS DESCRIBED IN THIS POLICY.

BUSINESS DESCRIPTION:   Distribution Company

LOSS PAYABLE NAME AND MAILING ADDRESS:

LOCATION ADDRESS:  Per SOV

FORMS APPLICABLE TO ALL COVERAGES:

1. IM 2021 (06/2013) Amendatory Endorsement - Georgia
2. CL 0610 (01/2015) Certified Act of Terrorism Exclusion
3. IM 7030 (01/2012) Equipment Schedule Contractor's Equipment
4. IM 7005 (01/2012) Schedule of Coverages Contractors' Equipment
5. IM 7019 (01/2012) Waterborne Endorsement
6. BIG MANU G Blanket Loss Payee
7. Z-IMCE 00003 00 (06/2019) Fraud and Deceit Coverage Endorsement
8. IM 7000 (04/2004) Contractors' Equipment Coverage

PREMIUM: $▮▮▮▮

CM 00011 00 (07/15)                              Page 1 of 2

Includes copyrighted material of the American Association of Insurance Services,
2002 with its permission

IN WITNESS WHEREOF, WE HAVE CAUSED THIS POLICY TO BE EXECUTED AND ATTESTED. THIS POLICY SHALL NOT BE VALID UNLESS COUNTERSIGNED BY OUR DULY AUTHORIZED REPRESENTATIVE.

PRESIDENT

ASST. SECRETARY

**AUTHORIZED REPRESENTATIVE**

CM 00011 00 (07/15)

Page 2 of 2

Includes copyrighted material of  the American Association of Insurance Services, 2002 with its permission

AAIS
IM 2021 06 13
Page 1 of 1

This endorsement changes
the policy
-- PLEASE READ THIS CAREFULLY --

# AMENDATORY ENDORSEMENT
## GEORGIA

1.  Under Perils Excluded, Criminal, Fraudulent, Dishonest, Or Illegal Acts, if applicable, is amended to include the following:

    However, if the loss is caused by an intentional act of an insured against whom a family violence complaint is brought for the act causing this loss, this exclusion will not apply to an otherwise covered loss suffered by another insured who did not cooperate with or contribute to the act that caused the loss.

    Subject to all other "terms" of this policy, "our" payment to an insured who did not cooperate in or contribute to the act that caused the loss may be limited to that person's insurable interest in the property, less any payment made to a mortgagee or other party with a legal secured interest in the property. "We" retain all rights set forth in the Subrogation condition of this policy with regard to action against the perpetrator of the act that caused the loss.

2.  Under Other Conditions, Misrepresentation, Concealment, Or Fraud is deleted and replaced by the following:

    **Misrepresentation, Concealment, Or Fraud** -- "We" do not provide coverage for "you" or any other insured if, before or after a loss:

    a.  "you" have or any other insured has willfully concealed or misrepresented:

        1)  a material fact or circumstance that relates to this insurance or the subject thereof; or
        2)  "your" interest herein; or

    b.  there has been fraud or false swearing by "you" or any other insured with regard to a matter that relates to this insurance or the subject thereof.

IM 2021 06 13

Copyright, American Association of Insurance Services, Inc., 2013

**AAIS**
**CL 0610 01 15**
**Page 1 of 1**

This endorsement changes
the policy
**-- PLEASE READ THIS CAREFULLY --**

# CERTIFIED ACT OF TERRORISM EXCLUSION

1. The following definition is added.

   "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States:

   a.  to be an act of terrorism;

   b.  to be a violent act or an act that is dangerous to human life, property, or infrastructure;

   c.  to have resulted in damage:

      1)  within the United States; or
      2)  to an air carrier (as defined in section 40102 of title 49, United States Code); to a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or at the premises of any United States mission;

   d.  to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion; and

   e.  to have resulted in insured losses in excess of five million dollars in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act, as amended.

2. The following exclusion is added.

   **CERTIFIED ACT OF TERRORISM EXCLUSION**

   "We" will not pay for loss or damage caused directly or indirectly by a "certified act of terrorism". Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

3. The following provisions are added.

   a.  Neither the "terms" of this endorsement nor the "terms" of any other terrorism endorsement attached to this Coverage Part provide coverage for any loss that would otherwise be excluded by this Coverage Part under:

      1)  exclusions that address war, military action, or nuclear hazard; or
      2)  any other exclusion; and

   b.  the absence of any other terrorism endorsement does not imply coverage for any loss that would otherwise be excluded by this Coverage Part under:

      1)  exclusions that address war, military action, or nuclear hazard; or
      2)  any other exclusion.

   **CL 0610 01 15**

Copyright, American Association of Insurance Services, Inc., 2015

AAIS
IM 7030 01 12

<div align="right">

POLICY NUMBER
0307-2801

</div>

# EQUIPMENT SCHEDULE
## CONTRACTORS' EQUIPMENT

(The entries required to complete this schedule
will be shown below or on the "schedule of coverages".)

## EQUIPMENT SCHEDULE

| Loc | ADDRESS | CITY | ST | ZIP | OCCUPANCY | FLOATER |
|---|---|---|---|---|---|---|
| 1 | 2301 SOUTH MAIN ST | MORTON | IL | | OFFICE, WHSE | |
| 2 | 391 LAWTON AVE | MONROE | OH | 45050 | OFFICE | |
| 3 | 1601 AND 1609 BLUE ROCK ST | CINCINNATI | OH | 45223 | OFFICE | $92,000 |
| 4 | 1638 BLUE ROCK ST | CINCINNATI | OH | 45223 | WHSE, SHOP, OFFICE | |
| 5 | 1660 DIXON AIRLINE RD | AUGUSTA | GA | 30906 | | |
| 6 | 5122 PATTERSON AVE | PERRIS | CA | 92571 | YARD | |
| 17 | 906 W CRYSTAL LAKE RD | FOREST CITY | IA | 50436 | OFFICE AND YARD | |
| 18 | 80 PAUL R. FOULKE PKWY | HAGERSTOWN | IN | 47346 | OFFICE | $30,000 |
| 19 | 56960 ELK PARK DR | ELKHART | IN | 46516 | OFFICE-YARD | |
| 20 | 501 KESCO DR | BRISTOL | IN | 46507 | OFFICE -YARD | |
| 21 | 3052 HACKBERRY DRIVE | GOSHEN | IN | 46526 | YARD, BLDG 10-12 acres fenced - modular bldg for office | |
| 22 | 4800 URBANA RD | SPRINGFIELD | OH | 45504 | OFFICE | $12,000 |
| 23 | 4620 NW MCKENNON RD | PENDLETON | OR | 97801 | 2 MH OFFICE- 5 ACRE YARD | $3,000 |
| 25 | 4900 JOHN DEERE PKWY | GROVETOWN | GA | 30813 | OFFICE/YARD | |
| 26 | 922 MOLLY POND RD | AUGUSTA | GA | 30906 | OFFICE/WAREHOUSE | |
| 27 | 2340 DOUG BERNARD PKWY-Airport Loc. | AUGUSTA | GA | 30906 | OFFICE-WAREHOUSE | $575,287 |
| 28 | 233 JOHN DEERE PKWY | GROVETOWN | GA | 30813 | OFFICE-WAREHOUSE | |
| 30 | 4301 EVANS TO LOCKS RD | EVANS | GA | 30809 | 6.00 acres | |
| 35 | 1001 INDUSTRIAL PKWY | MCDONOUGH | GA | 30253 | OFFICE | |
| 36 | 1001 INDUSTRIAL PKWY | MCDONOUGH | GA | 30253 | OFFICE | |
| 37 | 1001 INDUSTRIAL PKWY | MCDONOUGH | GA | 30253 | OFFICE | |
| 38 | 1001 INDUSTRIAL PKWY | MCDONOUGH | GA | 30253 | OFFICE | |
| 39 | 1001 INDUSTRIAL PKWY | MCDONOUGH | GA | 30253 | OFFICE | |
| 40 | 1001 INDUSTRIAL PKWY | MCDONOUGH | GA | 30253 | OFFICE | |
| 41 | 1001 INDUSTRIAL PKWY | MCDONOUGH | GA | 30253 | OFFICE | |
| 42 | 1001 INDUSTRIAL PKWY | MCDONOUGH | GA | 30253 | STORAGE | |
| 43 | 1001 INDUSTRIAL PKWY | MCDONOUGH | GA | 30253 | SHOP-OFFICE | |
| 44 | 1001 INDUSTRIAL PKWY | MCDONOUGH | GA | 30253 | OFFICE | |
| 45 | 1001 INDUSTRIAL PKWY | MCDONOUGH | GA | 30253 | OFFICE | $25,000 |
| 46 | 1001 INDUSTRIAL PKWY | MCDONOUGH | GA | 30253 | DRIVERS LOUNGE | |
| 47 | 375 RIVERSIDE DRIVE | LITHIA SPRINGS | GA | 30122 | DATA CENTER | |
| 48 | 4117 S MERIDIAN | PAUYALLUP | WA | 98373 | OFFICE | |
| 50 | 1649 S 59TH AVE | PHOENIX | AZ | 85043 | OFFICE | $66,015 |
| 51 | 18111 S SANTA FE AVE UNIT B | RANCHO DOMI | CA | 90221 | WAREHOUSE-YARD-OFFICE | $16,000 |
| 52 | 2966 E VICTORIA ST | RANCHO DOMI | CA | 90221 | WAREHOUSE | |
| 53 | 1767 DIXON AIRLINE ROAD | AUGUSTA | GA | 30906 | STORAGE YARD | |
| 56 | 276 W STATE RD  130 | VALPARAISO | IN | 46385 | OFFICE - YARD | |
| 58 | 1021 E 17TH ST | CHATTANOOGA | TN | 37408 | OFFICE-YARD | |
| 59 | 5451 OATES RD | HOUSTON | TX | 77013 | OFFICE/YARD | |
| 60 | 1510 N HAMPTON RD STE 110 | DESOTO | TX | 75115 | OFFICE | |
| 61 | 10600 OLD BEAUMONT HWY | HOUSTON | TX | 77078 | OFFICE-YARD | $505,500 |
| 62 | 402 S MCCOY BLVD | NEW BOSTON | TX | 75570 | OFFICE | $100,000 |
| 63 | 20951 MINES RD | LAREDO | TX | 78045 | OFFICE -YARD | $400,000 |
| 64 | 801 N 2ND AVE | CARBON CLIFF | IL | 61239 | OFFICE-SHOP | $43,000 |
| 68 | 806 HWY 181 NORTH | BEEVILLE | TX | 78102 | OFFICE AND YARD | |
| 69 | 2101 NW Frontage Rd 181 Bypass Apt 715 | BEEVILLE | TX | 78102 | Apartment | |
| 70 | 4836 W LOOP 281 | LONGVIEW | TX | 75603 | | |
| 75 | 8515 PRATT AVE | DURHAM | CA | 95938 | OFFICE | |
| 80 | 608 CARNATION DRIVE | NAMPA | ID | | YARD ONLY | |
| 82 | 11872 CR 12 | MIDDLEBURY | IN | 46540 | | |
| 84 | 1144 N MAIN ST STE B | ROXBORO | NC | 27573 | OFFICE | |
| 86 | 1360 INDUSTRIAL WAY | WOODBURN | OR | 97071 | OFFICE-YARD | |
| 91 | 10646 RT 322 | SHIPPENVILLE | PA | 16254 | OFFICE-YARD | |
| 93 | 1203 N OLD ROBINSON RD | ROBINSON | TX | 76706 | MOBILE OFFICE | |
| | | | | | | $1,867,802 |

IM 7030 01 12

Copyright, American Association of Insurance Services, Inc., 2012

AAIS
IM 7005 01 12
Page 1 of 2

POLICY NUMBER
0307-2801

# SCHEDULE OF COVERAGES
## CONTRACTORS' EQUIPMENT

(The entries required to complete this schedule
will be shown below or on the "schedule of coverages".)

**PROPERTY COVERED**

(check one)

[X]  Scheduled Equipment (Refer to Equipment Schedule)

[ ]  Schedule On File

**"Limit"**

**Catastrophe Limit** -- The most "we" pay
for loss in any one occurrence is:            $1,867,802

**COVERAGE EXTENSIONS**

Additional Debris Removal Expenses          $5,000

**SUPPLEMENTAL COVERAGES**

Employee Tools                              $5,000

Equipment Leased or Rented From Others       $125,000

Newly Purchased Equipment (check one)

    [ ]  Percentage of Catastrophe Limit          _____ %

    [X]  Dollar Limit                          $250,000

Pollutant Cleanup and Removal               $25,000

Rental Reimbursement

    -- Reimbursement Limit                    $5,000

    -- Waiting Period                         72 Hours

Spare Parts and Fuel                        $10,000

Copyright, American Association of Insurance Services, Inc., 2012

AAIS
**IM 7005 01 12**
**Page 2 of 2**

**COINSURANCE**  (check one)

[ ] 80%          [ ] 90%          [ ] 100%          [ ] Other _____%

**REPORTING CONDITIONS**     (check if applicable)

[ ] **Equipment Leased or Rented From Others**

    -- Reporting Rate                       $ ███_____

    -- Deposit Premium                $ ███_____

    -- Minimum Premium              $ ███_____

**VALUATION**     (check if applicable)

[X] Actual Cash Value                          All Other Equipment

[X] Replacement Cost                          Equipment 5 Years and Newer

[ ] Indicated on Equipment Schedule

**DEDUCTIBLE**   (check one)

[X] Flat Deductible Amount                 $███

[ ] Percentage Deductible                    _____%

    Maximum Deductible Amount          $_____

    Minimum Deductible Amount          $_____

**ADDITIONAL INFORMATION**

Fraud and Deceit  - $50,000

Waterborne Equipment - $50,000

_____

_____

_____

_____

_____

**IM 7005 01 12**

Copyright, American Association of Insurance Services, Inc., 2012

| AAIS | This endorsement changes the | POLICY NUMBER |
|---|---|---|
| IM 7019 01 12 | Contractors' Equipment Coverage | 0307-2801 |
| Page 1 of 1 | -- PLEASE READ THIS CAREFULLY -- | |

# WATERBORNE ENDORSEMENT

(The entries required to complete this endorsement
will be shown below or on the "schedule of coverages".)

## SCHEDULE

| | "Limit" |
|---|---|
| **Waterborne Equipment** -- The most "we" pay in any one occurrence for loss to covered property while waterborne: | $50,000 |
| **Waterborne Equipment Deductible** -- "We" pay only that part of "your" loss over the deductible amount in any one occurrence: | $5,000 |

## COVERAGE EXTENSIONS

**Waterborne Property** -- "We" cover direct physical loss caused by a covered peril to covered property while waterborne.

## PROPERTY NOT COVERED

The exclusion for Waterborne Property still applies except to the extent that coverage is provided under this endorsement.

IM 7019 01 12

Copyright, American Association of Insurance Services, Inc., 2012

This endorsement changes
the policy
**--PLEASE READ THIS CAREFULLY--**

This endorsement, effective: March 30, 2019
(at 12:01 A.M. standard time at the address of the Named Insured as shown on the Declarations)
forms a part of Policy No: 0307-2801

---

**Blanket Loss Payee**

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE
CONTRACTORS' EQUIPMENT
EQUIPMENT SCHEDULE

The **COMMERCIAL INLAND MARINE; CONTRACTORS EQUIPMENT SCHEDULE,** is
amended to include the following:

**Blanket Loss Payee**
Blanket Loss Payee is added for covered property under this policy as their interest(s) may
appear under a written agreement with you prior to any loss or damage.

All other terms and conditions remain unchanged.

BIG MANU G

This endorsement changes
the policy
**--PLEASE READ THIS CAREFULLY--**

This endorsement, effective:March 30, 2019
(at 12:01 A.M. standard time at the address of the Named Insured as shown on the Declarations)
forms a part of Policy No:0307-2801

---

### FRAUD AND DECEIT COVERAGE ENDORSEMENT

This endorsement modifies the insurance provided under the following:

CONTRACTORS' EQUIPMENT COVERAGE

The **SUPPLEMENTAL COVERAGES** section is amended to include the following:

**Fraud And Deceit --**

a. **Coverage** -- "We" cover theft of covered property when "you", "your" agents, customers, or consignees are fraudulently induced to part with the covered property: 1) to persons who falsely represent themselves as the proper persons to receive the property; 2) by the acceptance of fraudulent bills of lading or shipping receipts; or 3) as a result of or directly related to the use of any electronic data processing hardware or software.

b. **Limit** -- The most "we" pay in any one occurrence for theft of covered property under this Coverage is $50,000.

All other terms and conditions remain unchanged.

Z-IMCE 00003 00 (06/19)

# CONTRACTORS' EQUIPMENT COVERAGE

## AGREEMENT

In return for "your" payment of the required premium, "we" provide the coverage described herein subject to all the "terms" of the Contractors' Equipment Coverage. This coverage is also subject to the "schedule of coverages" and additional policy conditions relating to assignment or transfer of rights or duties, cancellation, changes or modifications, inspections, and examination of books and records.

Endorsements and schedules may also apply. They are identified on the "schedule of coverages".

Refer to Definitions for words and phrases that have special meaning. These words and phrases are shown in quotation marks or bold type.

## DEFINITIONS

1. The words "you" and "your" mean the persons or organizations named as the insured on the declarations.

2. The words "we", "us", and "our" mean the company providing this coverage.

3. "Contractors' equipment" means machinery, equipment, and tools of a mobile nature that "you" use in "your" contracting, installation, erection, repair, or moving operations or projects.

   "Contractors' equipment" also means:

   a. self-propelled vehicles designed and used primarily to carry mounted equipment; or

   b. vehicles designed for highway use that are unlicensed and not operated on public roads.

4. "Equipment schedule" means a schedule of "contractors' equipment" that is attached to this policy and that describes each piece of covered equipment.

5. "Jobsite" means any location, project, or work site where "you" are in the process of construction, installation, erection, repair, or moving.

6. "Limit" means the amount of coverage that applies.

7. "Pollutant" means:

   a. any solid, liquid, gaseous, thermal, or radioactive irritant or contaminant, including acids, alkalis, chemicals, fumes, smoke, soot, vapor, and waste. Waste includes materials to be recycled, reclaimed, or reconditioned, as well as disposed of; and

   b. electrical or magnetic emissions, whether visible or invisible, and sound emissions.

8. "Schedule of coverages" means:

   a. all pages labeled schedule of coverages or schedules which pertain to this coverage; and

   b. declarations or supplemental declarations which pertain to this coverage.

9. "Sinkhole collapse" means the sudden settlement or collapse of earth supporting the covered property into subterranean voids created by the action of water on a limestone or similar rock formation. It does not include the value of the land or the cost of filling sinkholes.

Copyright, American Association of Insurance Services, Inc., 2004

AAIS
IM 7000 04 04
Page 2 of 13

10. "Specified perils" means aircraft; civil commotion; explosion; falling objects; fire; hail; leakage from fire extinguishing equipment; lightning; riot; "sinkhole collapse"; smoke; sonic boom; vandalism; vehicles; "volcanic action"; water damage; weight of ice, snow, or sleet; and windstorm.

Falling objects does not include loss to:

a. personal property in the open; or

b. the interior of buildings or structures or to personal property inside buildings or structures unless the exterior of the roofs or walls are first damaged by a falling object.

Water damage means the sudden or accidental discharge or leakage of water or steam as a direct result of breaking or cracking of a part of the system or appliance containing the water or steam.

11. "Terms" means all provisions, limitations, exclusions, conditions, and definitions that apply.

12. "Volcanic action" means airborne volcanic blast or airborne shock waves; ash, dust, or particulate matter; or lava flow.

Volcanic action does not include the cost to remove ash, dust, or particulate matter that does not cause direct physical loss to the covered property.

## PROPERTY COVERED

"We" cover the following property unless the property is excluded or subject to limitations.

1. **Scheduled Equipment --**

a. **Coverage --** "We" cover direct physical loss caused by a covered peril to:

1) "your" "contractors' equipment"; and

2) "contractors' equipment" of others in "your" care, custody, or control.

b. **Coverage Limitation --** "We" only cover "your" "contractors' equipment" and "contractors' equipment" of others:

1) that are described on the "equipment schedule"; and

2) when Scheduled Equipment is indicated on the "schedule of coverages".

2. **Schedule On File --**

a. **Coverage --** "We" cover direct physical loss caused by a covered peril to:

1) "your" "contractors' equipment"; and

2) "contractors' equipment" of others in "your" care, custody, or control.

b. **Coverage Limitation --** "We" only cover "your" "contractors' equipment" and "contractors' equipment" of others:

1) that are listed in a schedule which "you" must submit to "us" and "we" keep on file, the schedule must contain a description of each item to be covered and a "limit" for each item; and

2) when Schedule on File is indicated on the "schedule of coverages".

## PROPERTY NOT COVERED

1. **Aircraft Or Watercraft --** "We" do not cover aircraft or watercraft.

2. **Contraband --** "We" do not cover contraband or property in the course of illegal transportation or trade.

3. **Leased Or Rented Property --** "We" do not cover property that "you" lease or rent to others.

Copyright, American Association of Insurance Services, Inc., 2004

AAIS
IM 7000 04 04
Page 3 of 13

4. **Loaned Property** -- "We" do not cover property that "you" loan to others.

5. **Underground Mining Operations** -- "We" do not cover property while stored or operated underground in connection with any mining operations.

6. **Vehicles** -- "We" do not cover automobiles, motor trucks, tractors, trailers, and similar conveyances designed for highway use and used for over the road transportation of people or cargo. However, this does not include:

   a. self-propelled vehicles designed and used primarily to carry mounted equipment; or

   b. vehicles designed for highway use that are unlicensed and not operated on public roads.

7. **Waterborne Property** -- "We" do not cover property while waterborne except while in transit in the custody of a carrier for hire.

## COVERAGE EXTENSIONS

**Provisions That Apply To Coverage Extensions** -- The following Coverage Extensions indicate an applicable "limit". This "limit" may also be shown on the "schedule of coverages".

If a different "limit" is indicated on the "schedule of coverages", that "limit" will apply instead of the "limit" shown below.

However, if no "limit" is indicated for a Coverage Extension, coverage is provided up to the full "limit" for the applicable covered property unless a different "limit" is indicated on the "schedule of coverages".

Unless otherwise indicated, the coverages provided below are part of and not in addition to the applicable "limit" for coverage described under Property Covered.

The "limit" provided under a Coverage Extension cannot be combined or added to the "limit" for any other Coverage Extension or Supplemental Coverage including a Coverage Extension or Supplemental Coverage that is added to this policy by endorsement.

If coinsurance provisions are part of this policy, the following coverage extensions are not subject to and not considered in applying coinsurance conditions.

**Debris Removal** --

1. **Coverage** -- "We" pay the cost to remove the debris of covered property that is caused by a covered peril.

2. **We Do Not Cover** -- This coverage does not include costs to:

   a. extract "pollutants" from land or water; or

   b. remove, restore, or replace polluted land or water.

3. **Limit** -- "We" do not pay any more under this coverage than 25% of the amount "we" pay for the direct physical loss. "We" will not pay more for loss to property and debris removal combined than the "limit" for the damaged property.

4. **Additional Limit** -- "We" pay up to an additional $5,000 for debris removal expense when the debris removal expense exceeds 25% of the amount "we" pay for direct physical loss or when the loss to property and debris removal combined exceeds the "limit" for the damaged property.

5. **You Must Report Your Expenses** -- "We" do not pay any expenses unless they are reported to "us" in writing within 180 days from the date of direct physical loss to covered property.

Copyright, American Association of Insurance Services, Inc., 2004

**AAIS**
**IM 7000 04 04**
**Page 4 of 13**

# SUPPLEMENTAL COVERAGES

**Provisions That Apply To Supplemental Coverages** -- The following Supplemental Coverages indicate an applicable "limit". This "limit" may also be shown on the "schedule of coverages".

If a different "limit" is indicated on the "schedule of coverages", that "limit" will apply instead of the "limit" shown below.

However, if no "limit" is indicated for a Supplemental Coverage, coverage is provided up to the full "limit" for the applicable covered property unless a different "limit" is indicated on the "schedule of coverages".

Unless otherwise indicated, a "limit" for a Supplemental Coverage provided below is separate from, and not part of, the applicable "limit" for coverage described under Property Covered.

The "limit" available for coverage described under a Supplemental Coverage:

a.   is the only "limit" available for the described coverage; and

b.   is not the sum of the "limit" indicated for a Supplemental Coverage and the "limit" for coverage described under Property Covered.

The "limit" provided under a Supplemental Coverage cannot be combined or added to the "limit" for any other Supplemental Coverage or Coverage Extension including a Supplemental Coverage or Coverage Extension that is added to this policy by endorsement.

If coinsurance provisions are part of this policy, the following supplemental coverages are not subject to and not considered in applying coinsurance conditions.

1.   **Employee Tools --**

   a.   **Coverage** -- "We" cover direct physical loss caused by a covered peril to tools owned by "your" employees.

   b.   **Coverage Limitation** -- "We" only cover tools owned by "your" employees while at a:

      1)   premises that "you" own or operate; or
      2)   "jobsite".

   c.   **Limit** -- The most "we" pay in any one occurrence for loss to employee tools is $5,000.

2.   **Equipment Leased Or Rented From Others --**

   a.   **Coverage** -- "We" cover direct physical loss caused by a covered peril to "contractors' equipment" that "you" have leased or rented from others.

   b.   **Limit** -- The most "we" pay in any one occurrence for equipment leased or rented from others is $25,000.

3.   **Newly Purchased Property --**

   a.   **Coverage** -- "We" cover direct physical loss caused by a covered peril to additional "contractors' equipment" that "you" purchase during the policy period.

   b.   **Limit** -- The most that "we" pay for any loss under this supplemental coverage is the least of the:

      1)   actual cash value of the covered property; or
      2)   "limit" for newly purchased property indicated on the "schedule of coverages". If no "limit" is indicated, then 30% of the Catastrophe Limit indicated on the "schedule of coverages" applies to this coverage.

Copyright, American Association of Insurance Services, Inc., 2004

c. **Time Limitation** -- "We" extend coverage to the additional "contractors' equipment" that "you" purchase for up to 60 days.

This supplemental coverage will end when any of the following first occur:

1) this policy expires;
2) 60 days after "you" obtain the additional "contractors' equipment"; or
3) "you" report the additional "contractors' equipment" to "us".

d. **Additional Premium** -- "You" must pay any additional premium due from the date "you" purchase the additional "contractors' equipment".

4. **Pollutant Cleanup And Removal** --

a. **Coverage** -- "We" pay "your" expense to extract "pollutants" from land or water if the discharge, dispersal, seepage, migration, release, or escape of the "pollutants" is caused by a covered peril that occurs during the policy period.

b. **Time Limitation** -- The expenses to extract "pollutants" are paid only if they are reported to "us" in writing within 180 days from the date the covered peril occurs.

c. **We Do Not Cover** -- "We" do not pay the cost of testing, evaluating, observing, or recording the existence, level, or effects of "pollutants".

However, "we" pay the cost of testing which is necessary for the extraction of "pollutants" from land or water.

d. **Limit** -- The most "we" pay for each location is $25,000 for the sum of all such expenses arising out of a covered peril occurring during each separate 12-month period of this policy.

5. **Rental Reimbursement** --

a. **Coverage** -- In the event of a direct physical loss by a covered peril to "your" "contractors' equipment", "we" reimburse "you" for "your" expense to rent similar equipment while "your" equipment is inoperable.

The deductible amount indicated on the "schedule of coverages" does not apply to a loss covered under this supplemental coverage.

b. **Waiting Period** -- "We" will not reimburse "you" for the rental of equipment until after the first 72-hours (unless otherwise indicated on the "schedule of coverages") following the direct physical loss to "your" "contractors' equipment" caused by a covered peril.

c. **Incurred Rental Expenses** -- After the waiting period has passed, "we" will only reimburse "you" for the rental expenses that "you" actually incur.

d. **Coverage After Expiration Date** -- "We" will continue to reimburse "you" for the rental of equipment after the expiration date of this coverage, provided the loss occurred before the expiration date.

e. **Coverage Limitations** -- "We" will not reimburse "you":

1) if "you" can continue or resume "your" operations with similar equipment that is available to "you" at no additional expense to "you"; or
2) for the rental expense of any equipment unless "you" make every reasonable effort to repair, replace, or rebuild the inoperable equipment after the loss by a covered peril occurs.

f. **Limit** -- The most "we" reimburse "you" in any one occurrence for rental expenses is $5,000.

Copyright, American Association of Insurance Services, Inc., 2004

**AAIS**
**IM 7000 04 04**
**Page 6 of 13**

6. **Spare Parts And Fuel --**

   a. **Coverage --** "We" cover direct physical loss caused by a covered peril to:

      1) spare parts and accessories for "contractors' equipment"; and
      2) fluids for vehicles and "contractors' equipment"; fluids include gasoline, oil, and hydraulic fluid.

   b. **Limit --** The most "we" pay in any one occurrence for loss to spare parts and accessories is $5,000.

# PERILS COVERED

"We" cover risks of direct physical loss unless the loss is limited or caused by a peril that is excluded.

# PERILS EXCLUDED

1. "We" do not pay for loss or damage caused directly or indirectly by one or more of the following excluded causes or events. Such loss or damage is excluded regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events.

   a. **Civil Authority --** "We" do not pay for loss caused by order of any civil authority, including seizure, confiscation, destruction, or quarantine of property.

      "We" do cover loss resulting from acts of destruction by the civil authority to prevent the spread of fire, unless the fire is caused by a peril excluded under this coverage.

   b. **Nuclear Hazard --** "We" do not pay for loss caused by or resulting from a nuclear reaction, nuclear radiation, or radioactive contamination (whether controlled or uncontrolled; whether caused by natural, accidental, or artificial means). Loss caused by nuclear hazard is not considered loss caused by fire, explosion, or smoke. Direct loss by fire resulting from the nuclear hazard is covered.

   c. **War And Military Action --** "We" do not pay for loss caused by:

      1) war, including undeclared war or civil war; or
      2) a warlike action by a military force, including action taken to prevent or defend against an actual or expected attack, by any government, sovereign, or other authority using military personnel or other agents; or
      3) insurrection, rebellion, revolution, or unlawful seizure of power including action taken by governmental authority to prevent or defend against any of these.

      With regard to any action that comes within the "terms" of this exclusion and involves nuclear reaction, nuclear radiation, or radioactive contamination, this War and Military Action Exclusion will apply in place of the Nuclear Hazard Exclusion.

2. "We" do not pay for loss or damage that is caused by or results from one or more of the following:

   a. **Contamination or Deterioration --** "We" do not pay for loss caused by contamination or deterioration including corrosion, decay, fungus, mildew, mold, rot, rust, or any quality, fault, or weakness in the covered property that causes it to damage or destroy itself.

      But if contamination or deterioration results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

Copyright, American Association of Insurance Services, Inc., 2004

b.  **Criminal, Fraudulent, Dishonest Or Illegal Acts** -- "We" do not pay for loss caused by or resulting from criminal, fraudulent, dishonest, or illegal acts committed alone or in collusion with another by:

1)  "you";
2)  others who have an interest in the property;
3)  others to whom "you" entrust the property;
4)  "your" partners, officers, directors, trustees, joint venturers, or "your" members or managers if "you" are a limited liability company; or
5)  the employees or agents of 1), 2), 3), or 4) above, whether or not they are at work.

This exclusion does not apply to acts of destruction by "your" employees, but "we" do not pay for theft by employees.

This exclusion does not apply to covered property in the custody of a carrier for hire.

c.  **Loss Of Use** -- "We" do not pay for loss caused by or resulting from loss of use, delay, or loss of market.

d.  **Mechanical Breakdown** -- "We" do not pay for loss caused by any mechanical, structural, or electrical breakdown or malfunction including a breakdown or malfunction resulting from a structural, mechanical, or reconditioning process.

But if a mechanical, structural, or electrical breakdown or malfunction results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

e.  **Missing Property** -- "We" do not pay for missing property where the only proof of loss is unexplained or mysterious disappearance of covered property, or shortage of property discovered on taking inventory, or any other instance where there is no physical evidence to show what happened to the covered property.

This exclusion does not apply to covered property in the custody of a carrier for hire.

f.  **Pollutants** -- "We" do not pay for loss caused by or resulting from release, discharge, seepage, migration, dispersal, or escape of "pollutants":

1)  unless the release, discharge, seepage, migration, dispersal, or escape is caused by a "specified peril"; or
2)  except as specifically provided under the Supplemental Coverages - Pollutant Cleanup and Removal.

"We" do cover any resulting loss caused by a "specified peril".

g.  **Temperature/Humidity** -- "We" do not pay for loss caused by dryness, dampness, humidity, or changes in or extremes of temperature.

But if dryness, dampness, humidity, or changes in or extremes of temperature results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

h.  **Voluntary Parting** -- "We" do not pay for loss caused by or resulting from voluntary parting with title to or possession of any property because of any fraudulent scheme, trick, or false pretense.

Copyright, American Association of Insurance Services, Inc., 2004

i. **Wear And Tear** -- "We" do not pay for loss caused by wear and tear, marring, or scratching.

But if wear and tear, marring, or scratching results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

## WHAT MUST BE DONE IN CASE OF LOSS

1. **Notice** -- In case of a loss, "you" must:

   a. give "us" or "our" agent prompt notice including a description of the property involved ("we" may request written notice); and

   b. give notice to the police when the act that causes the loss is a crime.

2. **You Must Protect Property** -- "You" must take all reasonable steps to protect covered property at and after an insured loss to avoid further loss.

   a. **Payment of Reasonable Costs** -- "We" do pay the reasonable costs incurred by "you" for necessary repairs or emergency measures performed solely to protect covered property from further damage by a peril insured against if a peril insured against has already caused a loss to covered property. "You" must keep an accurate record of such costs. "Our" payment of reasonable costs does not increase the "limit".

   b. **We Do Not Pay** -- "We" do not pay for such repairs or emergency measures performed on property which has not been damaged by a peril insured against.

3. **Proof Of Loss** -- "You" must send "us", within 60 days after "our" request, a signed, sworn proof of loss. This must include the following information:

   a. the time, place, and circumstances of the loss;

   b. other policies of insurance that may cover the loss;

   c. "your" interest and the interests of all others in the property involved, including all mortgages and liens;

   d. changes in title of the covered property during the policy period; and

   e. estimates, specifications, inventories, and other reasonable information that "we" may require to settle the loss.

4. **Examination** -- "You" must submit to examination under oath in matters connected with the loss as often as "we" reasonably request and give "us" sworn statements of the answers. If more than one person is examined, "we" have the right to examine and receive statements separately and not in the presence of others.

5. **Records** -- "You" must produce records, including tax returns and bank microfilms of all canceled checks relating to value, loss, and expense and permit copies and extracts to be made of them as often as "we" reasonably request.

6. **Damaged Property** -- "You" must exhibit the damaged and undamaged property as often as "we" reasonably request and allow "us" to inspect or take samples of the property.

7. **Volunteer Payments** -- "You" must not, except at "your" own expense, voluntarily make any payments, assume any obligations, pay or offer any rewards, or incur any other expenses except as respects protecting property from further damage.

8. **Abandonment** -- "You" may not abandon the property to "us" without "our" written consent.

9. **Cooperation** -- "You" must cooperate with "us" in performing all acts required by this policy.

Copyright, American Association of Insurance Services, Inc., 2004

## VALUATION

1. **Actual Cash Value** -- The value of covered property will be based on the actual cash value at the time of the loss (with a deduction for depreciation) unless replacement cost is indicated on the "schedule of coverages".

2. **Replacement Cost** -- The value of covered property will be based on the replacement cost without any deduction for depreciation unless Actual Cash Value is indicated on the "schedule of coverages".

   a. **Replacement Cost Limitation** -- The replacement cost is limited to the cost of repair or replacement with similar materials and used for the same purpose. The payment will not exceed the amount "you" spend to repair or replace the damaged or destroyed property.

   b. **Replacement Cost Does Not Apply Until Repair Or Replacement** -- Replacement cost valuation does not apply until the damaged or destroyed property is repaired or replaced.

   c. **Time Limitation** -- "You" may make a claim for actual cash value before repair or replacement takes place, and later for the replacement cost if "you" notify "us" of "your" intent within 180 days after the loss.

3. **Pair Or Set** -- The value of a lost or damaged article which is part of a pair or set is based on a reasonable proportion of the value of the entire pair or set. The loss is not considered a total loss of the pair or set.

4. **Loss To Parts** -- The value of a lost or damaged part of an item that consists of several parts when it is complete is based on the value of only the lost or damaged part or the cost to repair or replace it.

## HOW MUCH WE PAY

1. **Insurable Interest** -- "We" do not cover more than "your" insurable interest in any property.

2. **Flat Deductible** -- "We" pay only that part of "your" loss over the deductible amount indicated on the "schedule of coverages" in any one occurrence unless Percentage Deductible is indicated on the "schedule of coverages".

3. **Percentage Deductible** -- When a percentage deductible is indicated on the "schedule of coverages", "we" pay only that part of "your" loss over the deductible amount as determined below.

   a. **Determining The Deductible Amount** -- The deductible amount is determined by applying the percentage indicated on the "schedule of coverages" to the value of the covered property that is involved in the loss. The value is determined by the provisions described under the Valuation section of this policy.

   b. **Two Or More Items** -- If a loss involves two or more pieces of equipment, the percentage indicated on the "schedule of coverages" will apply only to the covered property with the highest value.

   c. **Minimum and Maximum Deductible** -- The percentage deductible will not exceed the Maximum Deductible amount and will not be less than the Minimum Deductible amount indicated on the "schedule of coverages".

4. **Loss Settlement Terms** -- Subject to paragraphs 1., 2., 3., 5., 6., and 7. under How Much We Pay, "we" pay the lesser of:

   a. the amount determined under Valuation;

Copyright, American Association of Insurance Services, Inc., 2004

b.   the cost to repair, replace, or rebuild the property with material of like kind and quality to the extent practicable; or

c.   the "limit" that applies to the covered property. However, the most "we" pay for loss in any one occurrence is the Catastrophe Limit indicated on the "schedule of coverages".

5.   **Coinsurance --**

a.   **When Coinsurance Applies --** "We" only pay a part of the loss if the "limit" is less than the percentage of the value of the covered property that is indicated on the "schedule of coverages".

b.   **How We Determine Our Part Of The Loss --** "Our" part of the loss is determined using the following steps:

1)   multiply the percent indicated on the "schedule of coverages" by the value of the covered property at the time of loss;

2)   divide the "limit" for covered property by the result determined in b.1) above;

3)   multiply the total amount of loss, after the application of any deductible, by the result determined in b.2) above.

The most "we" pay is the amount determined in b.3) above or the "limit", whichever is less. "We" do not pay any remaining part of the loss.

c.   **If There Is More Than One Limit --** If there is more than one "limit" indicated on the "schedule of coverages" for this coverage part, this procedure applies separately to each "limit".

d.   **If There Is Only One Limit --** If there is only one "limit" indicated on the "schedule of coverages" for this coverage, this procedure applies to the total of all covered property to which the "limit" applies.

e.   **When Coinsurance Does Not Apply --** Conditions for coinsurance do not apply unless a coinsurance percentage is indicated on the "schedule of coverages".

6.   **Insurance Under More Than One Coverage --** If more than one coverage of this policy insures the same loss, "we" pay no more than the actual claim, loss, or damage sustained.

7.   **Insurance Under More Than One Policy --**

a.   **Proportional Share --** "You" may have another policy subject to the same "terms" as this policy. If "you" do, "we" will pay "our" share of the covered loss. "Our" share is the proportion that the applicable "limit" under this policy bears to the "limit" of all policies covering on the same basis.

b.   **Excess Amount --** If there is another policy covering the same loss, other than that described above, "we" pay only for the amount of covered loss in excess of the amount due from that other policy, whether "you" can collect on it or not. But "we" do not pay more than the applicable "limit".

## LOSS PAYMENT

1.   **Loss Payment Options --**

a.   **Our Options --** In the event of loss covered by this coverage form, "we" have the following options:

1)   pay the value of the lost or damaged property;

2)   pay the cost of repairing or replacing the lost or damaged property;

Copyright, American Association of Insurance Services, Inc., 2004

3) rebuild, repair, or replace the property with other property of equivalent kind and quality, to the extent practicable, within a reasonable time; or

4) take all or any part of the property at the agreed or appraised value.

b. **Notice Of Our Intent To Rebuild, Repair, Or Replace** -- "We" must give "you" notice of "our" intent to rebuild, repair, or replace within 30 days after receipt of a duly executed proof of loss.

2. **Your Losses** --

a. **Adjustment And Payment Of Loss** -- "We" adjust all losses with "you". Payment will be made to "you" unless another loss payee is named in the policy.

b. **Conditions For Payment Of Loss** -- An insured loss will be payable 30 days after:

1) a satisfactory proof of loss is received, and

2) the amount of the loss has been established either by written agreement with "you" or the filing of an appraisal award with "us".

3. **Property Of Others** --

a. **Adjustment And Payment of Loss To Property of Others** -- Losses to property of others may be adjusted with and paid to:

1) "you" on behalf of the owner; or

2) the owner.

b. **We Do Not Have To Pay You If We Pay The Owner** -- If "we" pay the owner, "we" do not have to pay "you". "We" may also choose to defend any suits brought by the owners at "our" expense.

## REPORTING CONDITIONS

**Equipment Leased Or Rented From Others** -- If indicated on the "schedule of coverages", the following reporting conditions apply.

1. **Reports** --

a. **You Will Report To Us** -- Within 30 days after the end of the policy period, "you" will report to "us" the total amount of "your" expenditures for "contractors' equipment" that "you" lease or rent from others.

b. **Cancellation** -- If this policy is canceled, "you" will report the total amount of expenditures up to and including the date of cancellation.

2. **Premium Computation And Adjustment** --

a. The premium will be adjusted at the end of the policy period. The total computed premium will be determined by multiplying "your" total equipment expenditures by the reporting rate indicated on the "schedule of coverages" for Equipment Leased or Rented From Others.

b. "We" will compare the total computed premium to the deposit premium. If it is more than the deposit premium, "you" will pay "us" the difference. If it is less than the deposit premium, "we" will pay "you" the difference subject to the minimum premium indicated on the "schedule of coverages".

3. **Provisions That Affect How Much We Pay** -- The following provisions apply to reports that are submitted and may affect How Much We Pay:

a. **Failure To Submit Reports** -- If "you" have failed to submit the required reports or no report has been submitted, the most "we" will pay is 90% of the "limit".

Copyright, American Association of Insurance Services, Inc., 2004

b.   **Reported Values Are Less Than The Full Value** -- If "your" last report before a loss shows less than the actual value of "your" expenditures for "contractors' equipment" that "you" lease or rent from others, "we" will only pay a part of the loss. "We" will not pay a greater portion of the loss, prior to the application of the deductible, than the total expenditures "you" reported divided by "your" actual expenditures for "contractors' equipment" that "you" lease or rent from others during the reporting period.

c.   **We Will Not Pay More Than The Limit** -- "We" will not pay more than the applicable "limit" regardless of any reported value used in computing the premium.

## OTHER CONDITIONS

1.   **Appraisal** -- If "you" and "we" do not agree on the amount of the loss or the value of covered property, either party may demand that these amounts be determined by appraisal.

If either makes a written demand for appraisal, each will select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days of receipt of the written demand. The two appraisers will then select a competent, impartial umpire. If the two appraisers are unable to agree upon an umpire within 15 days, "you" or "we" can ask a judge of a court of record in the state where the property is located to select an umpire.

The appraisers will then determine and state separately the amount of each loss.

The appraisers will also determine the value of covered property items at the time of the loss, if requested.

If the appraisers submit a written report of any agreement to "us", the amount agreed upon will be the amount of the loss. If the appraisers fail to agree within a reasonable time, they will submit only their differences to the umpire. Written agreement so itemized and signed by any two of these three, sets the amount of the loss.

Each appraiser will be paid by the party selecting that appraiser. Other expenses of the appraisal and the compensation of the umpire will be paid equally by "you" and "us".

2.   **Benefit to Others** -- Insurance under this coverage will not directly or indirectly benefit anyone having custody of "your" property.

3.   **Conformity With Statute** -- When a condition of this coverage is in conflict with an applicable law, that condition is amended to conform to that law.

4.   **Estates** -- This provision applies only if the insured is an individual.

a.   **Your Death** -- On "your" death, "we" cover the following as an insured:

1)   the person who has custody of "your" property until a legal representative is qualified and appointed; or
2)   "your" legal representative.

This person or organization is an insured only with respect to property covered by this coverage.

b.   **Policy Period Is Not Extended** -- This coverage does not extend past the policy period indicated on the declarations.

Copyright, American Association of Insurance Services, Inc., 2004

5. **Misrepresentation, Concealment, Or Fraud** -- This coverage is void as to "you" and any other insured if, before or after a loss:

   a. "you" or any other insured have willfully concealed or misrepresented:

      1) a material fact or circumstance that relates to this insurance or the subject thereof; or
      2) "your" interest herein.

   b. there has been fraud or false swearing by "you" or any other insured with regard to a matter that relates to this insurance or the subject thereof.

6. **Policy Period** -- "We" pay for a covered loss that occurs during the policy period.

7. **Recoveries** -- If "we" pay "you" for the loss and lost or damaged property is recovered, or payment is made by those responsible for the loss, the following provisions apply:

   a. "you" must notify "us" promptly if "you" recover property or receive payment;

   b. "we" must notify "you" promptly if "we" recover property or receive payment;

   c. any recovery expenses incurred by either are reimbursed first;

   d. "you" may keep the recovered property but "you" must refund to "us" the amount of the claim paid or any lesser amount to which "we" agree; and

   e. if the claim paid is less than the agreed loss due to a deductible or other limiting "terms" of this policy, any recovery will be pro rated between "you" and "us" based on "our" respective interest in the loss.

8. **Restoration Of Limits** -- A loss "we" pay under this coverage does not reduce the applicable "limit" unless it is a total loss to a scheduled item. In the event of a total loss to a scheduled item, "we" refund the unearned premium on that item.

9. **Subrogation** -- If "we" pay for a loss, "we" may require "you" to assign to "us" "your" right of recovery against others. "You" must do all that is necessary to secure "our" rights. "We" do not pay for a loss if "you" impair this right to recover.

   "You" may waive "your" right to recover from others in writing before a loss occurs.

10. **Suit Against Us** -- No one may bring a legal action against "us" under this coverage unless:

    a. all of the "terms" of this coverage have been complied with; and

    b. the suit has been brought within two years after "you" first have knowledge of the loss.

       If any applicable law makes this limitation invalid, then suit must begin within the shortest period permitted by law.

11. **Territorial Limits** -- "We" cover property while it is in the United States of America, its territories and possessions, Canada, and Puerto Rico.

IM 7000 04 04

Copyright, American Association of Insurance Services, Inc., 2004

Law Offices

# McMICKLE, KUREY & BRANCH, L.L.P.

217 ROSWELL STREET, SUITE 200
ALPHARETTA, GEORGIA 30009
www.mkblawfirm.com

TELEPHONE (678) 824-7800
FACSIMILE (678) 824-7801

SCOTT W. McMICKLE
swm@mkblawfirm.com
JON M. HUGHES
jhughes@mkblawfirm.com

December 22, 2020

**VIA EMAIL (jbrooks@networkadjusters.com)**
**and CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
Mr. Jonathan Brooks
Claim Director
Network Adjusters, Inc.
Stanford Place
8055 E. Tufts Avenue, Suite 600
Denver, CO 80237

| | | | |
|---|---|---|---|
| Re: | Your Insured | : | Bennett International Group, LLC |
| | Insurer | : | Allied World Specialty Insurance Company |
| | Claim No. | : | 2020002908 |
| | Allied Policy No. | : | 0307-2801 |
| | Date of Loss | : | February 7, 2020 |
| | Our File No. | : | 3030-15187 (SWM/JMH) |

Dear Mr. Brooks:

We represent Bennett International Group, LLC ("Bennett") with regard to the above-referenced claim.  The purpose of this letter is to provide a formal demand to Allied World Specialty Insurance Company ("Allied"), pursuant to O.C.G.A. § 33-4-6, for payment of this claim in full within sixty (60) days after receipt of this letter.  If full payment of the claim is not made within that time frame, Bennett will proceed with an action for bad faith for Allied's wrongful denial of the claim, which will allow recovery of the actual loss as well as an additional amount equal to 50% of the loss and all attorneys' fees incurred by Bennett.   For the reasons explained below, the coverage position Allied has taken thus far is incorrect under Georgia law.

As you are aware, Bennett suffered a loss to business property of others on February 7, 2020.  The loss consisted of flood damage to 25 travel trailers at one of Bennett's locations. Allied had the trailers inspected by McLarens, which determined that they were a total loss and further determined that the value of the travel trailers was $481,387.  Bennett subsequently paid $478,417 to satisfy the claim of the owner.   Allied has refused to make any payment on Bennett's claim, wrongly asserting that the claim is subject to a $500,000 deductible, despite such a deductible appearing nowhere in the policy issued by Allied to Bennett.

M0678582.1 15187

EXHIBIT B

Mr. Jonathan Brooks
December 22, 2020
Page 2

Allied issued policy number 0307-2801 to Bennett, with an effective policy period of March 30, 2019 to March 30, 2020. The policy contains a form titled Commercial Output Program Property Coverage Part providing coverage for Business Personal Property. Per the terms of the policy, covered business personal property includes "g. personal property of others. This means personal property of others that is in 'your' care, custody, or control." It is undisputed that the travel trailers were in Bennett's care, custody, or control, so the policy clearly provides coverage for damage to the trailers.

Further, the policy contains a Schedule of Coverages adding flood coverage to the policy. On that endorsement, the box next to flood coverage is checked and it provides for a limit in the amount of $1,000,000. As to the "Flood Deductible," the Schedule of Coverages endorsement states as follows: "Per BIG MANU E – Deductible Endorsement."

The BIG MANU E – Deductible Endorsement is also a part of the policy and states that "[f]or the perils of earthquake, flood, windstorm and hail, the deductibles set forth below apply." Below that language is the following:

(2) Flood: See Endorsement

The monetary amount of any flood deductible is not provided on the BIG MANU E – Deductible Endorsement. Moreover, **there is no other endorsement to the policy that provides for any deductible amount that is specific to the policy's flood coverage. More importantly, there is certainly no endorsement to the policy providing for a $500,000 deductible.**

The only deductible listed in the policy that might apply is the "Property of Others" deductible in the amount of $10,000 listed on endorsement CO 1235 04 02. That provision applies to damage to property of others at scheduled locations, and it is undisputed that this loss occurred at a location scheduled under the policy.

Allied has repeatedly denied Bennett's claim without ever even acknowledging that the $500,000 deductible on which it relies does not even appear in the policy. Rather, Allied has mischaracterized the policy and related documents in an attempt to impose a deductible that its policy does not contain.

First, the initial denial letter of May 21, 2020 from Quentin Kareiva of Network Adjusters referred not to the policy itself, but what the letter described as the "Policy Binder." That was apparently a reference to the Quote provided by Allied and dated February 22, 2019. However, that Quote is not a "Policy Binder." Indeed, the first sentence of it reads "here is our Quotation." The Quote did not have the effect of binding coverage, nor did any of its language indicate that it was intended to bind coverage. It was merely a Quote, not a "Policy Binder."

Mr. Jonathan Brooks
December 22, 2020
Page 3

In addition, even if the Quote provided by Allied were to be considered a binder, it would still not take precedence over the terms of the actual policy. See, e.g., King v. Allstate Ins. Co., 906 F.2d 1537, 1541 (11th Cir. 1990) ("It is hornbook insurance law that a binder merges into the subsequently issued policy so that *the terms and conditions of the policy*, in case of conflict or ambiguity, *are controlling.*") (emphasis added); Howell v. U.S. Fire Ins. Co., 185 Ga. App. 154, 156, 363 S.E.2d 560, 562 (1987) (holding that the language of the policy controls, not the binder).

The Allied policy issued to Bennett does not contain a $500,000 deductible, and the law is clear that the terms of the policy are controlling. It is clear, then, that Allied's reliance on a $500,000 deductible that does not even appear in the policy is misplaced.

After Bennett's agent asked Allied to reconsider its denial, Network Adjusters sent another letter dated May 29, 2020 reiterating its denial. That letter did not even reference the purported "Policy Binder" like the previous letter, but rather wrongly stated that "the Policy provides" for a $500,000 deductible. This was obviously an incorrect statement, as the policy contains no reference to a $500,000 deductible.

Bennett again asked for reconsideration in an email to you dated November 18, 2020, which pointed out that only the Quote, not the actual policy, mentioned the purported flood deductible of $500,000. Allied's response letter dated November 30, 2020 again ignored the fact that there is no such deductible in the policy, and again incorrectly stated that "the Allied Policy provides" for a $500,000 deductible. To date, Allied has not addressed or even acknowledged the absence of a $500,000 deductible from its policy, yet continues to attempt to rely on it.

To the extent that Allied believes a mistake was made in the issuance of the policy, such a mistake was Allied's alone and does not allow Allied to modify the terms of the policy that it issued. Georgia courts have addressed this issue directly and clearly established that a unilateral mistake does not entitle an insurer to modify or reform a policy. Specifically, the Georgia Court of Appeals has explained as follows:

> Where reformation is sought on the ground of mutual mistake, it must, of course, be proved to be the mistake of both parties. We have examined the record in this case and find no evidence of mutual mistake. Equity will reform a written instrument for the unilateral mistake of one party accompanied by fraud or inequitable conduct on behalf of the other party. There is likewise no evidence of fraud or inequitable conduct in the record before us. As far as the evidence shows, *the policy was drafted at the direction of only one of the contracting parties, the insurer, and therefore if it was a mistake, it was a unilateral mistake, which will not warrant reformation.*

Mag Mutual Ins. Co. v. Gatewood, 186 Ga. App. 169, 174 (1988) (emphasis added).

Mr. Jonathan Brooks
December 22, 2020
Page 4

Similarly, the policy issued to Bennett was drafted by Allied. If there was any mistake in the drafting of the policy, it was a unilateral mistake on Allied's part, and it does not warrant reforming the policy.

As noted above, the only deductible within the actual policy that might apply is a $10,000 deductible that applies to damage to property of others at scheduled locations. Allied has already, through its agents, valued Bennett's loss at $481,387 and Bennett has paid out slightly less than that on the owner's claim, $478,417. The $10,000 deductible in the policy is all that can be properly applied to the loss. Therefore, **Bennett is entitled, under the terms of its policy, to payment from Allied in the amount of $468,417.**

In addition to the foregoing, even if the deductible language in the Quote relied upon by Allied were to be applicable, which is not the case for the reasons explained above, that language is blatantly ambiguous and would be construed against Allied. The language in the Quote is as follows:

> $1,000,000 Limit
> $50,000 Deductible for locations in Flood Zone X/C
> $500,000 for all other locations and any locations in Tier 1, Harris County, or within 1 mile of the coast

Allied has taken the position that the $500,000 deductible applies because the property is within Flood Zone X Shaded. However, the Quote does not differentiate between X Shaded and X Unshaded. It simply provides that anything within Flood Zone X is subject to a $50,000 deductible, not a $500,000 deductible. If Allied had intended to distinguish between Flood Zone X Shaded and X Unshaded, it could easily have done so. Instead, Allied has created an ambiguity.

Several courts have held similar language to be ambiguous. For example, in Sylvania Gardens Apartments v. Legion Ins. Co., 2001 WL 1807780 (Pa. Com. Pl. Feb. 14, 2001), the policy provided for an increased deductible of $500,000 for property in flood zones A or V. The property was actually located in flood zone AE, which was not referenced in the policy. The court found the policy ambiguous and rejected the insurer's argument that zone AE was a subzone of zone A. The court held that the insurer could have been more specific in drafting the policy but chose not to do so, the resulting ambiguity was construed in favor of the insured, and the court rejected the insurer's attempt to apply a $500,000 deductible.

For the same reasons, in this case, we are confident that the language in Allied's quote will similarly be found ambiguous. Allied could have been more specific and could have distinguished between X Shaded and X Unshaded, but it chose not to do so. Because the ambiguity in the language of the Quote will be construed against Allied, its attempt to apply a $500,000 deductible will fail. Of course, the discussion of the flood zones and ambiguity is ultimately irrelevant in the case since none of that language even appears in the policy, and the policy language controls. Rather, Bennett expects to prevail based on the plain language of the

Mr. Jonathan Brooks
December 22, 2020
Page 5

policy, and the absence of a $500,000 deductible in the policy, with no need to even reach the issue of the ambiguous language in the Quote, which is not controlling.

It is undisputed that Bennett has incurred a loss in the amount $478,417. As explained above, the $10,000 deductible in the policy is all that can be properly applied to the loss. **Accordingly, pursuant to O.C.G.A. § 33-4-6, Bennett hereby demands payment from Allied in the amount of $468,417, which must be received within sixty (60) days for Allied to avoid an action for bad faith refusal to pay a valid claim.**

Finally, please note that Bennett is in the process of attempting to sell the damaged travel trailers as salvage. However, this fact does not excuse Allied from the obligation to pay Bennett's valid claim in full. If Bennett receives any salvage payment, Bennett will hold any such funds in trust to be returned to Allied once Allied pays this claim in full.

If you have any questions or would like to discuss this matter, please feel free to contact us at your convenience.

With kind regards,

*Scott W. McMickle*

SCOTT W. MCMICKLE

*Jon M. Hughes*

JON M. HUGHES
For the Firm

SWM/JMH

cc:   **VIA EMAIL (awacus.propertyclaims@awac.com)
      and CERTIFIED MAIL – RETURN RECEIPT REQUESTED**
      Allied World Property Claims
      3424 Peachtree Road NE
      Suite 550
      Atlanta, GA 30326

M0678582.1 15187

15187

Allied World Property Claims
3424 Peachtree Road NE
Suite 550
Atlanta, GA 30326



US POSTAGE
$ 005.75⁰
02 7H
0001236938   DEC 22 2020
MAILED FROM ZIP CODE 30009

FIRST-CLASS

PITNEY BOWES



Label 890-PR, Oct. 2015
Pitney Bowes

9949 0600 0027 5313 1913 10

CERTIFIED MAIL

McMickle, Kurey & Branch, LLP
217 Roswell Street, Suite 200
Alpharetta, GA 30009

---

15187

Mr. Jonathan Brooks
Claim Director
Network Adjusters, Inc.
Stanford Place
8055 E. Tufts Avenue, Suite 600
Denver, CO 80237



US POSTAGE
$ 005.90⁰
02 7H
0001236938   DEC 22 2020
MAILED FROM ZIP CODE 30009

FIRST-CLASS

PITNEY BOWES



Label 890-PR, Oct. 2015
Pitney Bowes

9949 0600 0027 5313 1913 94

CERTIFIED MAIL

McMickle, Kurey & Branch, LLP
217 Roswell Street, Suite 200
Alpharetta, GA 30009


**UNITED STATES**
**POSTAL SERVICE**

January 11, 2021

Dear Tricia Green:

The following is in response to your request for proof of delivery on your item with the tracking number: **9489 0090 0027 6313 1913 18**.

| Item Details | |
|---|---|
| **Status:** | Delivered to Agent for Final Delivery |
| **Status Date / Time:** | December 29, 2020, 11:14 am |
| **Location:** | DENVER, CO 80237 |
| **Postal Product:** | First-Class Mail® |
| **Extra Services:** | Certified Mail™ |
| | Return Receipt Electronic |

| Shipment Details | |
|---|---|
| **Weight:** | 1.1oz |

| Recipient Signature | |
|---|---|
| Signature of Recipient: (Authorized Agent) | *L CIS Lmach* |
| Address of Recipient: | *8055 c TUFD Denver 80237* |

Note: Scanned image may reflect a different destination address due to Intended Recipient's delivery instructions on file.

Thank you for selecting the United States Postal Service® for your mailing needs. If you require additional assistance, please contact your local Post Office™ or a Postal representative at 1-800-222-1811.

Sincerely,
United States Postal Service®
475 L'Enfant Plaza SW
Washington, D.C. 20260-0004


**UNITED STATES POSTAL SERVICE**

January 11, 2021

Dear Tricia Green:

The following is in response to your request for proof of delivery on your item with the tracking number:
**9489 0090 0027 6313 1913 01**.

## Item Details

| | |
|---|---|
| **Status:** | Delivered, Front Desk/Reception/Mail Room |
| **Status Date / Time:** | December 28, 2020, 1:35 pm |
| **Location:** | ATLANTA, GA 30326 |
| **Postal Product:** | First-Class Mail® |
| **Extra Services:** | Certified Mail™ |
| | Return Receipt Electronic |

## Shipment Details

| | |
|---|---|
| **Weight:** | 1.0oz |

## Recipient Signature

Signature of Recipient:

Address of Recipient:

Note: Scanned image may reflect a different destination address due to Intended Recipient's delivery instructions on file.

Thank you for selecting the United States Postal Service® for your mailing needs. If you require additional assistance, please contact your local Post Office™ or a Postal representative at 1-800-222-1811.

Sincerely,
United States Postal Service®
475 L'Enfant Plaza SW
Washington, D.C. 20260-0004

*L1011737*

| Print Form |

SHERIFF'S ENTRY OF SERVICE

Civil Action No. SUCV2021001066

Superior Court [X]
State Court [ ]
Juvenile Court [ ]

Magistrate Court [ ]
Probate Court [ ]

Date Filed April 15, 2021

Georgia, HENRY _____ COUNTY

Attorney's Address

Jon M. Hughes, Esq.

McMickle, Kurey & Branch, LLP

217 Roswell St., #200, Alpharetta, GA
30009

Bennett International Group, LLC

_____
Plaintiff

VS.

Name and Address of Party to Served

Allied World Specialty Insurance Company

c/o Corporation Service Co., Reg. Agent

2 Sun Court, #400, Peachtree Corners, GA   30092

Allied World Specialty Insurance Company

_____
Defendant

_____
Garnishee

## SHERIFF'S ENTRY OF SERVICE

**PERSONAL**
[ ] I have this day served the defendant _____ personally with a copy
of the within action and summons.

**NOTORIOUS**
I have this day served the defendant _____ by leaving a
copy of the action and summons at his most notorious place abode in this County.

[ ] Delivered same into hands of _____ described as follows:
age, about _____ years; weight _____ pounds; height _____ feet and _____ inches, domiciled at the residence of
defendant.

**CORPORATION**
Served the defendant _____ Allied _____ a corporation
[X] by leaving a copy of the within action and summons with
In charge of the office and place of doing business of said Corporation in this County.

**TACK & MAIL**
I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises
designated in said affidavit and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an
[ ] envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate postage affixed thereon containing notice
to the defendant(s) to answer said summons at the place stated in the summons.

**NON EST**
Diligent search made and defendant
[ ] not to be found in the jurisdiction of this Court.

This _16_ day of _April_, 20 _21_

M E Digz 501763

DEPUTY

**CLERK'S COPY**